## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ANTHONY PRATER,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:07-cv-00022** |
| | ) | |
| **FEDEX CORPORATE SERVICES, INC.** | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

Defendant FedEx Corporate Services, Inc., ("FedEx Services"), pursuant to Fed. R. Civ. P. 56, submits this memorandum in support of its motion for summary judgment on all claims brought by Plaintiff Anthony Prater.

### Introduction

Plaintiff Anthony Prater was terminated from his position in the Government Sales department at FedEx Services after he received two unsatisfactory performance reviews and three disciplinary letters from two different management chains over a two and half year period. Prater, an African American, now brings claims of race discrimination and hostile work environment against FedEx Services. However, the only other sales person with a comparable performance record in the Government Sales department was also terminated, and that other employee was Caucasian. In addition, Plaintiff admits that he was treated professionally at all times by his manager, so he was not the victim of harassment on the basis of his race.

For these reasons, summary judgment should be granted to FedEx Services on all counts in the Complaint.

## Statement of Undisputed Material Facts

1.      Plaintiff Anthony Prater is a former employee of FedEx Services.  Plaintiff worked for FedEx Services from June 1, 2000 until his employment was terminated on January 3, 2006.  (Plaintiff's depo. at pp. 21-22, 163; Exhibits 4 and 39 to Plaintiff's depo.).[1]

2.      Plaintiff initially worked as an Account Executive, which was a sales position calling upon local corporate accounts.  (Plaintiff's depo. at p. 25).

3.      Plaintiff sought a promotion to a position in the Government Sales department at FedEx Services.  The Government Sales department called upon large government agencies, so the position involved a significant increase in responsibility and demanded that the sales employee manage much larger and more complex accounts.  All of the sales representatives in Government Sales, regardless of their race, had a heavy workload.  (Plaintiff's depo. at pp. 25-26; Carson depo. at pp. 13-14, 40).

4.      Plaintiff was hired into the Government Sales department by Manager John Middlebrooks and his supervisor, Director Marilyn Thomas.  (Plaintiff's depo. at pp. 27-28, 31).

5.      John Middlebrooks is African-American.  Plaintiff admits that he has no evidence of racial bias on the part of Middlebrooks, and that he was never harassed or mistreated by Middlebrooks.  (Plaintiff's depo. at p. 27).

6.      Similarly, Plaintiff admits that he never heard Middlebrooks' supervisor, Marilyn Thomas, say anything that would indicate that she was biased against African Americans.  (Plaintiff's depo. at pp. 28, 31).[2]

---

[1]      Prior to June 1, 2000, Plaintiff had worked for a different FedEx entity that is not a party to this lawsuit.  Plaintiff admits that he was never discriminated against by anyone at the previous FedEx entity.  (Plaintiff's depo. at p. 21).

7.    In December of 2002, John Middlebrooks gave Plaintiff a performance review in which Middlebrooks noted that Plaintiff's performance was below satisfactory in two categories.  In the category of "Planning," Middlebrooks noted that Plaintiff had "[n]o visible plan to work from" and that without a plan Plaintiff was "just reacting." Middlebrooks also noted that Plaintiff's administrative work was "weak and not on time" and that Plaintiff needed to improve his time management.  (Plaintiff's depo. at pp. 48-49; Exhibit 12 to Plaintiff's depo.).

8.    After John Middlebrooks left the company, Laurie Carson became the manager of the Government Sales team, and Plaintiff began reporting to Laurie Carson. (Plaintiff's depo. at p. 24; Carson depo. at pp. 14-15).

9.    Plaintiff admits that Laurie Carson never said anything that would indicate that she is biased against African Americans.  In fact, Laurie Carson had recommended Plaintiff for the promotion into Government Sales.  (Plaintiff's depo. at pp. 26-27).

10.    In 2004, Laurie Carson gave Plaintiff a performance review which rated Plaintiff's overall performance as "Needs Improvement."  The three possible ratings on the Performance Review were "Exceeds Expectations," "Achieved Expectations" and "Needs Improvement," so Plaintiff's overall performance rating was unacceptable.  (Plaintiff's depo. at pp. 59-61; Exhibit 13 to Plaintiff's depo.; Carson depo. at pp. 19, 26).

11.    Carson noted that Plaintiff had failed to achieve his revenue growth targets in all three measured categories.  She also noted that he needed to plan ahead to anticipate the

---

[2]    Plaintiff did hear "through the grapevine" that Marilyn Thomas once made a comment about Plaintiff being paid too much.  Plaintiff's coworker, Gail Allen, explained that Marilyn Thomas once joked that she must be paying Plaintiff too much money after Thomas rode with Plaintiff in his BMW, which was a more expensive car than the car that Thomas drove.  The

needs of his customers and to be less reactive.  In particular, she noted that he unduly procrastinated in submitting requests for approval for pricing discounts that he was attempting to negotiate or include in bids to his customers.  (Plaintiff's depo. at pp. 59-61; Exhibit 13 to Plaintiff's depo.; Carson depo. at pp. 17-26).

12.    On September 13, 2004, Carson issued Plaintiff a Letter of Counseling for Unacceptable Performance.  In that letter, Carson noted that Plaintiff had failed to provide a timely response to her requests for information on several occasions, and that he needed to pay closer attention to details to ensure that his administrative submissions were complete, on time and accurate.  (Plaintiff's depo. at pp. 64-65; Exhibit 14 to Plaintiff's depo.; Carson depo. at pp. 27-33).

13.    Plaintiff admits that his performance suffered from the deficiencies outlined in the letter of counseling that Laurie Carson issued to him.  (Plaintiff's depo. at p. 65).

14.    After issuing the letter of counseling, Carson put Plaintiff on a Performance Planner and began meeting with Plaintiff on a weekly basis in an effort to address his performance issues.  (Plaintiff's depo. at p. 69; Exhibit 15 to Plaintiff's depo.).

15.    In November of 2004, Plaintiff sent Carson an e-mail in which he admitted that he had been distracted from his job by events in his personal life and that he had not been performing up to expectations.  (Plaintiff's depo. at pp. 70-71; Exhibit 16 to Plaintiff's depo.).  Plaintiff stated as follows:

> . . . I hate that my personal life took a turn these past eleven months but I'll continue to work through somehow.  Some of the money will be tied up in litigation for years but it will all work out

alleged comment made no reference to Plaintiff's race.  (Plaintiff's depo. at pp. 29-30; Allen depo. at pp. 34-35).

for the best in the end.  I no longer have to worry about my kids education or my retirement but I still enjoy working for FedEx even with the challenges.

I will continue to strive for excellence after your departure and get back to the Anthony of old.  Thanks again for your patience and understanding.

A.P.

(Plaintiff's depo. at pp. 70-71; Exhibit 16 to Plaintiff's depo.).

16.    After Laurie Carson left the company, Plaintiff began reporting to manager Vince Scarfo, a sales manager who FedEx hired from rival UPS in the spring of 2005.  (Scarfo depo. at pp.  6, 12-13).  While working in government sales at UPS, Scarfo had attended some of the same events that Plaintiff attended, so he had met Plaintiff and considered Plaintiff to be a friend.  (Scarfo. depo. at pp. 19-21).

17.    Plaintiff admits that he never heard Scarfo say anything that would indicate that Scarfo is biased against African Americans.  (Plaintiff's depo. at p. 92).[3]

18.    Plaintiff maintained a home office, and his primary duty was making sales calls on customers, so he did not spend much time in the office.  In fact, he was not assigned office space from the summer of 2005 until his termination, and he only came to the office around once or twice a month.  As a result, most of his interactions with Scarfo were by e-mail or telephone.  (Plaintiff's depo. at pp. 78-80, 99-100).

19. Plaintiff admits that Scarfo was professional in his interactions with Plaintiff:

---

[3]    Plaintiff alleges that a coworker once overheard Scarfo say that he had been hired to "clean house."  The coworker, Barbara Gamble, assumed that Scarfo's comment had a racial connotation, since Scarfo had been hired to manage the FedEx Government Sales team, which had a number of African American employees.  However, Gamble admitted that Scarfo did not mention race, and Scarfo did not focus on or discipline several other African American employees on the team.  (Plaintiff's depo. at pp. 94-97; Gamble depo. at pp. 65-66, 68).

> Q.    During the entire time that you worked for [Scarfo], did he
> ever raise his voice or yell at you?
> A.    No.
>
> Q.    Did he ever call you names?
> A.    No.
>
> Q.    Did he ever physically threaten you?
> A.    No.
> . . .
> Q.    Was there ever any time where you felt that he did not treat
>        you professionally?
> A.    No.
>
> Q.    Did he do anything [that] interfered with your ability to do
>        your job?
> A.    No.

(Plaintiff's depo. at pp. 112-113).

20.    After Director Marilyn Thomas retired, she was replaced by Director Gurn Freeman, who became Scarfo's immediate supervisor.  Plaintiff admits that he never heard Gurn Freeman say anything that would indicate that Freeman is biased against African Americans.  (Plaintiff's depo. at pp. 25, 91, 110-111).

21.    Plaintiff only interacted with Gurn Freeman around once a month or once every two months.  Plaintiff admits that he never felt harassed by Freeman.  (Plaintiff's depo. at pp. 91-92, 152).

22.    Upon taking over the FedEx Government Sales team in 2005, Scarfo reviewed the employment files for his entire team, which included both African American and Caucasian employees.  (Scarfo depo. at pp. 21-25; Plaintiff's depo. at p.  86).  Scarfo sent an e-mail to Plaintiff that noted that Plaintiff was significantly below the sales revenue goals for the customers within his assigned territory, and that his performance was pulling down the entire team's numbers.  Plaintiff admits that this objective measurement of his

performance was accurate, and the referenced revenue goals had been established before Scarfo was employed by FedEx.  (Plaintiff's depo. at pp. 80-81; Exhibit 18 to Plaintiff's depo.; Scarfo depo. at pp. 213-215).[4]

23.    One of Plaintiff's customers was a GSA shipping facility in Burlington, New Jersey.  In an effort to win GSA Burlington's ground shipping business from a rival shipping company, Plaintiff promised GSA that FedEx would supply dock workers to help load the shipments at the warehouse.  However, when Plaintiff submitted the request for approval of the proposed pricing that he wanted to offer to GSA Burlington, Plaintiff failed to include the cost of the dock labor as a factor in his pricing request.  (Plaintiff's depo. at pp. 74-77; Exhibit 17 to Plaintiff's depo.; Freeman depo. at pp. 54-58).

24.    FedEx later learned that it was going to be obligated to supply shifts of dock workers to GSA at a cost of 160 hours of labor per day, causing the GSA Burlington account to result in a _negative_ 12% profit margin.  (Plaintiff's depo. at pp. 82-84; Freeman depo. at pp. 54-55).

25.    Although Plaintiff claims that the local FedEx terminal manager had promised that he could supply dock labor, it was Plaintiff's duty to factor in the cost of the labor in the pricing request.  In addition, the e-mails that Plaintiff offered as evidence of the local manager's agreement to supply dock labor were sent _after_ Plaintiff had already submitted his pricing request.  (Scarfo depo. at pp. 68-69, Freeman depo. at p. 60; Exhibit 17 to Plaintiff's depo.).

---

[4]    Plaintiff's revenue goals were determined by looking at the historical trends of what a government agency that was assigned to Plaintiff had spent on shipping in prior years, as well as the growth potential for that agency's business.  (Plaintiff's depo. at p. 53).

26.     Shortly after the GSA fiasco, Plaintiff failed to complete a required update for customer software upgrades by the communicated deadline, resulting in additional cost to FedEx.  Based upon Plaintiff's lack of attention to detail on the GSA Burlington deal and the software upgrades, Scarfo issued Plaintiff a Letter of Warning.  (Plaintiff's depo. at pp. 88-89; Exhibit 21 to Plaintiff's depo.).

27.     After issuing the Letter of Warning to Plaintiff, Scarfo put Plaintiff on a Performance Planner and began meeting with Plaintiff on a monthly basis in an effort to address Plaintiff's performance issues.  (Plaintiff's depo. at pp. 109-110; Exhibit 23 to Plaintiff's depo.).

28.     When Scarfo gave Plaintiff a performance review, he gave Plaintiff an overall rating of "Needs Improvement," which constituted the second consecutive year that Plaintiff had received an overall rating of "Needs Improvement" on his performance review. Other members of Scarfo's team, including both African American members and Caucasian members of the team, performed up to expectations, and did not receive an overall performance rating of "Needs Improvement."(Plaintiff's depo. at pp. 86, 108-109; Exhibit 22 to Plaintiff's depo.; Scarfo depo. at pp. 33-36; Ames depo. at pp. 35-36; Gamble depo. at p. 178).

29.     During the time that GSA Burlington was transitioning its business to FedEx, Plaintiff's primary customer contact at the GSA Burlington facility asked for someone to be on-site to supervise the transitional activities and temporary employees supplied by FedEx.  As a result, Plaintiff spent three weeks acting as an on-site manager to ensure a smooth transition of the business.  Plaintiff admits that his assignment to work at the Burlington facility was not based upon his race.  (Plaintiff's depo. at pp. 118, 131-132).

30.    During the installation of FedEx's shipping equipment at the GSA Burlington facility, the manager of the GSA Burlington facility sent an e-mail to Vince Scarfo and Plaintiff complaining that welders had failed to show up at the appointed time on two separate days during the prior week.  Plaintiff did not respond until after he received the e-mail from the customer, which Scarfo viewed as an example of Plaintiff being reactive instead of proactive (because Plaintiff had failed to check on the status of the welders during the prior week).  (Plaintiff's depo. at pp. 114-115; Exhibit 25 to Plaintiff's depo.).

31.    In September of 2005, Scarfo issued Plaintiff another Letter of Warning. In that letter, Scarfo noted that Plaintiff had failed to achieve his business plan for five consecutive quarters.  In addition, Scarfo noted that Plaintiff had ranked in last place on the team for two consecutive quarters.  Moreover, despite prior counselings regarding Plaintiff's lack of attention to detail and his need to focus on administrative tasks to ensure that they were accurate, Plaintiff had submitted another report containing errors.  The Letter of Warning informed Plaintiff that if he failed to correct his performance issues, he would be recommended for termination.  (Plaintiff's depo. at pp. 142-143; Ex. 33 to Plaintiff's depo.).

32.    Plaintiff admits that the performance deficiencies outlined in the Letter of Warning were accurate, and Plaintiff admits that no other member of the Government Sales team (of any race) had amassed a similar combination of performance issues as Plaintiff. (Plaintiff's depo. at pp. 152-153).[5]

---

[5]    FedEx Services anticipates that Plaintiff will argue that manager Vince Scarfo is a comparator.  Scarfo once inadvertently copied a former colleague at UPS on an e-mail containing some of FedEx's confidential information when his e-mail editor automatically populated the wrong recipient in a string of recipient addresses.  Scarfo promptly addressed this one time mistake and asked his former colleague to delete the information.  There was no evidence that the information was misused by FedEx's competitor, and Scarfo was verbally

33.    After receiving the Letter of Warning, Plaintiff sent an e-mail to Scarfo in which Plaintiff admitted that his performance had fallen short of expectations.  Plaintiff stated as follows:

> . . . .  I will continue to work towards getting things back on track within my territory starting with the engagement of the CVT team, Florida newsletter by Monday etc. and continuing with the other items outlined within the Business Plan with specific dates for completion.  I do feel this and other strategy sessions were very beneficial, and developing a solid plan was the first step.
>
> I will definitely think through and develop a strategy for each opportunity using the SMART criteria as a guide.  Again, thank you for your time and effort.  I really appreciate it[.]  I look forward to our follow-up session.
>
> Anthony

(Plaintiff's depo. at pp. 156-157; Ex. 35 to Plaintiff's depo.).

34.    After reviewing Plaintiff's proposed action plan for improving his performance, Scarfo asked Plaintiff for a more detailed plan that provided specific and measurable steps, as opposed to a general, macro level approach.  Although Plaintiff promised Scarfo that he would provide a more detailed plan by the end of the week, Plaintiff failed to provide a more detailed plan by the deadline.  (Plaintiff's depo. at p. 160; Exhibit 37 to Plaintiff's depo.).

35.    Subsequently, Plaintiff was required to process a pricing request for one of Plaintiff's customers.  Despite communications from Scarfo and the sales support staff regarding the need for Plaintiff to process the pricing request, Plaintiff failed to address the request for over a week.  (Plaintiff's depo. at pp. 161-162).

---

counseled about his mistake.  (Freeman depo. at pp. 87-90, 94-96).  Unlike Plaintiff, Scarfo did not have record of performance deficiencies over more than two years.

36.    As a result of the culmination of over two years of deficient performance, Plaintiff's employment was terminated on January 3, 2006.  (Plaintiff's depo. at p. 163; Exhibit 39 to Plaintiff's depo.).

37.    FedEx Services has a process that involves a review of proposed terminations by human resources personnel to ensure that the employee is being treated consistently with other employees.  Upon reviewing the facts of Mr. Prater's performance history, the human resources department determined that termination was appropriate and consistent with the treatment of similar employees.  (Miller depo. at pp. 13, 19-20, 36-39).

38.    During Gurn Freeman's tenure as Director of the Government Sales department, the department terminated one other sales representative for performance issues. Like Plaintiff, the other employee was a long term employee who was put on a performance plan, but who failed to improve his performance, resulting in his termination.  The other terminated sales representative was Caucasian.  (Freeman depo. at pp. 31-32, 39, 122).

39.    FedEx Services has a well publicized policy that allows employees to complain and trigger an internal investigation by human resources personnel if an employee feels that he has been the victim of racial discrimination or unlawful harassment.  Plaintiff was aware of this policy, but he never filed an internal complaint of discrimination or harassment prior to his termination.  (Plaintiff's depo. at pp. 22-23, 61-62, 68, 89-90, 143-145; Miller depo. at pp. 49, 52; Declaration of Jim Wallace).

**Legal Analysis**

I.    STANDARD OF REVIEW

A moving party is entitled to summary judgment under Rule 56 of the Federal Rules of Civil Procedure when the non-moving party fails to make a sufficient showing as to an essential

element of the case on which the non-moving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 106 S.Ct. 2548 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). "A plaintiff cannot defeat a motion for summary judgment by merely restating the conclusory allegations contained in his complaint." *Bryant v. O'Connor*, 848 F.2d 1064, 1067 (10th Cir. 1988). There are cases "where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir. 1988). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Ultimately, where the non-moving party fails to produce sufficient specific material facts to support each essential element, summary judgment must be granted.

## II.     FEDEX SERVICES IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM OF RACE DISCRIMINATION.

Where, as here, there is no direct evidence of racial discrimination,[6] the allocation and order of proof for claims brought pursuant to Title VII are as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

---

[6]      "Direct evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in question without any need for inference. Such evidence includes any statement or written document showing a discriminatory motive *on its face*." *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 86 (D.D.C. 2006) (internal quotation marks, citations, and ellipsis omitted)(emphases in original). The factual record in this case contains no such direct evidence of discrimination. (*See* Plaintiff's depo. at pp. 26, 28, 91, 92) (conceding that Carson, Scarfo, Thomas and Freeman never made any comments about his race).

*St. Mary's Honor Center v. Hicks*, 509 U.S. at 510 (quoting *Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)). "A Title VII plaintiff carries the initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.'" *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576 (1978).

Only if the plaintiff succeeds in establishing a *prima facie* case does the burden of articulation shift to the defendant. "[T]he employer's burden is satisfied if he simply 'explains what he has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons.'" *Burdine*, 450 U.S. at 256 (quoting *Board of Trustees of Keene State College v. Sweeny*, 439 U.S. 24, 25 n.2 (1978)).

An employer that produces a legitimate reason is entitled to judgment in its favor unless plaintiff can prove, by a preponderance of the evidence, that the proffered explanation is merely a pretext for discrimination. *See Hicks*, 509 U.S. at 511. Further, an employee cannot prevail in a discrimination case if the employer articulates a "lawful reason [that] alone would have sufficed to justify the firing." *See McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 359, 130 L. Ed. 2d 852, 115 S. Ct. 879 (1995).

Once the employer has met this burden, to avoid summary judgment on the ultimate issue, a plaintiff must produce some objective evidence that the employer's asserted reason is a mere pretext for unlawful retaliation. To do so, he must prove "both that the reason was false and that intentional discrimination was the real reason." *Hicks*, 509 U.S. at 515. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id*. at 507 (quoting *Burdine*, 450 U.S. at 253).

Courts evaluating claims of wrongful termination are concerned only with whether the employer intentionally discriminated against the plaintiff, and thus do not, and should not, act as "super-personnel department[s] that reexamine[] an entity's business decisions." *Holcomb v. Powell*, 369 U.S. App. D.C. 122, 433 F.3d 889, 897 (D.C. Cir. 2006) (internal quotation marks citations omitted); *see also Arraleh v. County of Ramsey*, 461 F.3d 967, 976 (8th Cir. 2006) (stating that "the employment discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination")(internal quotation marks and citation omitted); *Royall v. Nat'l Ass'n of Letter Carriers*, 507 F. Supp. 2d 93, 102 (D.D.C. 2007) (same).

A.      Plaintiff Is Unable To Establish a *Prima Facie* Claim of Race Discrimination

To establish a prima facie case of unlawful discrimination under Title VII, a plaintiff must show that "(1) []he is a member of a protected class; (2) []he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *See George v. Leavitt*, 366 U.S. App. D.C. 11, 407 F.3d 405, 412 (D.C. Cir. 2005) (internal quotation and citation omitted); *Holloman v. Chertoff*, 533 F. Supp. 2d 162, 168 (D.D.C. 2008) (same). Although Plaintiff can meet the first two elements of this claim, the undisputed evidence does not satisfy the third.

One method by which a plaintiff can satisfy the third prong of the prima facie test is by demonstrating that he was treated differently from similarly situated employees who are not part of the protected class. *Czekalski v. Peters*, 374 U.S. App. D.C.351, 475 F.3d 360, 365-66 (D.C. Cir. 2007). To show that a comparator is similarly situated, a plaintiff must show that "the individuals with whom he seeks to compare his treatment have dealt with the same supervisor,

14

have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Hopkins v. Women's Div.*, 284 F. Supp. 2d 15, 27 (D.D.C. 2003).

A plaintiff in a discharge case can also satisfy the third prong of the prima facie requirement by "show[ing] that the discharge was not attributable to the two most common legitimate reasons for discharge: performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether." *Czekalski*, 475 F.3d at 366 (internal quotation and citation omitted); *Holloman v. Chertoff*, 533 F. Supp. 2d 162, 168-169 (D.D.C. 2008).

Plaintiff cannot produce admissible evidence for any of these options. First, Plaintiff has no evidence that any similarly situated comparator has been treated differently. In this case, the only other salesperson in the Government Sales department who put together a similarly dismal performance record over an extended period of time was also terminated, and that person is Caucasian. Other members of the Government Sales team, including both African American members and Caucasian members of the team, performed up to expectations and were not terminated.

To the extent that Plaintiff attempts to compare himself to Scarfo, the two are not similarly situated. First, Scarfo was Plaintiff's supervisor, so the two did not report to the same supervisor. Second, Scarfo made an isolated mistake by inadvertently copying a former coworker on an e-mail containing confidential information. In contrast, Plaintiff had repeated performance deficiencies over a period of more than two years, including numerous instances of

failing to provide requested information on time, submitting incomplete or inaccurate information, and failing to meet his sales revenue goals.

Second, Plaintiff cannot demonstrate that he was meeting his employer's legitimate expectations. Plaintiff received an overall score of "Needs Improvement" on two consecutive performance reviews that were administered by different managers. In addition, Plaintiff received a Letter of Counseling from one manager (Carson) and two Letters of Warning from the next (Scarfo). At his deposition and through his e-mails to Carson and Scarfo, Plaintiff admitted that he suffered from the performance deficiencies identified in these reviews and letters.

B.    <u>FedEx Had Legitimate, Non-discriminatory Reasons To Discipline Plaintiff</u>

Even if the Court were to find that Plaintiff established a *prima facie* case of racial discrimination, FedEx Services can "articulate some legitimate non-discriminatory reason for the adverse employment action." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798 (1973). Because failure to perform satisfactorily is one of the "most common legitimate reasons for discharge," *Czekalski*, 475 F.3d at 366 (internal quotation marks, citation, and bracketing omitted), a defendant satisfies its burden by "produc[ing] admissible evidence that, if believed, would establish that its action was motivated by a legitimate, nondiscriminatory reason," *Carter*, 387 F.3d at 878 (internal quotation marks and citation omitted). FedEx Services has offered evidence that Plaintiff's performance was deficient. Evidence indicating that Plaintiff's performance was below the employer's expectations constitutes a legitimate, non-discriminatory reason. *See Royall v. Nat'l Ass'n of Letter Carriers*, 507 F. Supp. 2d 93, 106-107 (D.D.C. 2007).

C.    <u>Plaintiff Cannot Establish that Defendant's Actions Were Pretexual</u>

Once FedEx Services sets forth its non-discriminatory reason for the termination, Plaintiff must prove that the proffered reason was merely a pretext for the acts of FedEx

Services.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  At that stage, "the issue is not 'the correctness or desirability of [the] reasons offered ... [but] whether the employer honestly believes in the reasons it offers.'"  *Fischbach v. District of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir. 1992)).  "It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible.  He must show that the explanation given is a phony reason."  *Id.* (quoting *Pignato v. American Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994)).  The Court may not "second-guess an employer's personnel decision absent demonstrably discriminatory motive."  *Milton v. Weinberger*, 225 U.S. App. D.C. 12 (D.C. Cir. 1982).

The plaintiff cannot create a genuine issue of material fact as to whether FedEx Services "honestly believes in the reasons it offers" for his termination simply by contesting some portion of the employer's account of his performance or citing certain instances in which he correctly performed the duties of his job.  *See George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) (internal quotation marks and citation omitted).  Because it is not the role of the federal courts to "review[] the wisdom or fairness of the  business judgments made by employers, except to the extent that those judgments involve intentional discrimination," *Arraleh*, 461 F.3d 967, 976 (8th Cir. 2006) (internal quotation marks and citation omitted), employers are surely "entitled to determine that the deficiencies in [an employee's] performance outweighed [his] accomplishments." *Dunn v. Nordstrom, Inc.,* 260 F.3d 778, 787 (7th Cir. 2001) (internal quotation marks and citation omitted);  *see also Royall v. Nat'l Ass'n of Letter Carriers*, 507 F. Supp. 2d 93, 110 (D.D.C. 2007) (same).

Plaintiff cannot establish pretext by showing that the reasons for his termination were false. Plaintiff admitted that he suffered from the performance deficiencies identified by FedEx Services. Moreover, even if Plaintiff claims that he performed some aspects of his job well or that extenuating circumstances caused his shortcomings, Plaintiff's mere disagreement with FedEx Services' negative evaluation of his performance is not evidence that he performed at or near the level legitimately expected by FedEx Services. *See Royall v. Nat'l Ass'n of Letter Carriers*, 507 F. Supp. 2d 93, 110 (D.D.C. 2007) (granting summary judgment despite plaintiff's argument that there were extenuating circumstances, including a backlog of work that made his job more difficult, as well as some positive attributes to his performance).

Nor can Plaintiff establish pretext by showing that a similarly situated comparator was treated differently. In order to show that an employee was similarly-situated at the pretext stage, Plaintiff is "required to demonstrate that all of the relevant aspects of [his] employment situation were 'nearly identical' to those of the [employee]." *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995). As noted above, the only other sales person in the Government Sales department who put together a similarly dismal performance record over an extended period of time was also terminated, and that person was Caucasian.

A plaintiff who offers only "mere speculation" to refute the employer's proffered legitimate, non-discriminatory reason fails to create a genuine issue of material fact to avoid summary judgment. *Brown v. Brody*, 339 U.S. App. D.C. 233, 199 F.3d 446, 459 (D.C. Cir. 1999). Therefore, FedEx Services is entitled to summary judgment on Plaintiff's claim of race discrimination.

III.    FEDEX SERVICES IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S
CLAIM OF HOSTILE WORK ENVIRONMENT.

To establish a claim of a hostile work environment based on race, a plaintiff must demonstrate: "'(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability.'" *Raymond v. U.S. Capitol Police Bd.*, 157 F. Supp. 2d 50, 57 (D.D.C. 2001) (*quoting Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996)).    "The hostile work environment must be the result of discrimination based on the plaintiff's protected status." *Roberson v. Snow*, 404 F. Supp. 2d 79, 97 (D.D.C. 2005).

In order for harassment to rise to the level of being so offensive as to be actionable as a matter of law, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998). When determining whether a work environment is so hostile or abusive as to be unlawful, courts examine the facts under the totality of circumstances, considering the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). In addition, the Supreme Court has stated that "these standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code[, and p]roperly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive

19

language." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (citation and quotations omitted).

In this case, Plaintiff cannot show that he was the victim of severe and pervasive harassment. Plaintiff primarily worked out of his home office, and spent the majority of his time calling on customers in the field, so he had only limited interaction with his supervisors. During those interactions, Plaintiff admits that his managers did not verbally abuse him, threaten him or call him names, and that he was treated professionally. He further admits that his supervisor did not interfere with the performance of his job.

In addition, even if Plaintiff's allegations rose to the level of actionable harassment, Plaintiff has no evidence that the alleged improper treatment was based upon his race. *See Roberson v. Snow*, 404 F. Supp. 2d 79, 97 (D.D.C. 2005) (summary judgment is appropriate where employee fails to link the harassment to his protected status). While Plaintiff's Government Sales position was demanding, it was demanding to sales people of all races.

Finally, even if Plaintiff was able to prove an actionably hostile work environment, FedEx Services is entitled to judgment as a matter of law because it has demonstrated (a) that it exercised reasonable care to prevent and correct any harassing behavior, and (b) Plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities provided by FedEx Services or avoid harm otherwise." *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Plaintiff does not dispute that FedEx Services had specific policies and a complaint procedure in place to prevent and correct racially harassing behavior. Nor does he dispute that he did not take advantage of these measures prior to his termination.

**Conclusion**

For the reasons stated, defendant FedEx Services is entitled to summary judgment on all of Plaintiff's claims, and the complaint in this matter should be dismissed.

Respectfully submitted,


 /s/ Michael E. Gabel_____

Edward J. Efkeman, DC Bar No. 479545
Michael E. Gabel
FedEx Legal Department
3620 Hacks Cross Road
Building B – 3rd Floor
Memphis, Tennessee  38125
901-434-0016
901-434-4523 (fax)

*Attorneys for Defendants*


**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing **MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** electronically this 30th day of June, 2008, upon:

Mindy G. Farber
*Farber Legal, LLC*
11300 Rockville Pike
One Central Plaza, Suite 808
Rockville, Maryland 20852
(301) 881-6800
(301) 770-3927 fax


 /s/ Michael Gabel_____

737303

Exhibit A

1    IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT
                    OF COLUMBIA
2

3    - - - - - - - - - - - - - x
     ANTHONY PRATER,                :
4                                   :
              Plaintiff             :
5                                   :
          v.                        :    Case No.
6                                   :    1:07-cv-00022
     FEDEX CORPORATE SERVICES,      :
7    INC.,                          :
                                    :
8             Defendant             :
                                    :
9    - - - - - - - - - - - - - x

10                              Thursday, January 3, 2008
                                Rockville, Maryland
11   Videotaped Deposition of

12                        ANTHONY PRATER

13   the plaintiff, called for examination by counsel for

14   the defendant, pursuant to notice, held at the offices

15   of Farber Legal, 11300 Rockville, Pike, Suite 808,

16   Rockville, Maryland, beginning at 9:41 a.m., before

17   Frances M. Freeman, a Notary Public in and for the

18   State of Maryland, when were present on behalf of the

19   respective parties:

20

21                        ORIGINAL

22

Page 218

# CERTIFICATE OF NOTARY PUBLIC

1

2    I, Frances M. Freeman, the officer before whom

3    the foregoing deposition was taken, do hereby certify

4    that the witness whose testimony appears herein was

5    duly sworn by me; that the testimony of said witness

6    was taken by me in shorthand and this transcript typed

7    under my direction; that said transcript is a true

8    record of the testimony given by said witness; that I

9    am neither counsel for, related to, nor employed by

10   any of the parties to the action in which this

11   deposition was taken; and, further, that I am not a

12   relative or employee of any attorney or counsel

13   retained by the parties hereto, nor financially or

14   otherwise interested in the outcome of the action.

15

16   *Frances M. Freeman*

17   Notary Public in and for the

18   State of Maryland

19

20   My commission expires:

21   June 30, 2010

1          Up until 2000 when FedEx Services came into

2    being, did you ever feel like any manager you reported

3    to discriminated against you because of your race?

4          A    Up to 2000?  No, I did not.

5          Q    I'll show you what we'll mark as Exhibit

6    Number 4 to your Deposition.

7               (Thereupon, Deposition Exhibit No. 4 was

8    marked for identification.)

9               BY MR. GABEL:

10         Q    And I'll ask you if you can tell me what this

11   is?

12         A    An offer letter.

13         Q    And did you receive this around early March

14   of 2000?

15         A    I did.

16         Q    Is that your signature at the bottom left

17   corner?

18         A    It is.

19         Q    And did you understand that by signing this

20   you were accepting a sales position with this new

21   entity that FedEx had created known as FedEx Corporate

22   Services?

22

```
1       A    I did.

2       Q    And that you would start with FedEx Corporate

3   Services on June 1st, 2000?

4       A    Yes.

5       Q    Next, I will show you what we'll mark as

6   Exhibit Number 5 to your Deposition.

7            (Thereupon, Deposition Exhibit No. 5 was

8   marked for identification.)

9            BY MR. GABEL:

10      Q    And let me ask if this is your signature at

11  the bottom of this document?

12      A    It is.

13      Q    And did you sign this on July the 6th, 2000?

14      A    I did.

15      Q    Did you receive a copy of the FedEx Corporate

16  Services employee handbook on July the 6th, 2000?

17      A    I don't recall.

18      Q    Do you have any reason to believe that you

19  did not receive a handbook the day you signed the

20  handbook receipt?

21      A    I don't.

22      Q    Do you recall having a copy of the FedEx
```

1    Corporate Services employee handbook?

2        A    Possibly.  I don't remember exactly, yes, I

3    have this handbook on this date.  No, I don't recall

4    that.

5        Q    But you have no reason to believe that you

6    didn't have that handbook?

7        A    I don't.

8        Q    In addition to the handbook, do you know

9    whether you could access Services' employment policies

10   online on the Internet?

11       A    At that time?  No.

12       Q    Did there ever come a time where you could do

13   that?

14       A    Yes.

15       Q    Do you know when that happened?

16       A    No, I don't.

17       Q    But it was while you were still employed by

18   Services?

19       A    Yes.

20       Q    Did you ever access any of their employment

21   policies on the Internet?

22       A    Yes, I did.

24

```
 1      Q    If you will, tell me who your manager was at

 2   the time that you went to work for FedEx Corporate

 3   Services.

 4      A    Corporate Services.  Are you referencing the

 5   date March 1st, 2000?

 6      Q    Really, June 1st, 2000.

 7      A    June 1st, 2000.  That would have been -- at

 8   the time, that would have been Laurie Carson.

 9      Q    Who was your next immediate manager after

10   Laurie Carson?

11      A    John Middlebrooks.

12      Q    And who was your next immediate manager after

13   John Middlebrooks?

14      A    Laurie Carson again.

15      Q    And who was your next immediate manager after

16   Ms. Carson?

17      A    Vince Scarfo.

18      Q    And Mr. Scarfo was your last manager?

19      A    That's correct.

20      Q    The first time that Laurie Carson was your

21   immediate manager, who did she report to?

22      A    I believe Tony Avella.
```

1      Q    Who did John Middlebrooks report to?

2      A    Marilyn Thomas.

3      Q    The second time that Laurie Carson became

4   your manager, who did she report to?

5      A    Marilyn Thomas.

6      Q    And who did Vince Scarfo report to?

7      A    Marilyn Thomas and Gurn Freeman.

8      Q    What was your position title when you first

9   started working for FedEx Services?

10     A    Account executive.

11     Q    And what type of accounts did you call on at

12   that point?

13     A    Corporate and local.

14     Q    What defined a corporate or local account?

15     A    Nongovernmental, nonmilitary.

16     Q    At some point did you apply for a government

17   sales position?

18     A    I did.

19     Q    Let me show you what we'll mark as Exhibit 6

20   to your Deposition.

21          (Thereupon, Deposition Exhibit No. 6 was

22   marked for identification.)

26

```
1              BY MR. GABEL:

2        Q    And ask if you can tell me what this is?

3        A    This is a job change application for the

4    position of senior corporate account executive in

5    government sales under the direction of John

6    Middlebrooks.

7        Q    So Mr. Middlebrooks would have been the

8    hiring manager for that position?

9        A    That's correct.

10       Q    And your manager who would have approved your

11   application at the time was Laurie Carson?

12       A    That's correct.

13       Q    Do you recall that Ms. Carson highly

14   recommended you for that position?

15       A    I do.

16       Q    And did Mr. Middlebrooks ultimately hire you

17   for that position?

18       A    He did.

19       Q    Did you ever hear Laurie Carson say anything

20   that you interpreted as indicating any sort of bias on

21   her part against African Americans?

22       A    Say anything?  No.
```

1      Q    Did you ever hear of her saying anything that

2    indicated any kind of bias or prejudice against

3    African Americans?

4      A    No.

5      Q    What was John Middlebrooks' race?

6      A    Black, African American.

7      Q    Did you ever hear John Middlebrooks say

8    anything that would lead you to believe that he was

9    biased against African Americans?

10     A    No.

11     Q    Did John Middlebrooks ever do anything that

12   led you to believe he was treating you differently

13   because of your race?

14     A    Would you repeat that?

15     Q    Did John Middlebrooks ever do anything that

16   led you to believe he was treating you differently

17   because of your race?

18     A    No.

19     Q    Did you ever feel in any way harassed or

20   mistreated by Mr. Middlebrooks?

21     A    No.

22     Q    Did you have to interview for the government

```
1   sales position?

2        A    I did.

3        Q    Do you recall who you interviewed with?

4        A    John Middlebrooks, Marilyn Thomas.  I believe

5   there was another hiring manager.  I can't recall who

6   the managers were on the panel.

7        Q    But you recall John Middlebrooks and then his

8   supervisor, Marilyn Thomas?

9        A    That's correct.

10       Q    Did Marilyn Thomas ever say anything that led

11  you to believe she was biased against you on the basis

12  of your race?

13       A    Did I ever hear?

14       Q    Yes.

15       A    No.

16       Q    Did you ever hear of or through the grapevine

17  that led you to believe she was biased against you

18  because of your race?

19       A    Yes.

20       Q    What did you hear through the grapevine of

21  Marilyn Thomas doing that led you to believe she was

22  biased against you because of your race?
```

```
1        A    I can't immediately recall the exact

2    statement.

3        Q    Ballpark it.

4        A    I don't remember exactly.

5        Q    What about it made you think it related to

6    race?

7        A    The statement itself.

8        Q    What about the statement made you think that?

9        A    Everything.

10       Q    Tell me what you recall.

11       A    Something to the effect that I made too much

12   money.  She was paying me too much money.

13       Q    Who did she say this to?

14       A    Another office employee.

15       Q    Who was the other office employee?

16       A    Nancy Compton.

17       Q    And who told you about this statement?

18       A    Another office employee.

19       Q    Who told you about it?

20       A    I don't remember.

21       Q    You don't remember who told you?

22       A    No.
```

30

1        Q    It wasn't Nancy?

2        A    No, it wasn't Nancy.  It was in conversations

3    with -- there were a group of people around.  So I

4    can't remember exactly who made the statement.

5        Q    So you didn't personally hear the statement?

6        A    No, I didn't.  That's what I said earlier.

7        Q    Your only knowledge of the statement is some

8    person who you can't presently recall claims that they

9    heard Marilyn tell Nancy that you were being paid too

10    much?

11        A    That is correct.

12             MS. FARBER:  Well, I think the question was,

13    correct me if I'm wrong, did he hear anything through

14    the grapevine.  And that's how he was trying to

15    answer.  I think you asked at one point, well, did you

16    hear anything through the grapevine.

17             Am I wrong on that?

18             MR. GABEL:  I think that's correct.

19             BY MR. GABEL:

20        Q    As best as you can recall, did you hear that

21    she said anything other than that she was paying you

22    too much?

1      A    No.  I don't recall anything else.

2      Q    Do you recall any other statements that

3   indicated to you that Marilyn Thomas might be biased

4   against you on the basis of your race?

5      A    No.

6      Q    Did you receive any raises during the time

7   that your boss reported to Marilyn Thomas?

8      A    Yes.

9      Q    Was your pay ever cut during the time that

10  your boss reported to Marilyn Thomas?

11     A    No.

12     Q    Was it your understanding that she would have

13  had to approve Mr. Middlebrooks' hiring of you for

14  this position?

15     A    Yes.

16     Q    I show you what we'll mark as Exhibit

17  Number 7 to your Deposition.

18          (Thereupon, Deposition Exhibit No. 7 was

19  marked for identification.)

20          BY MR. GABEL:

21     Q    And ask you if you received this offer letter

22  from Mr. Middlebrooks?

1        A    I did.

2        Q    And did you participate in that review with

3    Mr. Middlebrooks?

4        A    I did.

5        Q    Was that review given to you in September

6    of 2001?

7        A    Yes.

8        Q    I'll show you what we'll mark as Exhibit 12

9    to your Deposition.

10            (Thereupon, Deposition Exhibit No. 12 was

11    marked for identification.)

12            BY MR. GABEL:

13        Q    I'll ask you if you can tell me what this

14    document is.

15        A    Individual performance and contribution

16    discussion form, sales professional.

17        Q    Was this another performance review by Mr.

18    Middlebrooks?

19        A    It was.

20        Q    And did you have this review in December

21    of 2002?

22        A    I did.

1      Q    And was your overall rating on this review a

2   2.7 out of 4.0?

3      A    It was.

4      Q    Did you consider that a fair review?

5      A    I did.

6      Q    If you will, flip over to the second page,

7   and in section Number 1 entitled Planning, do you

8   recall Mr. Middlebrooks giving you a score of 1.5 out

9   of 4.0 in planning?

10      A    Yes.

11      Q    Do you recall him telling you that you had no

12   visible plan to work from and that without a plan you

13   were just reacting?

14      A    Yes.

15      Q    Do you recall that in the area of management

16   of work responsibilities, Mr. Middlebrooks gave you a

17   score of 1.5 out of 4.0?

18      A    Yes.

19      Q    Do you recall him telling you that he thought

20   your administrative work was weak and not on time?

21      A    Yes.

22      Q    If you will, flip over to the page with 2-31

1    General Services Administration contractors'

2    contractors.  The Department of Justice -- I'm sorry

3    U.S. courts.  Not Department of Justice.  U.S.

4    courts.  States of North,  South Carolina, Florida and

5    Virginia.  Department of Labor.  National Industries

6    for the Blind, NASA, Department of Education, their

7    contractors, their subcontractors.

8           That's all I can recall right now.

9       Q    Were any of those new customers you had not

10   previously called on that were added to you within the

11   last year of your employment?

12      A    No.

13      Q    Were any customers taken away from you in

14   your last year of employment?

15      A    No.  Definitely not.

16      Q    So when you say that goals would be based on

17   historical trends, was it your understanding that at

18   least as a starting point they would look at

19   historically what this list of customers had spent and

20   use that as sort of the base to build what they were

21   going to predict you could grow the business to?

22      A    Along with the growth potential.

1        A    Not the exact date.  No.  I believe it was in

2    2004.

3        Q    And how long was she your manager once she

4    became your manager the second time?

5        A    Just a few months, if I recall correctly.

6        Q    I'm going to show you what we'll mark as

7    Exhibit Number 13 to your Deposition.

8             (Thereupon, Deposition Exhibit No. 13 was

9    marked for identification.)

10            BY MR. GABEL:

11       Q    And I will ask you if you recall receiving

12   this performance review from Laurie Carson around,

13   maybe, the summer of 2004?  It appears to have been

14   actually printed October of 2004.

15       A    Yes.

16       Q    And did you check the online box on the

17   second page that says, I have reviewed this

18   information with my manager?

19       A    As I recall, I did.

20       Q    Do you recall that your first objective under

21   Ms. Carson had been to grow your express revenue by

22   10 percent, your ground revenue by 20 percent, and

60

1    your international revenue by 10 percent?

2        A    Yes.

3        Q    And do you recall that you had actually had

4    an express growth of .01 percent, a ground growth of

5    18.14 percent, an international growth of 1.51

6    percent?

7        A    Yes.

8        Q    Do you recall Ms. Carson telling you that you

9    needed improvement in that category?

10       A    I do.

11       Q    Do you recall her telling you that you had

12   achieved expectations in completing online training

13   courses?

14       A    Yes.

15       Q    Do you recall her telling you that you needed

16   to improve in customer orientation and relationship

17   building?

18       A    No.

19       Q    Well, do you recall Ms. Carson telling you

20   that she felt you should have a plan in place to

21   address each obstacle and a specific timeline for

22   completion?

1      A    Yes.

2      Q    Do you re -- telling her (sic) that she

3   wanted you to please plan in advance so that we were

4   not waiting until the due date to get pricing back?

5      A    Yes.

6      Q    Do you recall her telling you that she felt

7   like you needed to plan and be less reactive in the

8   WWAM position?

9      A    Yes.

10     Q    And do you recall her telling you that you

11  needed to plan better for meeting contract deadlines,

12  Objective 4?

13     A    Yes.

14     Q    Did you file any type of internal complaint

15  or appeal of this performance review?

16     A    I did not.

17     Q    Did FedEx Services have a different name for

18  its internal complaint process?

19     A    No.

20     Q    Do you recall the name Explore versus GFT?

21     A    I do.

22     Q    Was it your understanding that Explore was a

```
 1    lot like a GFT?

 2        A    I do.

 3        Q    Were you aware that process was available to

 4    FedEx Services employees?

 5        A    Yes.

 6        Q    When did Ms. Carson leave FedEx?

 7        A    Fall of 2004.

 8        Q    Do you know why she left FedEx?

 9        A    In my conversations with her, she was not

10    satisfied with upper management and the way things

11    were going in FedEx government sales, and then she

12    wanted to pursue outside opportunities.

13        Q    Did she tell you what she wasn't satisfied

14    with?

15        A    The issuance of disciplinary warning letters

16    and just the entire management of FedEx government

17    sales, her faith -- her lack of faith in government

18    sales management.

19        Q    And Laurie Carson told you?

20        A    These are the things that she told me in my

21    conversation with her.

22        Q    What about the issuance of letters caused her
```

64

```
 1        Q    I'll show you what we'll mark as Exhibit 14

 2    to your Deposition.

 3             (Thereupon, Deposition Exhibit No. 14 was

 4    marked for identification.)

 5             BY MR. GABEL:

 6        Q    And I'll ask you if you received this letter

 7    of counseling for unacceptable performance from Laurie

 8    Carson from September 13th, 2004.

 9        A    I did.

10        Q    And is that your signature on the second page

11    of this document?

12        A    It is.

13        Q    On the third paragraph, it indicates that you

14    all had met on Monday, June 24th, 2004 to review the

15    completed compass reports.  And at that time you

16    discussed the results of the PPEs for FY04.

17             Do you recall meeting with Laurie Carson in

18    June of 2004 to discuss your performance evaluation?

19        A    Yes.

20        Q    And was that the performance evaluation we

21    just discussed as Exhibit No. 13?

22        A    Yes.
```

1      Q   She indicates that at the time that she met

2   with you in June that we both agreed that you needed

3   to work on improving the required administrative tasks

4   of a worldwide account manager.

5          Did you agree to that in June of 2004?

6      A   I did.

7      Q   She also indicates that during this

8   discussion you stated you agreed to the improvement

9   and you made a verbal commitment to addressing this

10  deficiency.  Is this true?

11     A   That is true.

12     Q   Did you feel like you had some deficiencies

13  you needed to address as of June 2004?

14     A   I did.

15     Q   What deficiencies were those?

16     A   The ones outlined in the letter of

17  counseling.

18     Q   She goes on to indicate that MBO results were

19  due to her office on or before September the 8th,

20  2004, and that as of September 10th, 2004, she didn't

21  have your results.  Is that true?

22     A   That is true.

68

1    I don't recall that.

2              Later that day when you came into the

3    office -- no, I don't recall doing that.  I asked

4    about the results, and they were due.  And I asked if

5    anyone had given me any information for me -- for you.

6              No.  I don't agree with that.

7        Q    Other than paragraph 4 beginning with the Q1

8    FYO5, do you agree with the accuracy of the rest of

9    this letter that Ms. Carson gave you?

10       A    Yes.

11       Q    Did you file any type of internal appeal of

12   this letter?

13       A    I did not.

14       Q    Did you ever file any type of internal

15   complaint of race discrimination or harassment against

16   Ms. Carson?

17       A    I did not.

18              THE VIDEOGRAPHER:    Pardon me.  This

19   concludes Tape 1 of the Videotaped Deposition of

20   Anthony Prater at 10:55 and 45 seconds a.m.

21              (Pause.)

22              THE VIDEOGRAPHER:    This commences Tape 2 of

69

1    the Videotaped Deposition of Anthony Prater at 10:56

2    and 48 seconds a.m.   Please proceed.

3         BY MR. GABEL:

4         Q    Mr. Prater, I will show you what we'll mark

5    as Exhibit Number 15 to your Deposition.

6         (Thereupon, Deposition Exhibit No. 15 was

7    marked for identification.)

8         BY MR. GABEL:

9         Q    And I'll ask you if you recall receiving this

10   memo from Laurie Carson on September the 20th, 2004?

11        A    I do.

12        Q    And is that your signature at the bottom of

13   this document?

14        A    It is.

15        Q    And is she accurate when she said you had

16   agreed to do the following bullet points to improve

17   your performance?

18        A    Yes.

19        Q    I'll show you what we'll mark as Exhibit

20   Number 16 to your Deposition.

21        (Thereupon, Deposition Exhibit No. 16 was

22   marked for identification.)

70

```
1              BY MR. GABEL:

2         Q    And I'll ask you if you recall sending the

3    top e-mail to Laurie Carson?

4         A    Yes.

5         Q    Did you send that on November the 10th, 2004?

6         A    I did.

7         Q    Did you tell Ms. Carson that you felt like

8    she was -- that you had truly missed having her as a

9    manager?

10        A    I did.

11        Q    That she was the best one yet and you really

12   meant that?

13        A    Yes.

14        Q    Was that true?

15        A    That was true.

16        Q    Did you tell her that you hated that your

17   personal life took a turn these past 11 months, but

18   that you will continue to work through somehow -- that

19   some of the money would be tied up in litigation for

20   years, but it will work out for the best in the end,

21   that you no longer had to worry about your kids'

22   education or your retirement but still enjoyed working
```

1    for FedEx even with the challenges?

2        A    That's correct.

3        Q    What were you talking about there?

4        A    Many deaths in my family.

5        Q    Many deaths in your family?

6        A    Yes.

7        Q    Who had passed away?

8        A    Oh, gosh.  Grandfather, grandmother, aunt,

9    uncle, cousin and a friend.

10       Q    So when you say some of the money will be

11   tied up in litigation --

12       A    That was money that was supposed to be left

13   to my family.

14       Q    Like inheritance?

15       A    Inheritances.  That's right.

16       Q    Did you tell Ms. Carson that you would

17   continue to strive for excellence after your departure

18   and get back to the Anthony of old?

19       A    Yes.

20       Q    What was the Anthony of old?

21       A    Hard working individual.

22       Q    Had you not been the hard working Anthony of

1              MR. GABEL:  And Mindy, I would ask if you

2    file anything with Exhibit 17, if you guys could file

3    it under seal.  It has some proprietary business

4    information of FedEx that its competitors may find

5    interesting.

6              MS. FARBER:  Okay.

7              BY MR. GABEL:

8        Q    I'm going to show you this document and ask

9    you if you can tell me what this document is?

10       A    It looks like a pricing request, a printout

11   of a pricing request for General Services

12   Administration.

13       Q    And as the salesperson who -- you were the

14   salesperson who called on General Services

15   Administration.  Correct?

16       A    Yes.

17       Q    As that salesperson, would you be the one who

18   would initiate a pricing request to provide pricing to

19   this customer?

20       A    I would.

21       Q    And do you recall initiating a pricing

22   request to provide services to GSA in spring of 2005?

1        A    I do.

2        Q    If you will, flip over to the page that says

3    3-299 at the bottom.   Would you have been responsible

4    for inputting the information in the middle of the

5    page under Strategy and Comments?

6        A    Yes.

7        Q    And did you enter that information?

8        A    I did.

9        Q    And if you will, flip over to 3-297, which is

10   two pages towards the front.

11        Would you have been responsible for inputting

12   the information under Roman Numeral III?

13        A    I would.

14        Q    And did you input that information?

15        A    I did.

16        Q    And did you input the information that based

17   on this pricing the margin on this would be minus

18   2.8 percent?

19        A    That's correct.

20        Q    Did you factor any cost of labor into that

21   pricing request?

22        A    I did not.

1    Q    Were you the person responsible for inputting

2    the initial data on pricing?

3    A    Yes.

4    Q    What location was this pricing request for?

5    A    General Services Administration, Burlington,

6    New Jersey.

7    Q    Did FedEx end up having to provide some type

8    of labor for that account?

9    A    They did.

10    Q    Do you know why it had to provide labor?

11    A    UPS provided labor.

12    Q    How much labor did FedEx have to provide?

13    A    As I recall, four to six -- no.  Eight

14    part-time employees for morning shift and eight -- I

15    believe -- up to eight part-time employees for the

16    evening shift.

17    Q    And what were these employees doing?

18    A    Loading, labeling, processing of shipments

19    and loading them onto conveyor belts to go into the

20    trailers and loading them into trailers.

21    Q    Was FedEx responsible for paying these

22    people?

1      A    They were.

2      Q    Did FedEx paying these people alter the

3   profitability of this deal?

4      A    I'm sure it did.  Yes.

5      Q    Do you remember when Vince Scarfo became your

6   manager?

7      A    April 2005.

8      Q    Had you been -- well, when did Ms. Carson

9   leave?

10     A    Fall of 2004.

11     Q    Who did you report to in the interim from her

12   departure to Mr. Scarfo being hired?

13     A    I didn't have immediate report.  I reported

14   to Marilyn Thomas when she was there.

15     Q    Where was Marilyn Thomas based?

16     A    Greenbelt, Maryland.

17     Q    Did you have a office you reported to every

18   day?

19     A    Yes.

20     Q    Where was that?

21     A    Same location as Marilyn Thomas.  In

22   Greenbelt, Maryland.

78

1      Q    And did that location remain the office you

2   reported to throughout your employment as a WWAM?

3      A    No, the offices moved to Virginia in 2005.

4   And then moved to D.C. in the winter of 2005.

5      Q    Did you report to the office each day when it

6   was in Virginia?

7      A    No.

8      Q    Did you report to the office each day when it

9   was in D.C.?

10      A    No.

11      Q    Did you have set office hours when it was in

12   Virginia or D.C.?

13      A    No.  I did not have an office in Virginia or

14   D.C.

15      Q    Did you office out of your home once the

16   office moved to Virginia?

17      A    Yes.

18      Q    How often would you be physically present in

19   the office once it moved to Virginia or D.C.?

20      A    As needed or when I needed to speak with

21   management or meet with management.

22      Q    Can you estimate how often that would be?

1      A    Maybe once or twice a month.

2      Q    When you were there once or twice a month,

3   how long were you typically there?

4      A    It all depended upon the activity.  If I was

5   working on a bid or something, I may meet four or

6   five, six hours.  If I needed to meet with Vince, an

7   hour or two.  If we had a meeting, it would be all

8   day.

9      Q    But that was typically something, you are

10   saying, maybe twice a month?

11      A    Maybe, yes.

12      Q    The rest of the time you would be either

13   working from your home office or out calling on

14   customers?

15      A    That's right.  It was a big difference from

16   when we were in Greenbelt.   I reported to that office

17   more often because it was -- everyone was housed and

18   it was closer and we had a lot of resources that were

19   readily available right then, right there on the spot.

20      Q    Where were the offices when Vince was hired?

21      A    In Greenbelt, Maryland.

22      Q    How long did you work in the same office as

80

1    Vince where you were reporting on a regular basis?

2        A    Just a few months.  Just a couple months.

3        Q    So probably until summer of 2005?

4        A    I believe that's when the move took place.  I

5    can't remember.

6        Q    And after that, you would only be physically

7    in the same location as Mr. Scarfo maybe two days a

8    month?

9        A    As needed.

10        Q    I'll show you what we'll mark as Exhibit 18

11    to your Deposition.

12            (Thereupon, Deposition Exhibit No. 18 was

13    marked for identification.)

14            BY MR. GABEL:

15        Q    And ask if you recall receiving this e-mail

16    from Mr. Scarfo --

17        A    I do.

18        Q    -- on April 18th, 2005?

19        A    I do.

20        Q    Do you believe that the e-mail accurately

21    reflects your goal attainment as of that date?

22        A    It does.

1      Q    So as of that point, you were at 84.1 percent

2    on your express goal, 74.8 percent on your ground

3    goal, 87 percent on your international goal and an

4    overall 80.5 percent of your goal?

5      A    Yes.

6      Q    And then the bottom numbers, those would have

7    been the entire team's goal which would have included

8    yours, I guess?

9      A    That's correct.

10     Q    Do you know what time period these would have

11   covered?

12     A    No.  It doesn't give a date.  I don't see a

13   date on here.  It would have -- I could only assume

14   that it would have been for February -- January,

15   February of 2005 and December of 2004.

16     Q    So this would have been your attainment of

17   goals that were set before Vince was employed by

18   FedEx?

19     A    That's correct.

20     Q    I will show you what we'll mark as Exhibit 19

21   to your Deposition.

22          (Thereupon, Deposition Exhibit No. 19 was

82

1    marked for identification.)

2          BY MR. GABEL:

3    Q    And ask you if you recognize this as a later

4    update of the pricing proposal for the GSA Burlington

5    facility?

6    A    Yes.

7    Q    And would you have input the data on this

8    later update?  Well, let me clarify that.  If you

9    will, flip over to 3-306, which is the second page of

10   the document.

11         Starting down at Roman numeral II at the

12   bottom, sales professional request / proposed program,

13   would you have input that data?

14   A    I would have.

15   Q    And so do you recall informing at some later

16   date FedEx that, in order to gain this business, you

17   were going to need 10 part-time workers at 160 hours

18   per day and, over on the next page, that with this

19   additional cost, the margin would be -- now be

20   negative 12 percent on this?

21   A    Yes.  I recall inputting this information.

22   After conversations with ground, FedEx ground

1    management -- previously, it wasn't included because

2    the FedEx terminal manager had said that he would

3    provide manpower.   Therefore, it wasn't included in

4    the first request.

5         I later found out that he didn't have the

6    authority to make that decision, and it was included

7    in the second request.

8         Q    Who had told you he would provide manpower?

9         A    I have it in writing.   I can't recall his

10   name right off.   I have a copy.   I believe I have

11   given to Mindy.

12        The local account executive met with the

13   customer.   I have that in writing also.   I will see if

14   we can go through our notes and provide that to you.

15        The local account executive met with the

16   customer and also the operations manager.   They all

17   agreed that he would put his manpower in there as soon

18   as possible regardless of what I had to put in the

19   PRS.   He done that in the past, and I saw no reason

20   for him not to be able to do it again.

21        So I will have to think of his name.   I just

22   can't think of it right off.

84

```
1       Q    But this would have been the manager of the

2    facility that actually moves the boxes?

3       A    That's correct.

4       Q    Not a sales manager?

5       A    Right.  The terminal manager.

6       Q    He would have actually worked for a

7    different --

8       A    Division.

9       Q    Different division of FedEx than what you

10   worked for.  Correct?

11      A    That's correct.

12      Q    But preparing the pricing proposal, this was

13   your responsibility.  Is that correct?

14      A    That's correct.

15      Q    And regardless of whether he had authority to

16   promise labor or not, FedEx was probably going to have

17   to pay for that labor.  Correct?

18      A    Yes.

19      Q    And it was probably going to affect what it

20   cost FedEx to do this business.  Correct?

21      A    Yes.

22      Q    I'll show you what we'll mark as Exhibit
```

1    received this e-mail?

2        A    Marilyn Thomas, Kirstin Knutt, Vincent

3    Scarfo.  Shannon Duncan was -- these were members of

4    both sales teams, both Department of Defense and

5    General Services Administration.

6        Q    So some of these people are members of your

7    team who report to Vince, others are members of

8    another team that report to, I guess, Kirstin?

9        A    Kirstin Knutt.

10       Q    At this point in time, who all were the sales

11   people reporting to Vince?

12       A    At this time it would have been myself,

13   Calvin Shaw, Barbara Gamble, Lillian Nash, Theresa

14   Rubinoff, Betsy Tolstoi and Monica Fleischmann.

15       Q    What were the races of these people?

16       A    Myself, African American.  Calvin Shaw,

17   African American.  Barbara Gamble, African American.

18   Lillian Nash, African American.  Theresa Rubinoff was

19   White.  Betsy Tolstoi, Caucasian.  Monica Fleischmann,

20   Caucasian.

21       Q    And were all the members of this group

22   required to provide this information to Ms.

1      A    No.

2      Q    Did you receive the bottom e-mail from

3    Jennifer Strawbridge?

4      A    Yes.

5      Q    I'll show you what we'll mark as Exhibit

6    Number 21 to your Deposition.

7           (Thereupon, Deposition Exhibit No. 21 was

8    marked for identification.)

9           BY MR. GABEL:

10     Q    And ask if you recall receiving this letter

11   of warning on June 3rd, 2005?

12     A    I do.

13     Q    Did Mr. Scarfo meet with you on June 3rd to

14   discuss his concerns?

15     A    He did.

16     Q    I guess the fourth paragraph down says,

17   today's letter of warning for performance is due to

18   your lack of attention to detail in handling GSA

19   Burlington and on lack of completion of the software

20   upgrade list.  Your PRS submission for GSA on

21   April 1st, 2005 clearly did not include the required

22   dock labor.

1            Is that statement true?

2      A    That's true.

3      Q    And the second paragraph says, on May 18th,

4  2005, you did not complete the required upgrade for

5  the software upgrades.

6            Is that statement true?

7      A    That's true.

8      Q    If you will, flip over to the second page.

9  It says that if you believe in good faith that the

10  action is unfair, you should hold an open and frank

11  discussion with me.  And if after that discussion you

12  continue to be dissatisfied, you have the right to

13  enter the Explore Process.

14            Did you enter the Explore Process to appeal

15  this letter?

16      A    I did not.

17      Q    And is that your signature on Page 2?

18      A    It is.

19      Q    Did you file an internal complaint of

20  discrimination or harassment against Mr. Scarfo in the

21  summer of 2005 after you received this letter?

22      A    Due to lack of faith and confidence in upper

1    management, I did not.

2        Q    You were aware of how to do that in the

3    summer of 2005?

4        A    I was.

5        Q    What was the basis of your lack of faith and

6    confidence in upper management at that time?

7        A    I did not feel management would be fair and

8    decisive.

9        Q    Why?

10       A    I did not.

11       Q    Any reason for that belief?

12       A    I just didn't feel that they would be fair.

13       Q    Did you base that on some knowledge or

14   experience?

15       A    No.

16       Q    Did you ever work for Kirstin Knutt?

17       A    I did not.

18       Q    Do you know Jean Miller?

19       A    I do not know her.

20       Q    Do you know Jim Wallace?

21       A    I do.  I have spoken to him.  I don't know

22   him.

1        Q     Have you ever met him in person?

2        A     I have not.

3        Q     Did Jim Wallace ever say anything to you that

4    led you to believe he was biased against minorities?

5        A     No.

6        Q     What was his position?

7        A     Human Resources Advisor.

8        Q     Did Kirstin Knutt ever say anything that led

9    you to believe she was biased against minorities?

10       A     No.

11       Q     Did Gurn Freeman ever say anything that led

12   you to believe he was biased against minorities?

13       A     No.

14       Q     Where was Gurn based?

15       A     Based?

16       Q     Where was his office?

17       A     His office was in Virginia and in D.C. and in

18   Greenbelt, Maryland when I was at FedEx.

19       Q     Was he there full-time at that point?

20       A     He was assigned to those full-time, yes, as

21   far as I know.  Yes.

22       Q     How often did you personally see Gurn

1    Freeman?

2        A    Not too often.

3        Q    Give me an estimate.

4        A    Once a month, maybe.  Once every two months.

5        Q    Did any of his actions ever -- towards you

6    ever make you feel like you were being harassed by

7    Gurn?

8        A    No.

9        Q    Did you ever hear Vince Scarfo say anything

10   that led you to believe that Vince was biased against

11   you because of your race?

12       A    No.

13       Q    Did you ever hear of Vince Scarfo saying

14   anything that led you to believe that Vince Scarfo was

15   biased against minorities?

16           MS. FARBER:  Do you want the question

17   repeated?

18           THE WITNESS:    Yes, please.

19           BY MR. GABEL:

20       Q    Have you ever heard --

21       A    Wait a minute.  Would you go back to the

22   previous question?

1    he was biased against African Americans?

2         A    Yes.

3         Q    Tell me what you heard of Vince Scarfo

4    saying?

5         A    Vince Scarfo -- I heard that Vince Scarfo

6    told a fellow employee that he was hired to clean

7    house.

8              And what that meant to the sales team is that

9    there were too many African Americans on the sales

10   team and that he needed to get rid of as many as he

11   could, as I was told.

12        Q    Who did Vince Scarfo allegedly say this to?

13        A    Barbara Gamble.

14        Q    And is Ms. Gamble who told you?

15        A    Yes.

16        Q    Did Ms. Gamble say anyone else was present

17   when Vince Scarfo told her this?

18        A    No, she did not.

19        Q    Did she say when Mr. Scarfo told her this?

20        A    April of 2005.

21        Q    Which would have been shortly after he was

22   hired?

1       A    That's correct.

2       Q    And what is Ms. Gamble's race?

3       A    African American.

4       Q    And tell me as best as you can recall what

5  she alleges Vince Scarfo said to her.

6       A    My previous statement.

7       Q    Well, you can tell me again.

8       MS. FARBER:  Are you asking him to repeat

9  what he said?  Because we can get the court reporter

10  to read it off.

11       BY MR. GABEL:

12       Q    Yeah.  I'm asking you to repeat it.  As best

13  as you can recall what Barbara told you Vince said to

14  Barbara.

15       A    He was hired to clean house.

16       Q    Period?

17       A    Yes.

18       Q    And I guess that's what I wasn't clear on.

19  You said something about needing to get rid of as many

20  African American employees as possible.  And what I'm

21  not clear on is if she is saying if he verbally said

22  that or she read that into what he is saying.

```
 1              MS. FARBER:  Let's not get him confused.

 2     Let's read the original answer from the court reporter

 3     so he has that.  And then if he would comment on it.

 4              MR. GABEL:  Well, if there is something

 5     unclear about my question, let me know.

 6              MS. FARBER:  I'm getting unclear about it.

 7     So...

 8              MR. GABEL:  I will start over.  I will start

 9     over.

10              MS. FARBER:  You are asking him, though, to

11     talk about his comment.  Why can't she just read it

12     out loud?

13              MR. GABEL:  Because I want to clarify it for

14     purposes of this.

15              BY MR. GABEL:

16      Q    Maybe I'm misunderstanding what you are

17     saying.  But it almost sounds like Ms. Gamble is

18     telling you that she read a meaning into what Vince

19     said or else you were telling me that she said Vince

20     actually said to an African American employee that he

21     was hired to get rid of African American employees.

22              So I'm going to say as clearly as I can what
```

1    words does Ms. Gamble attribute to coming out of

2    Vince's mouth?

3        A    I was hired to clean house.

4        Q    Period?

5        A    Yes.

6        Q    Does Ms. Gamble then tell you that she

7    interpreted that as meaning something?

8        A    The entire sales team interpreted that to

9    mean exactly what I said, there was too many African

10   Americans on the team.  Vince was hired to get rid of

11   as many as he could.

12       Q    But Ms. Gamble doesn't allege that Vince

13   actually said, I was hired to get rid of as many

14   African Americans as possible?

15       A    Not that I recall.  No.

16       Q    The only thing she alleges he said to her is

17   that he was hired to clean house?

18       A    That's correct.

19       Q    And at the time he was hired, this team

20   consisted of both Caucasians and African Americans.

21   Correct?

22       A    That's correct.

1    Gamble's situation?

2        A    Not really.   No.

3            MS. FARBER:   Off the record a minute.

4            MR. GABEL:   Sure.

5            THE VIDEOGRAPHER:   Going off the record at

6    11:32 and 14 seconds a.m.

7            (Thereupon, a brief recess was taken.)

8            THE VIDEOGRAPHER:   Going back on the record

9    at 11:46 and 10 seconds a.m.   Please proceed.

10           BY MR. GABEL:

11       Q    After the office moved out of Maryland and

12   you were working from home and only periodically

13   reporting in, how did you primarily communicate with

14   Vince Scarfo?

15       A    E-mail and telephone.   I worked out of my

16   home from the time I was hired into government sales

17   until I was terminated.

18           The office, we just had satellite offices.

19   Each individual -- you could go into the office if you

20   wanted to.   But I had an office physically there

21   because I wanted to be close to management when we

22   were in Greenbelt.   And we didn't have offices

1    assigned to us in Virginia or D.C.

2        Q    So when the office was in Greenbelt through

3    roughly summer of '05, you would report in almost

4    daily to a physical office?

5        A    When in town and when time allowed, yes.

6        Q    Did your job involve a good bit of travel?

7        A    Yes.

8        Q    How much?

9        A    Pretty substantial.

10        Q    Where all would you travel to?

11        A    I traveled all over the world.

12        Q    I know you mentioned that some of your

13    assigned clients were the governments of several

14    states.  Obviously, you probably went to those state

15    capitals and other locations in those states?

16        A    Yes.

17        Q    And then even though many of the federal

18    agencies are based here, I assume you had to go to

19    different locations where they may have operations?

20        A    That's correct.

21        Q    Such as Burlington?

22        A    That's right.

1      Q   Do you remember reviewing an online

2   performance review with Vince?

3      A   Yes.

4      Q   In the summer of 2005?

5      A   Yes.

6      Q   Do you recall that Vince indicated that you

7   needed improvement in the growing business objective,

8   Number 1?

9      A   Yes.

10      Q   Objective Number 2 says that you had achieved

11   completing negotiations training.  But then below that

12   it has first quarter, second quarter, third quarter,

13   12 / 25, 25 /25, O /10.

14          Do you know what those numbers represent?

15      A   No, I don't.  12 of 25?  I don't remember

16   what those were.

17      Q   Did they relate to your IDP?

18      A   I believe they did.

19      Q   What was your IDP?

20      A   I don't recall.

21      Q   Do you recall that Vince said you needed

22   improvement for whatever these numbers are?

1       A    Yes.

2       Q    Did you file any type of internal appeal of

3   this performance review?

4       A    No.

5       Q    Did you file any type of internal complaint

6   of discrimination as a result of this performance

7   review?

8       A    No, I did not.

9       Q    Do you know whether any other member of Mr.

10   Scarfo's team got a performance review from Mr. Scarfo

11   that had an overall rating of needs improvement?

12       A    No, I do not.

13       Q    I show you what we'll mark as Exhibit 23 to

14   your Deposition.

15            (Thereupon, Deposition Exhibit No. 23 was

16   marked for identification.)

17            BY MR. GABEL:

18       Q    And I'll ask you if you sent this memo to

19   Vince Scarfo on June 7th, 2005?

20       A    Yes, I did.

21       Q    And did you prepare this document?

22       A    I did.

110

1        Q    Was it your understanding that as of

2    June 7th, 2005 you had agreed to complete all assigned

3    tasks, take ownership of responsibilities and improve

4    your communications?

5        A    Yes.

6        Q    Now, was it your understanding that at that

7    point you were going to meet with Vince at 8:30 a.m.

8    on the first Friday of each of the next three months

9    to discuss your progress on your performance planner?

10       A    Yes.

11       Q    I see that you CC'd Gurn Freeman and Marilyn

12   Thomas both.  Was Marilyn still in your chain of

13   command at that point?

14       A    She was.

15       Q    What position did she hold?

16       A    She was still the sales director.

17       Q    What was Gurn's position at that point?

18       A    He was training, in training to become the

19   sales director.

20       Q    When did Marilyn leave?

21       A    I believe two weeks after this.

22       Q    Do you know why she left?

1          A    Retirement.

2          Q    Where did Gurn come from?

3          A    Another division within FedEx.  Retail, I

4    believe.

5          Q    Prior to Marilyn's retirement and Gurn's

6    training, had you ever worked for Gurn before?

7          A    I had not.

8          Q    Had you ever interacted with Gurn before

9    this?

10         A    No.

11              (Whereupon, the witness wrote on an exhibit.)

12              THE WITNESS:  I can't write on this?

13              MR. GABEL:   Don't write on the ones that we

14    give her.

15              THE WITNESS:   Okay.

16              MS. FARBER:  Have you been doing that?

17              THE WITNESS:  No.  I just wrote a note.  I

18    thought this was mine.  Sorry.

19              MR. GABEL:  The court reporter is going to

20    keep those.  Are there any others that have anything

21    written on them?

22              THE VIDEOGRAPHER:  Going off the record at

112

1    12:02 and 20 seconds p.m.

2              (Thereupon, a luncheon recess was taken.)

3              THE VIDEOGRAPHER:    Going back on the record

4    at 1:02 and 59 seconds p.m.    Please proceed.

5              BY MR. GABEL:

6         Q    Looking back at what we had marked as I

7    believe it's Exhibit 23, the June 7th, 2005 memo from

8    you to Vince, the, I guess you would say, second

9    paragraph or bottom paragraph says, we will meet at

10   8:30 a.m. on the first Friday of each of the next

11   three months to review your progress.

12             Did you and Mr. Scarfo actually meet once a

13   month for the next three months to review your

14   progress on this?

15        A    As I recall, we did.    Yes.

16        Q    And were those in-person meetings?

17        A    Yes.

18        Q    During any of these meetings, did Mr. Scarfo

19   ever raise his voice at you or yell at you?

20        A    No.

21        Q    During the entire time you worked for him,

22   did he ever raise his voice or yell at you?

1        A    No.

2        Q    Did he ever call you names?

3        A    No.

4        Q    Did he ever physically threaten you?

5        A    No.

6        Q    Would you say that in your one-on-one

7    interactions with him he treated you professionally?

8        A    For the most part, yes.

9        Q    Was there any time where you felt that he did

10   not treat you professionally?

11       A    No.

12       Q    Did he do anything interfered with your

13   ability to do your job?

14       A    No.

15       Q    I show you what we'll mark as Exhibit

16   Number 24 to your Deposition.

17            (Thereupon Deposition Exhibit No. 24 was

18   marked for identification.)

19            BY MR. GABEL:

20       Q    And I'll ask you if you sent the bottom

21   e-mail to Mark Dooley?

22       A    Yes.

1      Q    And who was Mark Dooley?

2      A    The decision maker at General Services

3 Administration in Burlington, New Jersey.

4      Q    And did you send a copy of that to Vince

5 Scarfo?

6      A    Yes.

7      Q    Did you receive the top response from Vince?

8      A    Yes.

9      Q    Did you interpret that as a positive form of

10 feedback from your manager?

11     A    Yes.

12     Q    I show you what we'll mark as Exhibit 25 to

13 your Deposition.

14          By the way, the handwritten notes at the top,

15 do you know whose those are on 24?

16     A    No, I don't.

17     Q    It's not your writing?

18     A    That is not my writing.

19     Q    I show you what we'll mark as Exhibit 25.

20          (Thereupon, Deposition Exhibit No. 25 was

21 marked for identification.)

22          BY MR. GABEL:

1    Q   And I will ask you if you sent the bottom

2    portion of this e-mail?

3    A   I did.

4    Q   Or actually, I guess, received the bottom

5    portion of this e-mail?

6    A   Right.  I did receive it.

7    Q   And then did you write the response to this,

8    the top portion of this e-mail?

9    A   Yes, I did.

10   Q   And did you copy Mr. Scarfo on that?

11   A   I certainly did.

12   Q   And again, is that your handwriting on the

13   e-mail?

14   A   No, it's not.

15   Q   Do you know whose it is?

16   A   It looks to be Vince's handwriting.

17   Q   I show you what we'll mark as Exhibit 26 to

18   your Deposition.

19       (Thereupon, Deposition Exhibit No. 26 was

20   marked for identification.)

21       BY MR. GABEL:

22   Q   Let me ask you if you recall this e-mail

118

1    feel a twinge or something.  But it wasn't major.

2        Q    Were you aware of any other members of Mr.

3    Scarfo's team who were assigned to manage dock labor

4    at one of their customers?

5        A    No.

6        Q    And that would include either Caucasian or

7    African American members?

8        A    Yes.  None of my other members.

9        Q    Do you have any reason to believe that you

10   were assigned to manage the dock labor at Burlington

11   on the basis of your race?

12       A    No.

13       Q    I show you what we'll mark as Exhibit 27 to

14   your Deposition.

15            (Thereupon, Deposition Exhibit No. 27 was

16   marked for identification.)

17            BY MR. GABEL:

18       Q    And ask you if you recognize this e-mail

19   string.

20       A    Yes.  I remember this.

21       Q    If you will, flip over to the second page.

22   It should have 3-1094 at the bottom.  And it's kind of

1          THE VIDEOGRAPHER:    This commences Tape 3 of

2    the Videotaped Deposition of Anthony Prater at 1:25

3    and 40 seconds p.m.   Please proceed.

4          BY MR. GABEL:

5      Q   I show what we'll mark as Exhibit 31 to your

6    Deposition.

7          (Thereupon, Deposition Exhibit No. 31 was

8    marked for identification.)

9          BY MR. GABEL:

10     Q   And I will ask you if you can tell me what

11   this document is.

12     A   MBO results for Q1 FY06, Anthony Prater.

13     Q   Is this something that you would have

14   prepared?

15     A   Yes.

16     Q   Why would you have prepared this document?

17     A   It's part of my MBO indices for my

18   performance review and for quarterly review.

19     Q   If you will look down to the bottom portion

20   of this page, the first page says, other highlights

21   for the quarter include obtaining volume commitment

22   from GSA Burlington.  The decision maker, Mark Dooley,

132

1    did not feel comfortable transitioning volume from UPS

2    to FedEx unless an on-site manager was in the

3    warehouse to monitor and supervise the temporary

4    employees and daily activities.  Prior to Supply Chain

5    Services taking over these duties, I acted as on-site

6    manager for three weeks.

7            Was that true?

8    A    Yes.

9    Q    And is that the reason that you acted as

10   on-site manager?

11   A    Yes.  I'm glad I did some of these things.

12   Q    I show you what we'll mark as Exhibit 32 to

13   your Deposition.

14           (Thereupon, Deposition Exhibit No. 32 was

15   marked for identification.)

16           BY MR. GABEL:

17   Q    And ask you whether you received the bottom

18   e-mail from Gurn Freeman on September 21st, 2005?

19   A    Okay.

20   Q    Do you recall receiving the bottom e-mail?

21   A    Yes.

22   Q    Had you had a conversation with Gurn Freeman,

142

1    race?

2        A    She felt as though it was based upon my race

3    and the fact that handling GSA, the entire GSA account

4    and everything was overwhelming as it was without, you

5    know -- I didn't deserve nor did I need any undue

6    pressure from upper management.

7        Q    Did she give you any basis for her belief

8    that it was based on your race?

9        A    No.

10       Q    Did Barbara Gamble give you any details of

11   any personal experiences she had had with Mr. Scarfo

12   that led her to believe that your treatment was

13   related to your race?

14       A    No, she didn't.

15       Q    She just made you aware that they had some

16   history from UPS?

17       A    Yes.

18       Q    Where they had both worked at some point?

19       A    That's correct.

20       Q    I show you what we'll mark as Exhibit 33 to

21   your Deposition.

22            (Thereupon, Deposition Exhibit No. 33 was

```
 1    marked for identification.)

 2            BY MR. GABEL:

 3        Q   Let me ask you if you recall receiving this

 4    warning letter for unacceptable performance from Mr.

 5    Scarfo on September 16th, 2005?

 6        A   Yes.

 7        Q   And is that your signature on the second page

 8    of this document?

 9        A   It is.

10        Q   Just above your signature, it says, you have

11    the right to enter the Explore Process to appeal this

12    discipline.  Did you do that?

13        A   I did not.

14        Q   Did you file any sort of internal complaint

15    of harassment or discrimination based on this

16    discipline?

17        A   No.  Due to the lack of faith in upper

18    management and Human Resources, I did not.

19        Q   What was the basis of your lack of faith in

20    upper management and Human Resources?

21        A   I didn't feel that I was being treated

22    fairly.  And if I did take issue with this, it would
```

144

1    not have been -- it would have been futile.

2        Q    What was the basis of your belief that it

3    would be futile?

4        A    Because the history of FedEx as a whole and

5    their -- if they wanted to get rid of someone, they

6    certainly would regardless of what the employee may

7    tell the Human Resource manager or Human Resource

8    advisor.

9            Human Resource advisor is more apt to believe

10   what management says as opposed to what the employee

11   says.

12       Q    And what's the basis of that belief?

13       A    My history.  History of other employees that

14   have been disciplined or terminated.

15       Q    Had you personally ever taken any issue to

16   Human Resources where you felt like they sided with

17   management over you?

18       A    No.  Human Resources, the advisor that I had,

19   was not forthcoming.  And if I didn't ask the

20   question, no information was volunteered.  So it was

21   as if he was working for a whole, another company.

22           And to me, that meant that regardless of what

1    I said, he was on the side of upper management.

2         Q   Other than the fact that you felt like he

3    wasn't forthcoming enough, did the Human Resources

4    person you worked with do anything else that led you

5    to believe he was on the side of management?

6         A   No.  Just he was a Human Resource advisor,

7    but he didn't advise me personally.  I just don't feel

8    that he gave me good advice.

9         Q   Well, in your history with FedEx, you

10   referred to the history of FedEx as a whole.  In your

11   history with FedEx, had you ever taken up an issue

12   with Human Resources where you felt like they sided

13   with management over you prior to September 2005?

14        A   No.

15        Q   Had you ever taken up any issue with Human

16   Resources?

17        A   No.

18        Q   Do you have personal knowledge of what

19   transpired in any other employee's issues with Human

20   Resources and management?

21        A   Yes.

22        Q   What personal knowledge do you have of other

152

1       A    No.

2       Q    Did Gurn ever yell at you or raise his voice

3    toward you or act unprofessionally towards you?

4       A    No, I had minimal contact with Gurn.  So, no.

5       Q    When Gayle Gilbert gave you advice about your

6    planner, did she agree that there were aspects of your

7    planner that were vague?

8       A    There were some things that I could have

9    expanded upon more from a management perspective.

10      Q    Looking back at the warning letter that Mr.

11   Scarfo gave you on September 16th, 2005, in the fourth

12   paragraph down he says, for the last two consecutive

13   years, you have received an overall evaluation on your

14   PPE of Needs Improvement.

15           Was that true?

16      A    Yes.

17      Q    And one of those had been given by Laurie

18   Carson and then the second one by Mr. Scarfo.

19   Correct?

20      A    Yes.

21      Q    The next paragraph says, for at least the

22   last five consecutive quarters, you have not achieved

1    your business plan.  The last two quarters you have

2    been in the last place position in the rankings and

3    rating of your fellow GSA team members.

4            Was that true?

5        A    Yes.

6        Q    The next paragraph says that on week ending

7    September 3rd, 2005, you appeared on the ORL

8    delinquent report with an error recorded thus

9    demonstrating a lack of attention to detail.

10            Was that true?

11        A    Myself and others, yes.  That is true.

12        Q    To your knowledge, was any other member of

13    Mr. Scarfo's team of any race in the position of

14    having received two consecutive Needs Improvement

15    performance reviews and going five consecutive

16    quarters without achieving their business plan and

17    being on the ORL delinquent report as of

18    September 2005?

19        A    Not to my knowledge.

20        Q    Was it your understanding that as of

21    September of '05 Mr. Scarfo was requiring you to --

22    going forward for the remainder of that quarter with

156

1    A    Yes.

2    Q    What is an ORL error?

3    A    It's an error that is made on a -- at the

4    time it was a noncorrectable report, unless you cut

5    and paste it out of that system into a Word document.

6    If you had a misspelled word within that report, it

7    caused the system to reflect an error.

8        And for those that showed up on this -- that

9    had errors, they all showed up on a report based upon

10   whatever error it might be.  It could be late,

11   delinquent, misspelled word.

12       And many others had that same error

13   consistently.  And I don't believe this is a

14   punishable offense any longer according to my

15   conversations with some of my past coworkers.

16       MR. GABEL:  Move to strike as nonresponsive.

17       BY MR. GABEL:

18   Q    I'll show you what we'll mark as Exhibit 35

19   to your Deposition.

20       (Thereupon, Deposition Exhibit No. 35 was

21   marked for identification.)

22       BY MR. GABEL:

1      Q    And ask if you recall receiving the bottom

2    e-mail from Mr. Scarfo on October 12, 2005?

3      A    Yes.

4      Q    And is the top e-mail on this page your

5    response?

6      A    Yes.

7      Q    The second paragraph of Mr. Scarfo's e-mail

8    to you says, I want to commend you for recognizing

9    that you have strayed from the responsibilities of the

10   WWAM position over the year.  You explained that you

11   have gotten away from the day-to-day tasks that

12   originally brought you to success.  And I think the

13   first steps in improvement is to take ownership of the

14   problem.

15          Had you made those statements to Mr. Scarfo

16   in that meeting that day, that you had gotten away

17   from the day-to-day tasks that originally brought you

18   to success?

19     A    Yes.  And I explained why.

20     Q    Is everything that you put in the responsive

21   e-mail true?

22     A    Yes.

160

1    suggestions that I might need to make.

2        Q    And did you get a response from him on

3    Monday, October 24, indicating that he felt like your

4    plan was not detailed enough?

5        A    Yes.

6        Q    And did you respond on Tuesday that you would

7    get him a revised plan by Friday?

8        A    Yes.

9        Q    I show you what we'll mark as Exhibit 37 to

10   your Deposition.

11           (Thereupon, Deposition Exhibit No. 37 was

12   marked for identification.)

13           BY MR. GABEL:

14       Q    I'll ask you if on Friday, October 28th,

15   2005, you told Mr. Scarfo that you would not be able

16   to get him a revised action plan as discussed on

17   Tuesday?

18       A    Would you repeat that?

19       Q    Yes.  Did you -- on Friday, October 28th, did

20   you tell Mr. Scarfo you would not be able to get him

21   the more detailed action plan that you had promised?

22       A    Yes.  I was working on a bid at the time.  So

161

1    the customer is -- always put the customer first.  And

2    then I continued to work on this action plan.  Yes.

3    I remember this.  Yes.

4        Q    I show you what we'll mark as Exhibit 38 to

5    your Deposition.

6             (Thereupon, Deposition Exhibit No. 38 was

7    marked for identification.)

8             BY MR. GABEL:

9        Q    And let me ask you if you recall receiving

10   the e-mail that is on the second page.  It should be

11   3-834 at the bottom.

12            At the bottom it says from Jennifer Edwards

13   to Anthony Prater on November the 8th.  AP, I was just

14   tracking all the open PRS requests.  I see the Ed pubs

15   I submitted last week hasn't moved to pricing yet

16   because it's still waiting on you to approve.  I know

17   we needed a quick turn on this, but now it sat with

18   you for almost a week.  Please go in and approve it.

19            Did you receive that from Jennifer Edwards?

20       A    I did.

21       Q    Did she accurately state that a request for

22   pricing had sat with you for a week for Ed pubs?

162

1    A    She did.  I did not have access to the system

2    because my secure token ID was not working.

3    Q    And does the front page of this accurately

4    reflect Mr. Scarfo's e-mail to you requesting his

5    displeasure that this sat with you for a week without

6    being input and your response to him?

7    A    Yes.

8    Q    Is what you put in your response true?

9    A    Yes.

10   Q    Had you advised Vince in a conference call on

11   Monday that you had not received your new secure token

12   that would allow you access to the computer?

13   A    That's correct.

14   Q    And did you then try to input the information

15   the following Saturday after that Monday and contact

16   the Verizon help desk?

17   A    Yes.

18   Q    Is it true that you did not actually update

19   the request until the following Tuesday, over a week

20   after you had advised him you were having trouble

21   getting into the computer?

22   A    That's correct.

1      Q    I show you what we'll mark as Exhibit 39 to

2   your Deposition.

3           (Thereupon, Deposition Exhibit No. 39 was

4   marked for identification.)

5           BY MR. GABEL:

6      Q    I'll ask if you received this document?

7      A    I did.

8      Q    On January 3rd, 2006?

9      A    I did.

10     Q    Is that your signature at the bottom of the

11  document?

12     A    It is.

13     Q    And was that when you learned that your

14  employment with FedEx was being terminated?

15     A    It was.  Yes.

16          MR. GABEL:  Let's take about a five-minute

17  break.

18          THE VIDEOGRAPHER:  Going off the record at

19  2:07 and 50 seconds p.m.

20          (Thereupon, a brief recess was taken.)

21          THE VIDEOGRAPHER:  Going back on the record

22  at 2:21 and 54 seconds p.m.  Please proceed.



Services

March 1, 2000

Anthony Prater
14601 Stratfield Circle
Laurel, MD 20707
Employee Number: 072380

Dear Anthony:

We are pleased to offer you the following position with FedEx Corporate Services:

**JOB TITLE: SR ACCOUNT EXECUTIVE        ORGANIZATION NAME:  SALES**

Your start date is June 1, 2000. Your salary as of May 31, 2000, will be used as your starting salary with FedEx Corporate Services. If the minimum pay rate of the new position is higher than your pay at that time, you will receive the higher rate on June 1.

There are two attachments to this offer letter. One attachment provides an overview of the new compensation structure that will be used at FedEx Corporate Services for your job. The second attachment provides instructions regarding the offer letter response.

Additional information regarding the new company's structure, personnel policies, and compensation programs will be forthcoming. You will continue to be a participant in the comprehensive FedEx benefits program.

All Personnel related questions may be sent to the email address PERQUEST@emc.fedex.com.

Please sign this letter indicating your decision as soon as possible. We must receive your response no later than March 15, 2000, or we will assume you have declined the offer.

The realignment of our companies will provide opportunities for growth in an environment that is challenging and satisfying. We hope that you will decide to join us in creating a stronger, exciting organization.

Best regards,

Mike Glenn
President/CEO

Dennis Jones
Executive Vice President

I accept the Job Offer.

3-2-00
Date

enc. # 11

I decline the Job Offer.
In declining this offer, I understand that if I have not found another position by May 31, 2000, I will be considered to have voluntarily resigned as of that date.

EXHIBIT
4  Prater
MA 1-3-08

3-188

# INDIVIDUAL PERFORMANCE AND
## CONTRIBUTION DISCUSSION FORM
### SALES PROFESSIONAL (BONUS-ELIGIBLE)



Complete the "bubble" sections, neatly darkening in the circles.

| Employee Number | First Letter of Last Name | Second Letter of Last Name | Rating Period | | | | Overall Rating |
|---|---|---|---|---|---|---|---|
| | | | From | | To | | |
| | | | Month / Year | | Month / Year | | |
| 072380 | P | R | 10 01 | | 10 02 | | 2.7 |

| | | |
|---|---|---|
| Anthony Prater | | |
| Employee Name | | |
| Sr Corp Acct Exec | | |
| Job Title | | |
| John Middlebrooks | | 144210 |
| Manager Name | | Manager Employee Number |

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | OVERALL RATING |
|---|---|---|---|---|---|---|---|---|---|
| Performance Rating | 1.5 | 1.5 | 4 | 3 | 3 | 4 | 2 | | 2.7 |

I have participated in this discussion with my manager and have reviewed my records in the PRISM system on a computer terminal and have indicated the necessary changes/corrections to my manager.

John W. Middlebrooks                                    12/10/02

I have participated in this discussion with this employee.

_(signature)_                                          12/16/02

EXHIBIT
12 Prater
MB 1-3-08

## PERFORMANCE AND CONTRIBUTION CATEGORIES

| 1. Planning | 4 | 3 | 2 | ✗ 1 | 0 |
|---|---|---|---|---|---|

**COMMENTS/DOCUMENTATION:**

No visible plan to work from. Without a plan you are just reacting. Create a plan for my review by Jan. 31, 2003.

| 2. Management of Work Responsibilities | 4 | 3 | 2 | ✗ 1 | 0 |
|---|---|---|---|---|---|

**COMMENTS/DOCUMENTATION:**

Administrative work is weak and not on time. I still believe you are are having some concerns bringing open items to a close.

Need to use office staff to improve time management

| 3. Quality | ✗ | 3 | 2 | 1 | 0 |
|---|---|---|---|---|---|

**COMMENTS/DOCUMENTATION:**

Great job with account reviews. 15 Acct reviews this year, continue to use them to secure FedEx Position

| 4. Communications | 4 | ✗ | 2 | 1 | |
|---|---|---|---|---|---|

**COMMENTS/DOCUMENTATION:**

I have seen communication through email & conference. Continue to use these tools to satisfy internal & external customers.

| 5. % To Goal | 4 | ✗ | 2 | 1 | 0 |
|---|---|---|---|---|---|

**COMMENTS/DOCUMENTATION:**

Good job in this area, continue to fight through ground issues next half.

| 6. Customer Automation | ✗ | 3 | 2 | 1 | 0 |
|---|---|---|---|---|---|

**COMMENTS/DOCUMENTATION:**

You have top compliance for automation on the team. Great job, continue to place right systems.

| 7. SWAT/Sales | 4 | 3 | ✗ | 1 | 0 |
|---|---|---|---|---|---|

**COMMENTS/DOCUMENTATION:**

Need to increase prospects, make sure you have min 10 prospects in your ~~prospect~~ file.

| 8. Optional | 4 | 3 | 2 | 1 | 0 |
|---|---|---|---|---|---|

**COMMENTS/DOCUMENTATION:**

**PERFORMANCE PLANNER**

In this section, you are to work with your staff member on a developmental plan to improve areas of performance concern and/or to acquire knowledge, skills, or abilities for future growth opportunities.

| Performance Areas Where Improvement Is Needed Or Future Growth Opportunities | Knowledge, Skills, Or Abilities That Must Be Developed To Result In The Improvement Or future Growth | Developmental Activities/ Assignments | Projected Implementation Date (Month/Year) | Projected Completion Date (Month/Year) |
|---|---|---|---|---|
| | | | | |

Anthony Prater (Anthony)
WW Account Manager
FedEx ID: 72380



**Obj for:** 2004 06/02/2003 - B9181

**Purpose:** DEVELOPS AND MAINTAINS STRATEGIC PARTNERSHIPS WITH ASSIGNED WORLDWIDE ACCOUNTS. IDENTIFIES OPPORTUNITIES FOR ACCOUNT GROWTH WHILE OFFERING CUSTOMERS A FULL ARRAY OF VALUE ADDED SERVICES. MONITORS COMPETITOR ACTIONS IN EACH ACCOUNT TO ENSURE THAT APPROPRIATE RESPONSES ARE FORMULATED AND COMMUNICATED. PROVIDES INPUT INTO THE OVERALL ACCOUNT STRATEGY IN CONJUNCTION WITH THE WWS DIRECTOR AND IS RESPONSIBLE FOR THE EXECUTION OF THAT STRATEGY AT THE LOCAL LEVEL.

**Objective 1:**   Most critical objective 40%

**Performance Expectations:**   Meet or exceed revenue growth year over year for the following:

10% express
20% ground
10% international

**Evaluation:**   Express Growth: .01%
Ground Growth: 18.14 %
International Growth: 1.51 %

Focus on being proactive. Request pricing in advance for State Contracts so you have time to work on additional opportunities during RFQ processes.

**Achievement Category for Objectives:**   Needs Improvement

**Objective 2:**   Professional selling skills development 20%

**Performance Expectations:**   Complete three training courses on line or outside seminars

**Evaluation:**   Completed all online training courses as per PRISM.

**Achievement Category for Objectives:**   Achieved Expectations

**Objective 3:**   Customer orientation/relationship building 20%

**Performance Expectations:**   Establish and foster customer relationships by maintaining consistent call patterns on multi-level contacts through on premise visits, telecommunications, entertainments, company sponsored events and industry focus groups. Exhibit sound judgment through prudent expenditures, frequency and customer contact relevancy. This must include 8 days of travel outside DC,MD, VA a month.

**Evaluation:**   Anthony, it will be very important moving forward for you to have sound business strategies for your accounts. Compass Reports must be updated on a regular basis to include a a plan for success, inclusive of pricing, plans for renewals and escalations, ect. You should have a plan in place to address each obstacle and a specific timeline for completiton. This needs to become evident with GSA Burlington, GPO, Dept of Education, HIB/Nish and Dept of Labor. When submitting prospects, these need to be detailed and we must be able to have a clear understanding of decision making process, ECT. Additionally, you know that pricing will be requested for contract and tender renewals. Please plan in advance so that we are not waiting until the date due to get pricing back. I realize that State of Florida took up a lot of time but you need to keep the communications flowing and building relationships with your other accounts. Account reviews should be done on all of your top accounts and I look forward to being included in these meetings. I liked the review presented to GSA Burlington in March. Pleas replicate this in your other accounts. Anthony ,you need to plan and be less reactive in the WWAM position.

EXHIBIT
13 Prater
M7 1-3-08

10/19/2004 11:45

3-286

Business travel is to be planned out in advance providing a monthly calendar on line to me and am committed to working closely with you for development in this area.

**Achievement Category for Objectives:**    Needs Improvement

**Objective 4:**    Communication/Contract Compliance 20%

**Performance Expectations:**    author,maintain and communicate a current Compass document for each customer and update strategies/plans as needed to meet customer/company requirements. Ensure Customer Contract Compliance is developed and maintained within current approved legal guidelines and satisfies internal audit requirements.

**Evaluation:**    Anthony you need to better plan for meeting contract deadlines. I realize that we need to ensure that RFQ's come out but you can begin to input the data into PRS before the bid comes out to ensure we have time for approvals. This will help you to be able to manage your other accounts as well.

Anthony , I'd also like better communications regarding accounts status such as GPO, and GSA. Because of the size and scope of the GSA Accounts, we truly need to keep our management updated and understand margins, the competition and value they add, any potential business at risk and a clear understanding of the opportunities. Should you know that we will have any challenges getting a contract or tender renewed, please work quickly on the renewal. Anthony, you understand the PRS process and do a good job working with pricing team so its important to plan so you are not rushed.

Anthony please respond on a timely basis to inquiries. Email and voice mail responses from internal and external customers need to be addressed completely and with a sense of urgency.

I appreciate your focus to addressing communications improvement.

**Achievement Category for Objectives:**    Needs Improvement

**Overall Evaluation for period:**    Needs Improvement                    **Status**    Closed

**Manager's Comments:**
I am excited to be a member GSA Sales Team and look forward to leading this talented team to overachieve the desired sales goals.

**Performance Planning Activities:**
Provide recommendations to improve specific areas of performance and/or knowledge, skills or abilities to be developed for future professional growth.

Anthony, I am committed to working with you on areas addressed above for improvement. We will work on this together on an Individual Development Plan to be reviewed quarterly.

Your contributions to the GSA team are very important and your are a valuable member of the team.

**I have reviewed this information with my manager:**    ☑

FedEx Services
8400 Ivylane 4th Floor
Greenbelt, MD 20770

Telephone 301-513-7219
Fax 301-982-2306



### INTER-OFFICE MEMORANDUM

Date:    September 13, 2004

To:   Anthony Prater

From:   Laurie I. Carson

cc:   Marilyn Thomas

RE:   **Letter of Counseling for Unacceptable Performance**

This letter is being provided as a written recap of our discussion regarding your performance on Monday, June 21, 2004 as well as follow-up of expectations sent to the GSA Government Sales Team.

A memo was sent to the GSA team specifically stating the requirements of the MBO's for Q4 FY04. This memo stated what documentation was required to demonstrate completion. Your MBO results were sent in on the incorrect format and incomplete as of June 8, 2004. I sent you an email to let you know and to specifically advise you which form to use and what information was requested.  The team received a reminder from me by email of what was due and a copy of the original MBO request form for Q4 FY04 on June 7, 2004.

Anthony, we met on Monday, June 21, 2004 as was requested to review the completed compass reports. At this time, we discussed the results of the PPE's for FY04 in which it was determined that your performance was  below expectations. I informed you again about reading email closely and paying attention to the MBO information in order for you to improve in this area immediately. I want you to receive credit for what you accomplish but it must be communicated and documented. We both agreed that you needed to work on improving the required administrative tasks of a Worldwide Account Manager. Assigned action items need to be complete, on time and accurate. Additionally, we discussed the need to have sound business strategies for the Government Agencies you are responsible for managing and to communicate these effectively to those who will be impacted. During this discussion, you stated that you agreed to the improvement and made a verbal commitment to addressing this deficiency.

The Q1 FY05 MBO requirements were sent out in email in June 30, 2004 and provided to each GSA Worldwide Account Managers again on July 26th. The memo specifically stated that all MBO results were due to my office on or before September 8, 2004. As of 9:00 AM on Friday, Sept 10, 2004, I did not see any MBO results from you and sent an email that morning asking if they were sent. Later that day when you came into the office, I asked you about the results that were due and you asked me "if anyone had given me any information for you". I replied that I did not receive anything that I was aware of but had checked off receiving from each WWAM on the team. Later that afternoon, I found a folder on my chair with some MBO results contained.

Finally, during all of our joint sales calls and one on one discussions, we have reviewed the importance of ensuring sound business strategies are communicated and to have a sense of urgency to carry them out. Anthony, you are on a team goal and our actions can have an impact on the success on the GSA team. I asked on several occasions for you to reach out to the Sales Professionals and the District Sales Managers in the State of Florida. While I realize that you worked hard to avoid this loss, we must have a plan, execute and keep everyone informed. On August 10, 2004, I sent to you via email a list of the Managers in the State of Florida. I also sent each of them with a copy into you an email letting them know that they would be hearing from you immediately. On August 12, I asked you for a list of the top Florida locations and your plans to address any potential losses and the impact of the decision of the State to award DHL this bid. On August 15th, I received a vague response and still no list of top locations. On August 16th I asked again for this list of top locations and some details as to how this strategy would be executed to be communicated to me before August 20th. On August 23, I still had not received and asked for some details on the information requested.  An email was sent to some of the District Sales Managers in the State of Florida stating the



3–138

situation as well as your strategy. However, this truly put the ownership on the Sales Professionals and the District Sales Managers in the State of Florida versus having a proactive list of top locations where you will be meeting with the decision makers and contacting the sales professionals to be formally engaged along with you as the lead.

After both verbal and email correspondence your performance was deficient based upon previously discussed expectations. Your actions have not demonstrated a commitment to improving performance of required activities of the Worldwide Account Manager position. During our meeting today, we will together develop an agreed to action plan with specific actions and time lines for completion.

***Please be advised that recurrent patterns of this performance will not be tolerated. A repeat of this or any other behavioral or performance problem may result in more severe disciplinary action up to and including termination.

Sincerely,

Laurie L Carson

By signing below, I signify that I have reviewed the contents of this letter with my manager and have received a copy for my records.

Employee Signature                                Date 9-13-04

3-139



**INTER-OFFICE MEMORANDUM**

**DATE:**  September 20, 2004                     **TO:**  Anthony Prater

**FROM:**  Laurie I. Carson                        **cc:**  Marilyn Thomas
                                                            Jim Wallace

**RE:**  Performance Planner

As we discussed on Monday, September 13, 2004, your job performance is not meeting the expectations of a Worldwide Account Manager. Your deficiencies were outlined in the documented counseling letter recently issued to you. In order to bring your performance up to an acceptable level, you have agreed to do the following:

- Immediate attention to updating all requirements for the quarterly MBO presented to the team.
- Respond in a timely manner to all action items that are requested. All responses are to be complete and accurate.
- All weekly entries of sales calls are to be completed on time in SAM and a minimum of five current opportunities to secure business are to be included and updated at a minimum of one time every two weeks.
- We will meet weekly for one hour on an agreed upon time and date to discuss your accounts, strategies to secure business and your plans to clearly execute with a definitive time line. Please come prepared with updates to address the accounts discussed the previous week and all action items completed.

We will meet again on October 11, 2004 to review your progress. If you have any questions or if there is anything that I can do to assist you, please let me know.

Sincerely,

Laurie I. Carson
Government Sales Manager
Worldwide Services
301-513-7219

By signing below, I signify that I have reviewed the contents of this letter with my manager and have received a copy for my records.

Employee Signature _____    Date _9-23-04_

EXHIBIT
15 Prater
MT 1-3-08

3-137

## Laurie Carson

**From:**    Anthony Prater
**Sent:**    Wednesday, November 10, 2004 5:01 PM
**To:**       Laurie Carson
**Subject:** RE: Follow-Up

Laurie,
Thanks for your positive feedback. I really appreciate it. I must say that I will truly miss having you as a manager. You are the best one yet and I really mean that. I knew when you got the job you would be spectacular and you have managed to surpass even that expectation. I can always depend on you whether I'm in a jam or just need someone to talk to. I hate that my personal life took a turn these past eleven months but I'll continue to work through somehow. Some of the money will be tied up in litigation for years but it will all work out for the best in the end. I no longer have to worry about my kids education or my retirement but I still enjoy working for FedEx even with the challenges.

I will continue to strive for excellence after your departure and get back to the Anthony of old. Thanks again for your patience and understanding.

A.P.

---

**From:** Laurie Carson
**Sent:** Tuesday, November 09, 2004 5:55 PM
**To:** Anthony Prater
**Cc:** Laurie Carson
**Subject:** Follow-Up

Anthony,

Thanks again for our meeting yesterday.
I believe that you have made improvement in the following areas and would like to commend you on your commitment.

* Reviewing Individual Development Plan and ensuring that you have specific activities to ensure that will assist you with working more closely with the team, closing business and ensuring solid strategies for long term relationships and business growth.

* Please continue to pay close attention to the MBO requirements and deadlines for submitting justifications. (Dec 8th for Q2)

* Your SAM calls have been in on time and you are meeting the required calls per week. Thanks for continued attention to updating your prospects and working to move them through the sales process.

* Finally, I am pleased with the improved communications and more timely follow-up to both internal and external customer requests.

Anthony, as we discussed, you have talent and I want to see you be successful.
Our meetings together have been productive and you seem to be genuinely focused improvement.
I am very encouraged by your recent improvement and am confident that you can and will continue to improve your job performance.

I look forward to our next follow-up meeting on 11/19.

Thank you,

11/15/2004

EXHIBIT
16 Prater
m2 1-3-08

Laurie

11/15/2004

*VERIFIED 10/18/2005 BY FL*

# FedEx.

### INTER-OFFICE MEMORANDUM

Date:   June 3, 2005
From:   Vincent Scarfo

To: Anthony Prater *# 70.380*
cc: Gurn Freeman
    Marilyn Thomas
    Jim Wallace
    HRIS Memphis

RE:   LETTER OF WARNING FOR PERFORMANCE

This letter is being provided as a written recap of our discussion regarding your performance on June 3, 2005.

On January 28, 1992 you received a letter of concern from Greg Andrusin regarding your lack of attention to detail to completing the AIMS system as instructed.  (Reference attached)

On September 13, 2004 you received from Laurie Carson a letter of counseling for unacceptable performance.  Documented in that letter was your inability to follow specific instructions as it relates to the use of FedEx tools; explicitly MBO forms.  Within that letter Ms. Carson informed you that there were two additional areas of concern she had, you did not complete the tasks required on the agreed upon date and you did an unacceptable job of keeping management informed on the state of Florida. (Reference attached)

Today's letter of warning for performance is due to your lack of attention to detail in handling GSA Burlington and on lack of completion of the software upgrade list.

> Your PRS submission for GSA on April 1, 2005 clearly did not include required dock labor. Thus, the consequence of this oversight on your part has cost us a great deal of man hours and potential lost business.  In addition, this oversight has tarnished our reputation with this customer. (Reference attached)

> On May 18, 2005 you did not complete the required update for software upgrades.  This lack of attention to detail also cost us man hours.  Internal region FedExers were forced to pick up your responsibility and complete the required report. (Reference attached)

Your recent lack of attention to detail is having a significant impact on your job performance and on your fellow FedExers.  I believe this is not the Anthony Prater I have come to know.  I desire to work with you and correct your current lack of attention to detail.  I included the above mentioned letter of concern from January 28, 1992 only to bring to your awareness that this is a skill set that you had once struggled with previously.  I am confident that your focus on this troubled skill set will once again turn you around as it has these past thirteen years.

\*\*\*Please be advised that recurrent patterns of this behavior will not be tolerated.  A repeat of this or any other behavioral or performance problem may result in more severe disciplinary action up to and including termination.

EXHIBIT
21 Prater
2012   1-3-08

2-11

Should you in good faith believe this action to be unfair, you should hold an open and frank discussion with me within three (3) days regarding any outstanding issues. If after our discussion, you continue to be dissatisfied and wish to enter the Explore Process, you must complete the form http://itdidevapo.peopleservices.fedex.com/hr/data/empinfoform.doc and submit it to (type director's name) within five (5) calendar days of this document date or within five (5) calendar days after our discussion. The policy may be accessed on the FedEx Intranet at http://itdidevapo.peopleservices.fedex.com/hr/level2.asp?id=0&id2=4200

Sincerely,


Vince Scarfo


By signing below, I signify that I have reviewed the contents of this letter with my manager and have received a copy for my records.

Employee Signature _____        Date __6-6-05__

**Anthony Prater (Anthony)**
WW Account Manager
FedEx ID: 72380

**FedEx**
Services

**PPE Print**

**Obj for:** 2005 06/01/2004 - B9181

**Purpose:** DEVELOPS AND MAINTAINS STRATEGIC PARTNERSHIPS WITH ASSIGNED WORLDWIDE ACCOUNTS. IDENTIFIES OPPORTUNITIES FOR ACCOUNT GROWTH WHILE OFFERING CUSTOMERS A FULL ARRAY OF VALUE ADDED SERVICES. MONITORS COMPETITOR ACTIONS IN EACH ACCOUNT TO ENSURE THAT APPROPRIATE RESPONSES ARE FORMULATED AND COMMUNICATED. PROVIDES INPUT INTO THE OVERALL ACCOUNT STRATEGY IN CONJUNCTION WITH THE WWS DIRECTOR AND IS RESPONSIBLE FOR THE EXECUTION OF THAT STRATEGY AT THE LOCAL LEVEL.

**Objective 1:**   Most Critical Objective/Grow Business 30%
**Performance Expectations:**   Meet or Exceed sales revenue goals for Express/Ground/International. Objectives measured by Dashboard performance and results of quarterly MBO's.
**Evaluation:**   Our Team did not our goal during any quarter of 2005

GSA Team
1st Qtr 2nd Qtr 3rd Qtr 4th Qtr
Air 95.52 95 97.38 93.27
Ground 110.41 106.19 84.22 92.61
Intl 102.46 110.38 110.9 130.28
Total 97.59 97.37 96.65 95.84

**Achievement Category for Objectives:**   Needs Improvement

**Objective 2:**   Personal Development 10%
**Performance Expectations:**   IDP/ Develop and execute the IDP as refected in the quarterly MBO results.

Complete Negotiations Training and any other required on/offline training in compliance with timelines.
**Evaluation:**   He has achieved
1st Qtr 2nd Qtr 3rd Qtr
12/25 25/25 0/10

Anthony your IDP is extremely important to your development and growth. You must turn this around in FY 06.

**Achievement Category for Objectives:**   Needs Improvement

**Objective 3:**   Cust External Comm/orientation/relationship buildi
**Performance Expectations:**   *Weighting 20%
*Minimum of 5 face to face calls per week.
*Mandatory face to face sales calls with top (5)five declining accounts monthly and top (5) five gainers quarterly.
*Minimum of 6 customer events as reflected in Quarterly MBO results
*Weekly input of Sales Calls and 5 current prospects/opportunities in SAM
*Customer Feedback Comments(written/oral)



EXHIBIT
22 Prater
1-3-08

**Evaluation:**    In the second Qtr he achieved 5/5 points for sales calls per week
SAMS Opportunities need to be kept current and opportunities must surpass shortfalls
Qtrly reviews are acceptable
You received a letter of counseling on Sept. 13, 2004 for lack of attention to detail
in completing your MBO tasks.

**Achievement Category for Objectives:**    Needs Improvement

**Objective 4:**    Internal Communications/Contract&Tender Compliance
**Performance Expectations:**    * weighting 20%
* All contracts/tenders to be renewed before expiration and the process to begin a min
of 60 days prior with PRS entry to meet expiration deadlines.
*Compass reports updated quarterly/complete and accurate and to include *negotiation
strategy: once think training is completed.
*Development and effective communication of sound business strategies of all
accounts responsible for managing
**Evaluation:**    He achieved the first Qtr 25/25 points for contract compliance
Anthony has not satisfactorily completes reports, accurately and timely in FY 05
Anthony needs to focus on his account strategies. His lack of including Dock Labor in
his April 2005 GSA Burlington PRS caused a great deal of FedEx man hours to correct
and lost potential revenues

**Achievement Category for Objectives:**    Needs Improvement

**Objective 5:**    Fiscal Responsibility 10%
**Performance Expectations:**    * Uses prudent judgment on travel and
entertainment, makes an effort to save money by using interline fares, reasonable
customer expenditures and ensures that we have appropriate ROI and justification for
expenses.
*Margin and Yield Management
*Manages to sell through surcharges or make revenue neutral adjustments
*Take negotiations beyond price
**Evaluation:**    While traveling, remember to work as efficiently and effectively as
possible. Stay focused on the mission of your trip and work hard to gain as much
success as possible.

**Achievement Category for Objectives:**    Achieved Expectations

**Objective 6:**    Incorporate 5 Pillars into Account Strategy 10%
**Performance Expectations:**    1. Global Reach: leverage international to gain other
revenue
2. Portfolio Strength: Selling other Opcos
3. Surgical/Bundled Pricing:
* Express and Ground bundled in contracts where possible
* Creative pricing to secure desired business from a customer

4. Customer Intimacy: collaborative relationship
5. Transportation Plus Logistics and Technology: electronic invoicing, leveraging supply
chain solutions, increase switching costs,
**Evaluation:**    He is focused on our Global Reach mission and works in conjunction
with Opcos to obtain the right business for FedEx. Working more closely with your
Opcos partners in FY 06, will bring you opportunities outside of our core business and
help you build customer loyalty.
**Achievement Category for Objectives:**    Achieved Expectations

**Overall Evaluation for period:** Needs Improvement

**Status:** Closed

## Manager's Comments:

Overall this was not a good year for your efforts. You have the skill set to be a very good government WWAM. You have proven yourself in the past and will prove yourself again in the future. Gain your focus and come out strong in FY 06.

## Performance Planning Activities:

Provide recommendations to improve specific areas of performance and/or knowledge, skills, or abilities to be developed for future professional growth

There are a number of key areas you should focus in on in FY06

Pay attention to detail-complete all assignment on time and accurately

Take ownership of your accounts-get to know your customers. Know what they do, how they do it and why they process the way they do. Proactively find solutions for them. When challenges arise, own the problem through completion.

Take ownership of your actions- be proud of who you are. Make sure the work you do reflects the professional that you are.

Be strategic in your efforts-have a defined purpose for your actions, don't just go through the motions.

**I have reviewed this information with my manager:**    ☑

**INTER-OFFICE MEMORANDUM**

Date:   June 7, 2005
To:     Vincent Scarfo
From:   Anthony Prater

cc:  Gum Freeman
     Marilyn Thomas
     Jim Wallace

**RE:   PERFORMANCE PLANNER**

As we discussed today, my job performance is not meeting the expectations of a
Worldwide Sales Manager. My deficiencies were outlined in the **LETTER OF
WARNING** recently issued. In order to bring my performance up to an acceptable level,
I have agreed to do the following:

> **Complete All Assigned Tasks**
> An example would be to complete SAMS, Accurately and on Time.
> **Take Ownership of Responsibilities**
> Take ownership of delegate work responsibilities more effectively.
> Hold myself accountable to those tasks I am required to complete.
> **Improve Communication**
> Voicemails/emails responded to all, completely and accurately.

We will meet at 8:30am on the first Friday of each of the next 3 months to review your
progress. We will use tools such as e-mail, Compass/GPS, SAMS, PRS, Corporate
Reports, etc. as monitoring tools to assist us at improving your business acumen.
Assuming that through our joint efforts you have achieved the desired outcome, then we
will no long use this formal review process to monitor your progress. If in the event you
do not meet our agreed upon outcome, then we will move to the next level of progressive
disciple.

Sincerely,

Anthony Prater
Worldwide Government Services Manager
301.513.7219

EXHIBIT
23 Prater
MP 1-308

By signing below, I signify that I have reviewed the contents of this letter with my
manager and have received a copy for my records.

2-13

**Vincent Scarfo**

| | |
|---|---|
| From: | Anthony Prater |
| Sent: | Monday, July 25, 2005 10:28 AM |
| To: | John Presper; David Steele; SCOTT BRUMBAUGH; Scott Ray; John Cameron |
| Cc: | Vincent Scarfo; MICHAEL DEVAULT |
| Subject: | GSA WELDERS |

*REACTIVE E-MAIL SHOULD HAVE BEEN ON TOP OF THIS*

John, Dave,
I was under the understanding the welders were to be at GSA last Wednesday then again on Friday. What happened? They want to give us the third line but can't until we can get the workstations installed. UPS has already vacated the line. If the welders couldn't make it, they should have contacted you or the customer, Mark Dooley. Can someone please let me know whats going on. We're severely at risk with this account and something needs to happen today.

Anthony
-----Original Message-----
From: mark.dooley@gsa.gov [mailto:mark.dooley@gsa.gov]
Sent: Monday, July 25, 2005 9:20 AM
To: Anthony Prater; Vincent Scarfo
Cc: tom.swenticky@gsa.gov
Subject:

Anthony / Vince,

The FedEx welders that were supposed to be here last Wednesday (cancelled) who were supposed to be here Friday (no show, no call) have now compromised the installation of the computers this week because the conveyor lines aren't ready.

You guys are in serious jeopardy of my having to ask your competitor to stay. Something needs to happen today or tomorrow or my hands are tied.
I have to protect the integrity of the facility and insure that our freight keeps moving in a reliable manner. You're not showing us that right now.

Mark A. Dooley
*******************************************
Traffic Manager
GSA Global Supply
Eastern Distribution Center
Ph.  (609) 499-7005    DSN 650-3362
Fax (609) 499-4904
*******************************************
GSA Global Supply:  Safe.  Simple.  Global.  Guaranteed.

EXHIBIT
25 - Prater
mjr 1-3-08

1

3-1109

## *VERIFIED 9/27/2005 BY FL*

INTER-OFFICE MEMORANDUM

Date:   September 16, 2005
From:   Vincent Scarfo

To: Anthony Prater 介绍380
cc:  Gurn Freeman
     Jim Wallace
     HRIS Memphis

RE:   LETTER OF WARNING FOR UNACCEPTABLE PERFORMANCE

This letter is being provided as a written recap of our discussion over the last two weeks regarding your unacceptable performance.

On September 13, 2004 you received from Laurie Carson a letter of counseling for unacceptable performance. Documented in that letter was your inability to follow specific instructions as it relates to the use of FedEx tools; explicitly MBO forms. Within that letter Ms. Carson informed you that there were two additional areas of concern. First, that you did not complete the tasks required on the agreed upon date and secondly that you did an unacceptable job of keeping management informed on the state of Florida.

On June 3, 2005 you received from me a letter of warning for performance that specifically addressed your lack of attention to detail in performing your basic job responsibilities as they related to Government Services Administration (GSA) Burlington.

For the last two consecutive years you have received an overall evaluation on your PPE of Needs Improvement.

For at least the last five consecutive quarters you have not achieved your business plan. The last two quarters you have been in the last place position in the Ranking and Rating of your fellow GSA team members.

On week ending September 3, 2005 you appeared on the ORL delinquent report with an error recorded thus demonstrating a lack of attention to detail. On August 31, 2005 you successfully completed 90 days of error free performance while working under a Performance Planner dated June 7, 2005.

Today's letter of warning for unacceptable performance is due to your unacceptable performance in your role of Government Worldwide Account Manager. This notice is to inform you that over the remainder of the second quarter fiscal year 2006 you will be held to the highest standard of your job performance. During the remainder of the quarter you will achieve the following:

Zero ORL errors
Zero late tender input
Zero late PRS input
Zero PRS errors caused by Anthony

100% completion of GPS by the end of Sept. 05
Minimum of 5 prospects in your pipeline throughout the second qtr fy06
Minimum of 5 customer calls per week
Minimum of $2,000 closed business in the second qtr fy06

100% attainment of goal in each of the following
Express
Ground
International



If you fail to achieve any of these elements during the quarter, you will be recommended for termination.

During our face to face meetings on September 6, 2005 we discussed your unacceptable performance and that if you were interested in remaining a member of FedEx that you must commit to significant improvement as articulated in the above paragraphs.

Our telephone conversation on September 8, 2005 revealed that you want to remain a FedEx employee and specifically you felt that you had the training, the tools and the skill set to perform your job as a FedEx Government Worldwide Account Manager in an acceptable manner.

On September 12, 2005 we met face to face and I reviewed with you the level of expectation FedEx and I have of you in order to continue your employment. I provided you in writing the above elements which you must achieve to remain employed by FedEx. I explained to you for the second time that failure to achieve any of the agreed upon elements would result in your termination. Today we will finalize your agreed upon action planner that will include specific required actions and time lines for completion.

**\*\*\*Please be advised that recurrent patterns of this behavior will not be tolerated. A repeat of this or any other behavioral or performance problem will result in termination.**

Should you in good faith believe this action to be unfair, you should hold an open and frank discussion with me within three (3) days regarding any outstanding issues. If after our discussion, you continue to be dissatisfied and wish to enter the Explore Process, you must complete the form http://itddevapp.peopleservices.fedex.com/hr/data/empinfoform.doc and submit it to __(type director's name)__ within five (5) calendar days of this document date or within five (5) calendar days after our discussion. The policy may be accessed on the FedEx Intranet at http://itddevapp.peopleservices.fedex.com/hr/level2.asp?id=0&id2=4200

Sincerely,

Vince Scarfo

By signing below, I signify that I have reviewed the contents of this letter with my manager and have received a copy for my records.

Employee Signature _____        Date 9-16-05

**From:**    Anthony Prater
**Sent:**    Monday, October 17, 2005 7:03 AM
**To:**      Vincent Scarfo
**Cc:**      Gurn Freeman
**Subject:** RE: Review of today's meeting

Thanks for the positive feedback Vince. I will continue to work towards getting things back on track within my territory starting with the engagement of the CVT team, Florida newsletter by Monday etc. and continuing with the other items outlined within the Business Plan with specific dates for completion. I do feel this and other strategy sessions were very beneficial, and developing a solid plan was the first step.
I will definitely think through and develop a strategy for each opportunity using the SMART criteria as a guide. Again, thank you for your time and effort. I really appreciate it I look forward to our follow-up session.

Anthony

---

**From:** Vincent Scarfo
**Sent:** Wednesday, October 12, 2005 8:54 PM
**To:** Anthony Prater
**Subject:** Review of today's meeting

Anthony,
   I would like to provide you my assessment of today's meeting. First, let me thank you for taking the time to go through this process. You have been quite professional and understanding throughout this challenging process. Although at times I have articulated that I feel we have not always been on the same page, I appreciate your efforts.

I also want to commend you for recognizing that you have strayed from the responsibilities of the WWAM position over the year. You explained that you have gotten away from the day to day task that originally brought you to success and I think the first step in improvement is to take ownership of the problem. Lastly, I want to say thank you for your kind words towards Gurn and I. You told us that you are very grateful for the time we have spent with you and that you have learned a great deal. You went on to say that you felt your fellow teammates would benefit from a thorough individual business plan redesign as you and I have performed and I think you are right. I am going to make the time to conduct business plan strategy sessions with our partners. I will share best practices with all as we go through the development.

Your business plan review yesterday was good. I could see your efforts and that you spent time to develop a solid plan. Now you must take that high-level plan and develop action steps. Think through each element that you identified as an opportunity and write a solid plan for each. Use the SMART criteria we discussed in our meeting.

Specific
Measurable
Action oriented
Realistic
Time bound



Develop your action plans both for your weekly repetitive activities and then a plan for those elements that are not repetitive. I will be glad to review them and give you my opinion to your plans. I think once we

agree to your plans, then I would like you to provide me a weekly update to where you are to your plan. I will develop a specific reporting worksheet and ask that you provide me copies so I can monitor your progress.

Getting you back on track is one of my top priorities. We have invested a great deal of valuable time over the last few months and I hope you are finding it beneficial.

Thanks for a good meeting today. Thanks for providing me the data I was looking for. I look forward to seeing your action items and next steps.

See you next week,
Vince

## Vincent Scarfo

**From:** Anthony Prater
**Sent:** Friday, October 28, 2005 11:02 PM
**To:** Vincent Scarfo
**Subject:** RE: Action Steps

Hello Vince,
Per my voice mail, today was too soon for me to get this to you but I will have something for your review by Monday morning. I've been trying to clean up NARA and NASA with billing issues before I officially hand these accounts over to Linda. I had to submit PRS requests, etc, and this was very time consuming.

Anthony

---

**From:** Vincent Scarfo
**Sent:** Monday, October 24, 2005 9:20 PM
**To:** Anthony Prater
**Subject:** RE: Action Steps

Good evening Anthony,

Over the weekend I reviewed your action steps in detail. I am sorry to say, but you have fallen short of what I expect of you. In my October 12th e-mail I articulated : Now you must take that high-level plan and develop action steps. Think through each element that you identified as an opportunity and write a solid plan for each. Use the SMART criteria we discussed in our meeting. You did identify some of the repetitive and non-repetitive activities, but once again there is no plan. With that being said, I do like some of your efforts and think that elements, such as weekly reviews of your decliners that you are committing to is a good start. However, you committed to using the SMART criteria and in doing so you should answer questions in your action step like, how will you keep track of your weekly phone calls? What are you hoping to accomplish by making these calls? When are you going to start working with inside sales to make decliner calls for you? Who is making the calls for you? How are they going to log the calls for you? Don't get me wrong, I like the idea, but once again I find that you are describing a macro level approach.

I want you to provide me a detailed action plan/business plan. I need you to demonstrate to me through your work efforts that you desire to remain in the position of a government WWAM. Provide for me your new plan by Friday. If Friday is too soon with your workload this week, then please let me know what a more realistic time table might be for you. As you progress on your action items, I will check in with you once and a while and see where I can help. I am also pleased to see that you like my idea to use the green-bar report as a lead source. However I am disappointed that your action plan, other then checking the newspaper for leads, consists only of the ideas I provided you. As a WWAM, you must find ways to make your business plan. You must be creative and find new ways to be successful if your current method isn't working.

In my opinion, the remainder of what you have captured as a business plan is strategic enough in its approach to turn around your short comings. The remainder lacks specifics, accountability and anticipated results. Also, there is nothing new in using your calendar and Blackberry; this is not different from what you currently do today. The only element that is remotely new is communicating with inside sales to identify opportunities. You asked for my review of your plan and I feel that what you have provided as a business plan is not close to what you must develop to meet your objectives. You have not captured specific tasks that you can perform to be successful. Remember Gurn's comments about developing specific strategies that you will do to get back on plan.

Let me be specific. I want your business plan to include answers to questions such as: How short are you to your plan? How will you make your plan by product? What wins do you anticipate to bring in next week, the week after that and so on? Which international, express and ground accounts are you working on? What's the strategy for each account? What are your targeted closed dates? Will these new wins be enough to meet your plan? If not, what will you do? How will you retain the business you have? How are you prospecting for new opportunities? What might you do that is new to your current working habits to win business? Might you work more closely with Technology? Might you ask your fellow government sales partners in the other OPCO's for leads?

11/21/2005

EXHIBIT

37 Prater

mg  1-3-08

I am willing to accept your plan in phases, but I am requesting a solid start this week. As a WWAM, you should be able to identify your short comings, develop a solid business plan and implement it. If you fall short of your goal, then you must demonstrate that you are working hard to develop a new direction to meet your plan. You have not done this and thus I conclude that you're not committed to performing your job in a satisfactory manor. You continue to demonstrate business as usual. In the last two years you have two separate managers tell you in your annual PPE reviews that your WWAM job performance has been unacceptable. I find that you are able to perform your job responsibilities in an acceptable manner if I direct you with specific instructions, then you carry out those tasks satisfactorily. However, when you are left on your own to perform the responsibilities of a WWAM you have not been able to self motivate to complete your job at an acceptable level.

Please demonstrate to me that you do have the desire to do your job and that you are fully committed to your responsibilities as a WWAM. Prove this to me with your written business plan and more importantly in your actions. You are part of a successful team. We are striving hard to create new ways to meet and exceed our plan. Your teammates, FedEx and I are counting on you. Please put your best effort forth and let us move to happier days.

Thanks,
Vince

---

**From:** Anthony Prater
**Sent:** Wednesday, October 19, 2005 11:52 PM
**To:** Vincent Scarfo
**Subject:** Action Steps

Attached are the action steps as promised. Please advise on any improvements or suggestions that I might need to make. I've provided you the overall Strategy in my territory Business Plan. These action steps will provide more detailed information on the day to day, week to week tactics I will use to make plan.

Thanks,
Anthony

11/21/2005

**FedEx** Services

**INTER-OFFICE MEMORANDUM**
Date: January 3, 2006

To: Anthony Prater
From: Vincent Scarfo

cc: Gurn Freeman
Jim Wallace
HRIS

RE:    LETTER OF TERMINATION FOR PERFORMANCE

This letter is being provided as a written recap of our discussion today, regarding your performance over the past two and a half years.

Since May 2003 your performance has been documented as needs improvement. For two and a half years you have been unable to perform at a continues acceptable level. Over the last six months I, Gurn Freeman and yourself have worked intensely to improve your performance. However, when provided empowerment your performance falls below and acceptable level.

6.02.04 PPB Review Needs Improvement
6.01.05 PPB Review  Needs Improvement
9.13.04 Letter of Counseling for Unacceptable Performance
6.03.05 Letter of Warning for Performance
9.16.05 Letter of Warning for Unacceptable Performance

**Please be advised that your employment is being terminated as of January 3, 2006 due to your performance deficiencies.**

Should you in good faith believe this action to be unfair, you should hold an open and frank discussion with me within three (3) calendar days regarding any outstanding issues. If after our discussion, you continue to be dissatisfied and wish to enter the EXPLORE process, you must complete the attached Employee Information Statement and submit it to DIRECTORS NAME within five (5) calendar days of this document date o within five (5) calendar days after our discussion. The policy is attached for your convenience.

Sincerely,

Vincent Scarfo
U.S. Worldwide Services Manager

EXHIBIT
39 Prater
1-3-08

By signing below, I signify that I have reviewed the contents of this letter with my manager and have received a copy for my records.

Employee Signature _____    Date 1-3-0 6

FedEx Services HR Employee Relations
Form Effective 08/29/05

1    2-2

Exhibit B

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF COLUMBIA

3

4

5    ANTHONY PRATER,                    )

                                        )

6                        Plaintiff,     )

                                        )

7       vs.                             )    Case No. 1:07-cv-00022

                                        )

8    FEDEX CORPORATE SERVICES, INC.,    )

                                        )

9                        Defendant.     )

     _____)

10

11

12              DEPOSITION OF LAURIE I. CARSON

13                Taken on Friday, May 9, 2008

14                      At 8:04 a.m.

15            At the offices of Depo International

16                   517 South Ninth Street

17                    Las Vegas, Nevada

18

19

20

21                      *ORIGINAL*

22

23

24

25    Reported by:  Ellen A. Goldstein, CCR 829

REPORTER'S CERTIFICATE

1

2

3

4        I, Ellen A. Goldstein, a duly certified court reporter
5    in and for the County of Clark, State of Nevada, do hereby
6    certify:
7        That I reported the taking of the deposition of the
8    witness, LAURIE I. CARSON, at the time and place aforesaid;
9        That prior to being examined, the witness was by me
10   duly sworn to testify to the truth, the whole truth and nothing
11   but the truth;
12       That the witness requested to read and sign the
13   transcript herewith;
14       That I thereafter transcribed my said shorthand notes
15   into typewriting and that the typewritten transcript of said
16   deposition is a complete, true and accurate transcription of my
17   said shorthand notes taken down at said time.
18       I further certify that I am not a relative or employee
19   of an attorney or counsel of any of the parties, nor a relative
20   or employee of any attorney or counsel involved in said action,
21   nor a person financially interested in the action.
22       IN WITNESS THEREOF, I have hereunto set my hand in the
23   County of Clark, State of Nevada, this 29th day of May 2008.
24
25       Ellen A. Goldstein, CCR No. 829

1    exhibit and let me ask you if you can tell me what that page

2    is.

3        A    This is a letter of recommendation to John

4    Middlebrooks stating that I was recommending Anthony for the

5    job as a corporate account manager.

6        Q    And did you draft this letter?

7        A    Yes.

8        Q    Okay.  How do you recognize it?

9        A    It's my signature.

10    MR. GABEL:  I'll offer this exhibit at this time.

11        Q    And I'll ask you, what is Anthony Prater's race?

12        A    African American.

13        Q    Did his race play any part in your decision on whether

14    or not you would recommend him for this position?

15        A    No.

16        Q    Did Mr. Prater get the job that he applied for?

17        A    Yes, he did.

18        Q    And did you consider that a promotion?

19        A    Yes, I did.

20        Q    How was the job he applied for different from the job

21    that he had in 2000 reporting to you?

22        A    Well, the corporate account manager position --

23    there's a lot more financial or fiscal responsibility.  It's

24    working on a team with a team goal or team revenue goal.  The

25    size and scope of the -- and complexities of the accounts are

14

```
 1     just huge and they're really really impactful to the entire

 2     district.  So how those accounts do can have a direct

 3     reflection of how a district does because of the volume and

 4     size.

 5        Q     This is the job he was going to?

 6        A     Correct.

 7        Q     You said he was part of a team or a team goal.  Do you

 8     remember what team it was he was going to?

 9        A     Well, he was going to the government sales team and

10     there was this civilian agency group under John.

11        Q     What did that team do?

12        A     That team was responsible for all of the civilian

13     agencies, not the DOD, and several of the states, I think about

14     40 of the state accounts -- no, about 29 state accounts.  So

15     they were responsible for renewing contracts, renewing tenders,

16     building the relationships and securing business and keeping

17     the business that we already had.

18        Q     Now, at the time that he moved to that team, did you

19     cease to be his supervisor at that point?

20        A     Yes.

21        Q     Did you ever come to supervise Mr. Prater again during

22     your career?

23        A     Yes, I did.

24        Q     When was that?

25        A     When I accepted a promotion to work with the
```

1    government sales team as their manager.

2        Q    So you eventually became the manager of that team he

3    had promoted to?

4        A    Correct.

5        Q    He was still in the same role at that point?

6        A    Yes, he was.

7        Q    Once you became the manager of that team, did you

8    interact with Mr. Prater?

9        A    Yes, on a regular basis.  I interacted with all of

10   them.  That was my way.  First of all I had to understand and

11   learn the business and I -- while I knew a lot, the team

12   members were the experts.  You know, Anthony had his accounts

13   and had the closest relationship to, you know, what was going

14   on and what the opportunities were and what the risks and all

15   of those things were.  So of course I worked with them to gain

16   insights into the account but also to coach and focus on what's

17   next for our team so that we could be successful.

18       Q    How often would you interact with Mr. Prater as the --

19   when you were the manager of the government sales team?

20       A    I definitely had at least one conference call a week.

21   I would say a couple times a week.  Anthony was in and out of

22   the office.  He worked a lot with the various staff members,

23   Gay Cook and Maxine Ames, who were the support staff in our

24   office because there were a lot of contracts and things going

25   on and tender renewals and just a variety of things.  So he was

1    in it to be a part of his success and that -- you know, "Come

2    to me so that I can work with you."  I did have formal coaching

3    sessions and I did meet with all of the account executives

4    regularly.

5        Q    Did FedEx Services give a formal evaluation to the

6    sales reps on the sales team?

7        A    Yes.  That was required to be done annually and we

8    actually moved to a new program that year from -- we moved to a

9    different type of performance review and, yes, I did do a

10   performance review on each account rep.  I mean it was a

11   requirement.

12       Q    And you did one on Mr. Prater?

13       A    Yes, I did.

14       Q    I'm going to show you what has previously been marked

15   as Exhibit No. 2 to your deposition and also was marked as

16   Exhibit 13 to Mr. Prater's deposition and I'm going to ask you

17   if you can tell me what this document is.

18       A    This document was called -- I think it was called PPE

19   and this particular document is "Anthony Prater, worldwide

20   account manager," and it's a performance review that -- on

21   specific categories that were determined by the worldwide sales

22   organization and our government account team as far as

23   measuring and stating specific required results.

24       Q    This appears to be a printout of an on-line or

25   computerized form.

1    A    Exactly.

2    Q    Did you have to input information into that form?

3    A    Yeah, we had to input the information.  We typed in

4    initially, you know, what the performance expectations were --

5    you know, for each account rep they were all the same -- and

6    then, you know, what the actual performance expectations or

7    what the actual results were and then, as a result, what the

8    evaluation looked like.

9    Q    Does this document contain what you input regarding

10    Mr. Prater's performance?

11    A    Yes.

12    MR. GABEL:  Okay.  I'll offer this exhibit.

13    Q    I see that this document is broken down into separate

14    objectives, and objective 1 has -- appears to be to "meet or

15    exceed revenue growth year over year for the following," and

16    down below that it says "Achievement for Category Objectives:

17    Needs improvement."  Did you decide whether the achievement

18    level was "needs improvement"?

19    A    Well, I decided it based on the numerical results.

20    There were specific expectations for revenue growth year over

21    year, to meet or exceed specific revenue growth that was

22    determined by our organization and then really the worldwide

23    sales group; and the results were -- for example, "needs

24    improvement" was because he fell short and didn't hit those

25    specific results.

1    Q    Did you have other options you could put there as far

2    as the level of achievement for a particular category?

3    A    Yeah.  There's "meets expectations" -- "achieved

4    expectations," "exceeds expectations" and "needs improvement."

5    Q    So you really had three options?

6    A    Yes.

7    Q    For objective 1 you put that he needed improvement?

8    A    Correct.

9    Q    Then for objective 2 you said that he achieved

10   expectations?

11   A    Exactly, because based on the results that were

12   measurable, he achieved expectations.

13   Q    Okay.  Objective 3 appears to have a lot more

14   evaluation discussion than the first two objectives.  It's

15   entitled "Customer orientation/relationship building," and then

16   the -- under the evaluation there's a paragraph that goes over

17   to the next page.  Is that information that you would have

18   input?

19   A    Yes.

20   Q    What do you recall being your views or opinion with

21   respect to what Mr. Prater was doing under the objective 3

22   category?

23   A    Under objective 3 this was about visiting accounts,

24   you know, meeting with them on a regular basis, you know, the

25   frequency and building the relationship that would allow for us

 1    to grow -- you know, to find, keep and grow business; and in

 2    this evaluation, one of the things that's really critical is

 3    when you -- you know, when you're in an account you gain

 4    valuable insights into the decisionmaking process, the

 5    strategic goals and plans of, one, the government

 6    organizations, how their decisions are made, when they're made,

 7    what their budget is.  What role does a carrier, meaning FedEx,

 8    play and how do we get to grow with them so that we can grow

 9    the business, you know, keep what we have and then grow

10    whatever opportunities are there.

11           And what's really important is to have something

12    completed called a compass report.  Those were required.

13    Basically it's sort of an internal road map for the accounts:

14    Who are the decisionmakers, how do they make decisions, and a

15    lot of basic information about the account and it's sort of a

16    working document.  It changes on a regular basis.  It's fluid

17    based on where you move and grow to the account.

18           And in a lot of these instances my recollection is

19    that we didn't have complete compass reports or we didn't have

20    updated compass reports from Anthony to address, you know,

21    where do we stand with the account?  What's going on?  How do

22    we grow with them?  What are their hot points?  Who else do

23    they use, all of the things that are really critical for myself

24    at the time and the rest of management to have a clear

25    understanding of where we are with the account, what kind of

1    relationship, you know, to really know, do we have any at-risk

2    points?  Do we have some huge opportunities?

3        Q    Okay.  Down about I guess midway through the paragraph

4    there's an all capital ECT, or I guess abbreviation for

5    "et cetera," and then the next sentence says, "Additionally,

6    you know that pricing will be requested for contract and tender

7    renewals.  Please plan in advance so that we are not waiting

8    till the date due to get pricing back."  What does that mean?

9        A    For example, if -- the process -- there was a process

10   and procedure for pricing, and Anthony was actually really good

11   at doing it.  I mean he understood the process and also had a

12   lot of good support too with our office staff, but he knew it.

13           But what happens is we were in a reaction mode.  You

14   know, these accounts are huge and in order to get the process

15   rolling you've got to sort of be -- plan in advance, anticipate

16   what's going on and by having that customer orientation and

17   knowing when tenders are due or when you have certain

18   deadlines.  We were waiting until sometimes the last possible

19   minute to input data, to go through the approval process at

20   FedEx, and that sometimes takes a while to get all those

21   approvals.  You have to have several different buy-offs from

22   pricing management, sales management, et cetera.  So we were

23   sort of behind in -- not being proactive.  We were reacting

24   like, "Okay, something's due.  Okay, we'll put it in" instead

25   of saying, "I know this is coming up."

22

1    Q    You say, "We were waiting until the last minute" and

2    "We were not being proactive."  Whose responsibility would it

3    have been to start the ball rolling on these --

4    A    Anthony.  He's the account manager.  He's responsible

5    for those accounts and, you know, I -- we did set up something

6    internally that was a reminder.  We always had things in place

7    to sort of say, "Guess what?  This is coming up, it's coming

8    up," but ultimately it was each WAM's responsibility to hit

9    those deadlines and know what's coming up and know when tenders

10   are going to be renewed and what -- you know, what deadlines

11   are coming up for each account.

12   Q    How would it --

13   MS. FARBER:  Excuse me.  I don't mean to interrupt.  This

14   is Mindy.  I just want to let you know that Mr. Prater has just

15   come in.

16   MR. GABEL:  Okay.

17   MS. FARBER:  So he's now in my office and I wanted to make

18   note of that.

19   MR. GABEL:  Okay.

20   MS. FARBER:  Sorry.  I apologize.

21   MR. GABEL:  No problem.

22   Q    How would it impact the business if someone waited

23   till the last minute to start inputting this pricing or

24   contract-renewal information?

25   A    Well, it's -- first of all we're missing deadlines.

1   Secondly, we're out of compliance, contract compliance, if we

2   don't hit those numbers and, secondly, it's money to the

3   company.  Let's say we're having a rate increase or something

4   is supposed to be done.  It can be money to the client because

5   they're paying more or paying less.  So it doesn't work from an

6   accounting standpoint.  You know, if you have certain deadlines

7   and time frames when an account is supposed to start or a

8   pricing program is supposed to begin, it can cause, you know --

9   it can cause -- I'm trying to remember what -- like an invoice

10  adjustment on either side so that you're -- so that you're

11  billing appropriately based on the dates and agreed-to tender

12  pricing.

13      Q    And on the second page of this review it has

14  "Achievement Category for Objectives."  Did you -- what

15  achievement rate or rating did you give him for that particular

16  objective on his performance review?

17      A    "Needs improvement."

18      Q    Did Mr. --

19      MS. FARBER:  Mr. Gable, I'm sorry.  Are you on the second

20  page of --

21      MR. GABEL:  I'm on -- it's the second page of the

22  performance review marked Exhibit 13 to Mr. Prater's

23  deposition.

24      MS. FARBER:  You're now on the second page of that?

25      MR. GABEL:  Yes.  It should be Bates stamp 3-287 at the

24

```
 1   bottom.

 2       MS. FARBER:  Okay, very good.  From this end it was

 3   slightly hard to follow, but now I see it.  Thank you.

 4       MR. GABEL:  Okay.

 5       Q    So from that objective 3 where you graded him as a

 6   "needs improvement," did his race impact or play any role in

 7   the grade that you gave him on that objective?

 8       A    No.

 9       Q    Objective 4 on this performance review is

10   "Communication/contract compliance," and again in the

11   discussion you say -- I guess in the last sentence of that --

12   "Anthony, you understand the PRS process and do a good job

13   working with pricing team, so it's important to plan so you are

14   not rushed."  What does that mean?

15       A    Well, in order to -- you know, there is a process to

16   go through the pricing program, and without -- if you're not

17   proactive and knowing what's going on in the account and

18   anticipating where to move and having a strategic plan in place

19   and deadlines to hit, then you run the risk of not getting the

20   pricing approved on the time frame that we need in order to hit

21   the deadlines.  So it was about preplanning and being proactive

22   versus reactive and knowing what's going on in the account by

23   communicating effectively and also communicating upward so that

24   everyone is clear on what the status is so that we can really

25   be a support.
```

1    Q    I guess in the fourth line down under the bold

2    "Evaluation" it says, "Anthony, I'd like better communications

3    regarding account status such as GPO and GSA."  Did you have

4    any issues with his communications regarding account status?

5    A    Yeah.  We weren't -- I didn't always get the -- an

6    updated version.  He had great relationships in those accounts,

7    but they were very large and so there was always a big risk of

8    not knowing what's going on.  So, yes, I was constantly being

9    asked, because of the size of those accounts, how we were

10   doing, what's the opportunity, you know, what's at risk

11   potentially, those types of questions.

12   Q    By whom?

13   A    By my management.

14        So, you know, I had to defer to Anthony because really

15   he's the expert.  He's the manager.  He's the owner of those

16   accounts.  He has the established relationships and the

17   responsibility for growing that business.  So really it was

18   about communicating effectively so that I could move things up

19   and also being support should he need me at any given moment.

20   Q    Three lines from the bottom of that evaluation it

21   says, "Anthony, please respond on a timely basis to inquiries."

22   Did you have any issues with his response to inquiries on a

23   timely basis?

24   A    Yes, I did.  You know, eventually he'd get back to me,

25   but I would have to ask multiple times in some instances.

26

1       Q    And what did you rate down overall under objective 4

2  in this performance review?

3       A    "Needs improvement."

4       Q    Did his race impact or play any role in that rating?

5       A    No.

6       Q    What was his overall score or evaluation for this

7  performance review?

8       A    "Needs improvement."

9       Q    And again did his race play any role or impact your

10  overall evaluation of his performance at that point?

11      A    No.

12      Q    Was there any sort of -- what was the impact of -- on

13  a sales rep or WAM's career of getting a "needs improvement" on

14  their performance review like this?

15      A    Typically when there's a "needs improvement," the

16  manager and the employee should put -- work together on some

17  type of performance planner.  You know, together they will work

18  through the areas that need improvement.  So that's what was

19  done in this particular instance.

20      Q    Did you attempt to coach Mr. Prater on the areas where

21  you thought he needed to improve?

22      A    Absolutely.

23      Q    How did he respond to your attempts to coach him?

24      A    He was open to it.  We would meet on a regular basis.

25  Actually I believe we met once a week.  I would have specific

1    time mapped out that we would review and go over what was going

2    on in his top accounts -- actually all of his accounts -- you

3    know, what areas I could support with, what areas the company

4    could better support him with, you know, what did he need from

5    us and then what was his plan, like how did he plan to move

6    forward.  What was his strategic ideas and then what kind of

7    roadmap were we going to build together so that he could get

8    there, such as updating compass reports, et cetera.

9         Q    Okay.  Did you ever issue any sort of formal

10   discipline to Mr. Prater during the time you supervised him?

11        A    I believe there was a letter.

12        Q    Okay.  Let me show you what has previously been marked

13   as Exhibit 3 to your deposition and was marked as Exhibit 14 to

14   Mr. Prater's deposition and I'm going to ask you if you can

15   tell me what this document is.

16        A    It's a letter of counseling for unacceptable

17   performance.

18        Q    And is this something that you would have drafted?

19        A    Yes.

20        Q    How do you recognize it?

21        A    I recognize it from both the content as well as my

22   signature at the bottom.

23        Q    And when did you draft this?

24        A    September 13th, 2004.

25        Q    Was that during the period you were supervising

1    Mr. Prater on the government sales team?

2        A    Yes.

3        MR. GABEL:  I'll offer this exhibit.

4        Q    And I'll ask you what this is exactly.

5        A    Okay.  Basically this was done based on the MBOs, or

6    the Management by Objectives, for that quarter.

7        Q    What is an MBO?

8        A    Well, they call them "Management by Objective" and

9    basically what it is is it was a team goal, okay, a team

10   financial responsibility; and everybody played -- had a

11   contributing role and there were specific milestones or things

12   to hit that it was decided each account rep would handle based

13   on their specific type of account.  So it was a little bit

14   subjective in terms of being mindful of what was possible in

15   each one of the accounts and it was holding each team member

16   accountable for, you know, hitting those objectives to get the

17   shared variable compensation payout, and it was responsibility

18   of the account executives or the WAM to provide the information

19   that was requested to everybody by a certain time frame in

20   order to input that data in the system and also to send it in

21   to compensation so that -- for payouts.

22       Q    And did Mr. Prater provide the information by the time

23   it was requested?

24       A    No.  They weren't sent in -- they were sent in

25   incorrectly and incomplete and then they weren't, you know, a

1    hundred percent.  So then I sent him an E-mail to let him know

2    specifically what form to use and the information that was

3    requested and then I'd send out a reminder to the team of when

4    it was due and a copy of the original MBO so that everybody was

5    clear on what I was requesting, and -- on June 7th.

6        Q    Had there been any additional -- I guess down in the

7    third paragraph of this -- I'm sorry, the fourth paragraph of

8    this counseling letter it talks about "The Q1 FY05 MBO

9    requirements were sent out in E-mail in June 30th, 2004 and

10   provided to each GSA worldwide account managers again on

11   July 26th.  The memo specifically stated that all MBO results

12   were due to my office on or before September 8, 2004.  As of

13   9:00 a.m. on Friday September 10th, 2004 I did not see any MBO

14   results from you and sent an E-mail that morning asking if they

15   were sent.  Later that day when you come in the office I asked

16   you about the results that were due and you asked me if anyone

17   had given me any information for you."

18           Does all that accurately reflect what had transpired

19   with regard to that?

20       A    Yeah.

21       Q    Was that a separate request for information from the

22   one you were talking about in June?

23       A    Yeah.  The first one was for the fourth quarter when I

24   was just coming on board, you know, and then the next one or --

25   yeah, the next one or the third paragraph then I think I was

```
 1    doing this chronologically.  So the first was the MBOs for the

 2    fourth quarter; then the second request was about compass

 3    reports and updating of information; and then the third

 4    paragraph, to answer your question, was a specific -- it was

 5    the next time it was due.

 6              The next quarter we also had the same memo and the

 7    same request and the same information being requested -- not

 8    the exact same.  I'm sure we could make some updates or

 9    et cetera from the quarter, but everybody on the team was

10    requested to provide this information by a specific period of

11    time.

12        Q    And did Mr. Prater do that?

13        A    Eventually they did come in, but at the time I was

14    prompted to have to ask him again "Where are they" because we

15    didn't have them and I wanted him to have credit for it.

16        Q    Now, in the -- I guess the third paragraph of this

17    counseling letter, midway through that paragraph you say, "We

18    both agreed that you needed to work on improving the required

19    administrative tasks of a worldwide account manager."

20              Do you recall Mr. Prater acknowledging to you that he

21    had room for improvement in his attention to administrative

22    tasks?

23        A    Yes.

24        Q    The last paragraph of this counseling letter indicates

25    that -- I guess the bottom paragraph of the first page says
```

1    that, "Finally, during all of our joint sales calls and

2    one-on-one discussions, we have reviewed the importance of

3    ensuring sound business strategies that are communicated and to

4    have a sense of urgency to carry them out" and talks about the

5    fact that "Anthony, you're on a team goal and our actions can

6    have an impact on the success of GSA team," and it goes on to

7    discuss some requests for information related to the state of

8    Florida.

9          Do you remember if Mr. Prater had any responsibility

10   related to the state of Florida?

11   A    Yes.  He was responsible for that particular account

12   and renewing the contract with them.

13   Q    And what do you recall happening with the state of

14   Florida?

15   A    I remember in the state of Florida Anthony worked

16   diligently and was really engaged in the process.  It was

17   really a large responsibility and I remember a lot of his

18   attention going towards that.  Ultimately we did not -- we

19   didn't renew or we didn't win the bid --

20   Q    So --

21   A    -- to the best of my recollection, so there was a

22   big --

23   Q    So FedEx lost the business of the state of Florida?

24   A    Uh-huh, and it would -- eventually would migrate

25   little by little; and the big piece there was keeping people

32

```
 1    informed who would -- 'cause that's a huge impact to a

 2    district.  So what was really important and something that

 3    needed to be done was that he was to communicate effectively

 4    with the managers and the sales reps in the area to see where

 5    we could possibly keep some business and to understand what the

 6    impact was of volume, et cetera, because it impacted the

 7    operations group as well as just numbers.

 8        Q    Did you have issues with his communications?

 9        A    Yeah.  Initially I was engaged a lot communicating

10    with the other managers and keeping information flowing.  You

11    know, it was just -- it was large in scope and the

12    responsibility was there to keep everybody informed of like the

13    top locations, what they were going to potentially lose and

14    what was our strategy to move forward with those accounts.

15        Q    Had you specifically asked Anthony for that type of

16    information?

17        A    Yes.

18        Q    And did he fail to give you a detailed response to

19    your request?

20        A    In that time, yes, uh-huh, because really at the end

21    of the day he was the one that was responsible, had the most

22    understanding and the relationships with the decisionmakers and

23    understanding what realistically could stay with the company

24    and what realistically would move.

25        Q    Why did you feel like you needed to issue this letter
```

1    of counseling to Mr. Prater?

2        A    Because I cared about -- and I care about -- Anthony,

3    how Anthony does in his position, and I know that he has

4    great -- he has great abilities to manage accounts and it had

5    been demonstrated before; but what I saw was inconsistent

6    behavior or just not responding and I wanted to be a part of

7    his success and I wanted to make sure that -- these are things

8    that can be corrected.  You know, these weren't things where

9    it's abilities.  These were choices of just not doing it or

10   focused on something else and, you know, it was my

11   responsibility to coach him and -- so that he could improve so

12   that he had acceptable or -- you know, achieved or overachieved

13   expectations on his next performance review because he chose to

14   address the areas that were deficient.

15       Q    Did his race play any role in your decision to issue

16   him a letter of counseling?

17       A    No.

18       Q    Now, when an employee received a letter of counseling,

19   was there any sort of formal process that would be triggered as

20   far as the coaching of that employee?

21       A    Yes.  In this instance I put together a performance

22   planner so that together we could work on areas that weren't

23   working and determine how we could best improve his performance

24   in each area so that the next performance review would have,

25   you know, acceptable or above-average results.

40

1    Q    The first time you managed him?

2    A    The first time I managed him and then coming into the

3    new position as the worldwide account manager and then directly

4    managing Anthony.  While the size and the scope of the accounts

5    were much larger, he did appear to be like stressed and that he

6    had a lot on his plate.

7        MS. FARBER:  He appeared what?  I'm sorry, I couldn't hear

8    that.

9        THE WITNESS:  I'm sorry.  He appeared to be stressed, a

10    little stressed out.

11        MS. FARBER:  Stressed out, okay.  I'm sorry, I hadn't heard

12    that.  I apologize.

13    BY MR. GABEL:

14    Q    Did other account managers on the government sales

15    team have a lot on their plate?

16    A    I mean as far as the sales -- I mean the

17    responsibility of each account rep, yes, everyone had a lot.

18    It's a challenging position.

19    Q    Were there nonAfrican American members of the sales

20    team who had a lot on their plate?

21    A    Absolutely, everyone.

22    Q    In this E-mail to you, Mr. Prater said that he would

23    continue to strive for excellence after your departure and get

24    back to the Anthony of old.  What did you interpret him to be

25    referring to as far as "the Anthony of old"?

Exhibit C

```
 1            IN THE UNITED STATES DISTRICT COURT

 2

     - - - - - - - - - - - - - - x
 3   ANTHONY PRATER,                :
                                    :
 4            Plaintiff             :
                                    :
 5        v.                        :   Case No.
                                    :   1:07-cv-00022
 6   FEDEX CORPORATE SERVICES,      :
     INC.                           :
 7                                  :
              Defendant             :
 8                                  :
     - - - - - - - - - - - - - - x
 9
                              May 14, 2008
10                            Washington, D.C.

11   Deposition of

12                    GAIL D. ALLEN

13   a witness, called for examination by counsel for the

14   defendant, pursuant to notice, held at the offices of

15   Bradford Associates, 1050 17th Street, N.W,  Suite

16   600, Washington, D.C., beginning at 2 p.m., before

17   Frances M. Freeman, a Notary Public in and for the

18   District of Columbia, when were present on behalf of

19   the respective parties:

20

21

22                    ORIGINAL
```

84

## CERTIFICATE OF NOTARY PUBLIC

1

2    I, Frances M. Freeman, the officer before whom

3    the foregoing deposition was taken, do hereby certify

4    that the witness whose testimony appears herein was

5    duly sworn by me; that the testimony of said witness

6    was taken by me in shorthand and this transcript typed

7    under my direction; that said transcript is a true

8    record of the testimony given by said witness; that I

9    am neither counsel for, related to, nor employed by

10   any of the parties to the action in which this

11   deposition was taken; and, further, that I am not a

12   relative or employee of any attorney or counsel

13   retained by the parties hereto, nor financially or

14   otherwise interested in the outcome of the action.

15

16   *Frances M Freeman*

17          Notary Public in and for the

18          District of Columbia

19

20   My commission expires:

21   June 30, 2010

34

```
1        Q    What did she say that was a compliment on his

2   attire?

3        A    She thought he was well dressed, well

4   groomed.

5        Q    Can you think of any other comments that we

6   haven't discussed that you heard from Marilyn Thomas

7   that you would assign some sort of racial motivation

8   to?

9        A    I can't think of any other unfavorable

10  remarks.

11       Q    You mentioned that she complimented Mr.

12  Prater's attire.  Did you ever hear her compliment Mr.

13  Prater in any other way?

14       A    She commented on his vehicle when she went on

15  a sales call with him.

16       Q    What did she say about that?

17       A    She indicated that he had a very nice car and

18  perhaps she was paying him too much money.

19       Q    Do you recall what kind of car he had?

20       A    I believe it was a BMW.

21       Q    Did she say anything else?

22       A    She indicated that he served her chilled
```

1   water and that his vehicle cost more than hers.  And

2   that's when she indicated perhaps she was paying him

3   too much money.

4        Q    Did she seem to be joking about that?

5        A    Yes, she did.

6        Q    Now, your next immediate supervisor after

7   Marilyn was Gurn Freeman.  Is that correct?

8        A    Yes.

9        Q    Did Mr. Freeman ever have an opportunity to

10  give you a performance review?

11       A    Yes.

12       Q    Did he say that you -- at some point, the

13  performance review scheme has changed?

14       A    Yes, it has.

15       Q    At one point there was a scale of 1 to 4.

16  Correct?

17       A    Yes.

18       Q    And then they went to a new review where your

19  options are either Needs Improvement, Achieved

20  Expectations or Exceeded  Expectations.  Is that

21  correct?

22       A    That's correct.

Exhibit D

COPY                                    1

1          IN THE UNITED STATES DISTRICT COURT
2             FOR THE DISTRICT OF COLUMBIA

3
          ------------------x
4                           :
   ANTHONY PRATER          :
5                           :
          Plaintiff        :
6                           :    Civil Action No.
          v.                :    1:07-CV-00022 (RBW)
7                           :
   FED EX CORPORATE        :
8  SERVS., INC.            :
                            :
9         Defendant        :
                            :
10        ------------------x

11                      Rockville, Maryland
                        April 30, 2008
12
   Deposition of:
13

14                  VINCENT SCARFO,

15  called for oral examination by counsel for

16  Plaintiff, pursuant to notice, at the offices

17  of Farber Legal, LLC, 11300 Rockville Pike,

18  Suite 808, Rockville, Maryland, before Zev V.

19  Feder, CSR, a Notary Public in and for the

20  State of Maryland, beginning at 10:15 a.m.,

21  when were present on behalf of the respective

22  parties:

                  FEDER REPORTING COMPANY
            (202) 863-0000    (800) 956-8996

1          CERTIFICATE OF NOTARY PUBLIC

2                    I, Zev V. Feder, the officer

3     before whom the foregoing deposition was

4     taken, do hereby certify that the witness,

5     whose testimony appears in the foregoing

6     deposition, was duly sworn by me; that the

7     testimony of said witness was taken by me in

8     shorthand and thereafter reduced to computer

9     type under my direction; that said deposition

10    is a true record of the testimony given by

11    said witness; that I am neither counsel for,

12    related to, nor employed by any of the parties

13    to which this deposition was taken; and

14    further, that I am not a relative or employee

15    of any attorney or counsel employed by the

16    parties hereto, nor financially or otherwise

17    interested in the outcome of the action.

18

19                        _____

                          Notary Public in and for
20                        The State of Maryland

21    My Commission Expires:
      September 1, 2008
22

                 FEDER REPORTING COMPANY
             (202) 863-0000    (800) 956-8996

1    today that would make it difficult for you to

2    speak or to think clearly?

3         A.    No, ma'am.

4         Q.    You feel like you are in good

5    shape at this point?

6         A.    Yes.

7         Q.    If, as I said, if there is

8    anything that you need repeated or clarified,

9    please let me know.

10          We will start off by asking you

11    what your position is currently.

12       A.    I am a U.S. Government services

13    manager for FedEx.

14       Q.    How long have you been doing that?

15       A.    Since April 1, 2005.

16       Q.    What brought you to this

17    employment in April of 2005?

18       A.    FedEx had a void in this position

19    and they were looking for someone to fulfill

20    it.

21       Q.    How did you know that?

22       A.    I sat on a nonprofit board with

1    thought they wanted to develop as management,

2    they would give them the opportunity of

3    evaluating positions within the organization.

4        Q.    What was the final position you

5    had with UPS?

6        A.    I was a worldwide government

7    manager for them.

8        Q.    Is that equivalent to what you are

9    doing now?

10       A.    To some respect.  I also had

11   responsibilities for individual agencies,

12   myself, as well.

13       Q.    What agencies?

14       A.    Mostly the civilian agencies.  For

15   example, like a GSA, a Department of Labor,

16   you know.

17       Q.    So if you were doing somewhat the

18   same job that you are doing now, why did you

19   move to FedEx?

20       A.    Mainly culturally.  FedEx, in my

21   opinion, values the Government much different

22   than what UPS does.  UPS sort of treats the

13

1    Federal Government as just another customer.

2    FedEx, Fred Smith, who is our CEO, has a real

3    desire to assist the Federal Government in as

4    many capacities as we possibly can.

5                    So, from my perspective -- I had

6    spent three years while at UPS, two and-a-half

7    to three years while at UPS, on loan to the

8    United Way of America.  While there I kind of

9    collected a salary but yet was doing good for

10   the community, as well.  That's kind of the

11   way I feel about working with the Government

12   is, at the end of the day, I am still able to

13   feed my family but yet I did a little

14   something good for the country.  Fred's

15   philosophy is pretty strong on assistance of

16   government.  So it was a good fit for me.

17         Q.    When you left UPS what were you

18   earning?

19         A.    About 125, 130, I would say.

20         Q.    And when you went to FedEx did

21   they increase your salary or decrease your

22   salary?

19

1          A.     No, ma'am.

2          Q.     So the one you spoke to about your

3    new job was Ms. Thomas?

4          A.     Ms. Thomas and Mr. Freeman.

5          Q.     Did they tell you, I take it, who

6    you would be working with?

7          A.     Yes, ma'am.

8          Q.     What did they tell you, if you can

9    recall?

10         A.     They told me the names of the

11   people that I didn't already know.  I pretty

12   much knew everyone on FedEx's team prior to

13   coming to FedEx.

14         Q.     Did you know Mr. Prater?

15         A.     Yes.

16         Q.     How did you know him?

17         A.     I would say AP and I knew each

18   other for probably two or three years prior to

19   me coming to FedEx.

20         Q.     How is that?

21         A.     The same kind of deal.  We would

22   see each other at different forums and expos

                FEDER REPORTING COMPANY
          (202) 863-0000    (800) 956-8996

20

1    and things of that nature.

2         Q.    Did you have any impression of him

3    in those two to three years before you came to

4    work directly with him?

5         A.    Yes.

6         Q.    What was your impression before

7    you came to work with him?

8         A.    I very much liked him.  I would

9    say that we formed a very good friendship.

10        Q.    Friendship because of the similar

11   things you were doing?

12        A.    Yes, ma'am.

13        Q.    Did you have any opportunity to

14   observe what he was doing professionally?

15        A.    No, ma'am.

16        Q.    So when you said you came to like

17   him, it was a personal, personality --

18        A.    Yes.  I would say.  We had -- we,

19   needless to say, couldn't really discuss

20   business at hand because we were on two

21   different sides of the table.  But, you know,

22   just like I articulated this morning about

21

1    Ms. Doan (phonetic) resigning, I mean, that

2    would be a subject matter both of us could

3    chat about.  We couldn't really go into

4    specifics about customers or things of that

5    nature.  I would say more on a personal.

6            Q.    When you, I guess, learned that

7    you would be supervising -- is that a fair

8    word to use -- Mr. Prater?

9            A.    Yes.

10           Q.    Did you have any preconceived

11   notions of what that would involve?

12           A.    I don't believe so, other than I

13   knew him personally and thought we had a

14   pretty good relationship going, starting off.

15           Q.    Did Ms. Thomas say anything about

16   her perceptions of Mr. Prater when you first

17   came on board?

18           A.    Ms. Thomas -- Marilyn went through

19   each folder of each worldwide account manager

20   with me.  From that perspective, yes.

21           Q.    Do you remember her saying

22   anything negative about him?

1      A.    I would say the only things that

2   were negative were what was in his folder at

3   the time.

4      Q.    What was negative in the folder,

5   that you recall?

6      A.    Two past warning letters.  One

7   from quite a while ago.  One from Laurie,

8   which happened within the year prior to me

9   coming.  And then we have this thing called

10   PP, performance.  It is a performance

11   measurement.  It is the tool by which we hold

12   ourselves accountable.  He had a "needs

13   improvement" the year prior to me coming,

14   which was not a good thing.

15      Q.    The one you said, one of them was

16   from a long time ago, what do you mean by

17   that?  Do you mean years and years ago?

18      A.    Yes.  We keep, obviously, employee

19   records, and something as severe as a letter

20   of warning would be kept in the file, I guess,

21   indefinitely.

22      Q.    Do you have any letters of warning

23

1    right now in your file?

2          A.    No, ma'am, I do not.

3          Q.    And she shared those documents

4    with you?

5          A.    Yes.

6          Q.    And did she comment on those

7    documents at all?

8          A.    Not to the best of my knowledge.

9    I mean, other than going through them with me.

10         Q.    Well, did she say those documents

11   were posing a real problem for Mr. Prater, or

12   something of that nature?

13         A.    I would say that -- I am going off

14   memory but I would say that she probably

15   discussed that, you know, Anthony probably

16   needs some help here; he is in a bad spot with

17   a warning letter and a needs improvement

18   within the same year.

19         Q.    Do you recall that or are you

20   speculating that she said that?

21         A.    I am speculating.

22         Q.    So she may not have said that?

24

1          A.    She may not.

2          Q.    When you saw those documents did

3    she conversely, or do you recall if she

4    conversely, said something very positive about

5    Mr. Prater, or if not very positive, positive?

6          A.    I would have to assume so.

7          Q.    Did she say that Mr. Prater was on

8    his last legs with FedEx because of those

9    documents?

10          A.    Not to the best of my knowledge.

11          Q.    I assume if she said something

12    like that, you would have recalled that?

13          A.    I would hope.

14          Q.    You said she probably said

15    something positive.  Do you know why you said

16    that?

17          A.    Anthony is a very likable man.

18    So, I mean, you know, I mean, I would say from

19    that perspective, yes.  I am sure -- I am

20    speculating.  I would say that.

21          Q.    When you got the records of

22    employees, as we have just been discussing,

1    like Mr. Prater, I assume you have got the

2    records of everybody else that you would be

3    working with, too.

4         A.    Yes, ma'am.

5         Q.    She wasn't just focusing on

6    Mr. Prater at the time?

7         A.    No, ma'am.

8         Q.    When you went through the records

9    of other people, did you note any documents

10   that were negative in other people's files?

11        A.    I believe so.

12        Q.    Do you recall who those people

13   were?

14        A.    I think Monica Fleischmann had a

15   letter of concern, not a warning letter.

16        Q.    What is the difference between a

17   letter of concern and a warning?

18        A.    FedEx has a process of progressive

19   discipline, and a letter of concern is

20   predominantly like a first kind of warning.

21        Q.    So she had at least a letter of

22   concern.  Did anyone else that you recall

1    in one area and shine in everything else?

2        A.    You could, yes.

3        Q.    If you shine in other things, can

4    that neutralize, so to speak, the needs

5    improvement?

6        A.    Yes, ma'am.

7        Q.    Does that happen sometimes with

8    people you work with?

9        A.    Yes, ma'am.

10        Q.    Will you sometimes give a needs

11    improvement and then give, at the same time,

12    very laudatory things about other areas they

13    are doing?

14        A.    I don't understand your question.

15        Q.    Can someone get a needs

16    improvement and, at the same time, get very

17    praiseworthy components, as well?

18        A.    On the document, itself, let's say

19    for the sake of argument there are six

20    categories, and there are three elements to

21    each category.  There is a needs improvement,

22    there is an achieved, or there is an exceeds

1    improvement.  You potentially could have an

2    exceeds improvement in one particular area, an

3    achieved on four other areas, and then a needs

4    improvement on the last.  Then there is an

5    overall rating based upon all six of those

6    elements.

7            Q.    So if you do very well in some

8    areas and get a needs improvement in one area,

9    that may still not impede you from getting a

10   bonus or from being viewed as a very plus kind

11   of person.  Is that correct?

12           A.    That's correct.

13           Q.    Are there people that you work

14   with that will sometimes get needs improvement

15   in one area, and very praiseworthy comments in

16   other areas?

17           A.    Yes, ma'am.

18           Q.    Would that be all of your

19   employees at this time?

20           A.    That potentially could be -- can

21   you rephrase that question?

22           Q.    Do you have employees working for

1    you right now where you have given a needs

2    improvement in one area but very praiseworthy

3    things in other areas at the same time?

4         A.    I believe that to be true.

5         Q.    Is that fairly common with your

6    employees?

7         A.    It is not fairly common but it

8    could happen.

9         Q.    Has it happened?

10         A.    I believe it has happened.

11         Q.    Did those include some of the

12    employees that you value fairly reasonably?

13         A.    Yes.

14         Q.    So if I opened up, let's say,

15    everybody's file right now, if they were all

16    on this table, of people working for you, it

17    would not surprise you to see a number of

18    needs improvement for some of these people?

19         A.    I don't know if I would say a

20    number but it wouldn't surprise me if, over

21    the course of -- if each person has eight --

22    it wouldn't surprise me to see a needs

1    improvement on a couple of them.

2         Q.    Half?

3         A.    I would not say half.

4         Q.    But a few?

5         A.    But a few, yes.

6         Q.    And those could include people

7    whose jobs are not in jeopardy?

8         A.    Yes.

9         Q.    If Mr. Prater had a needs

10   improvement when you first came in, could that

11   include him, as well, that he had a needs

12   improvement but he also had some very

13   praiseworthy elements, as well?

14        A.    I think you are talking about two

15   different things.  Here is what I think you

16   are talking about.  In Anthony's circumstance,

17   on his PPE, his overall rating, when you total

18   all eight elements up, was a needs

19   improvement.  I would tell you that none of my

20   employees have an overall rating of needs

21   improvement.

22             We have focused in on one of them

68

1    PRS would have already been submitted some

2    time ago, prior to this date.

3           Q.    So you think that this is well

4    after the problem had already been put in

5    place?

6           A.    That would be my assumption, yes,

7    ma'am.

8           Q.    Why is that your assumption?

9           A.    Because the main problem that took

10   place here -- this is all cleanup to needing

11   manpower on the dock.  Where AP went wrong was

12   he didn't communicate to FedEx through this

13   PRS process that we need to cost in employees

14   on this dock.  Therefore, FedEx never costed

15   employees on this dock.

16          Q.    Costed FedEx employees or any

17   employees?

18          A.    Well, even the temporary service,

19   I assume, FedEx was paying for.  So any

20   employees.

21          Q.    So what you are saying is that the

22   number he priced didn't include manpower and

69

1     that's where this all fell short?

2          A.    Yes, ma'am.  I believe that to be

3     the case.

4          Q.    Whether the manpower was

5     internally staffed or manpower from FedEx

6     didn't matter?

7          A.    Right.

8          Q.    According to what you are saying?

9          A.    Right.

10         Q.    And this was all after the fact?

11         A.    Yes, ma'am.

12         Q.    So that when you say, "Who

13    approved the temps in the first place, where

14    is that in writing, this is a rush, Anthony,"

15    what were you trying to do at that point?

16         A.    I was trying to do the same thing,

17    satisfy this customer's needs.  AP had --

18    actually, I don't know whether he promised.  I

19    don't know if he just communicated.  I don't

20    know how it came to be that the customer

21    believed that we were going to put manpower on

22    the dock.  But since the agreement was, I

1    Q.    One of the things your team was

2    graded on, was it volume you brought in?

3    A.    Back then it was revenue we

4    brought in.

5    Q.    So regardless of whether it was a

6    profitable deal or not, the fact that it was a

7    big deal still had some positive aspects to

8    it.  Correct?

9    A.    Correct.

10    Q.    You talked about the business plan

11    and goal from Memphis.  Does every WWAM on

12    your team have the same goal?

13    A.    No.

14    Q.    Why not?

15    A.    Because every worldwide account

16    manager has a different territory so one may

17    have significantly higher revenues than

18    another WWAM may have.  I don't know how the

19    business plan is written.  I have never

20    written one at FedEx.  But each WWAM's

21    territory is different and --

22    Q.    Is each WWAM given a revenue goal

214

1    in these various buckets of ground,

2    international, express?

3         A.    Yes.

4         Q.    Are they scored on what percentage

5    of that goal they bring in in some way?

6         A.    Percentage, percentage to goal is

7    the way they were noted, yes.

8         Q.    Where does that goal come from?

9         A.    Memphis.

10        Q.    Who determines what percentage of

11   that goal they achieved?

12        A.    The WWAM does.

13        Q.    Where do you get the numbers

14   saying this person got 90 percent of their

15   goal, this person got 105 percent of their

16   goal?

17        A.    Those numbers come from Memphis

18   based on the billed revenue from that customer

19   base.

20        Q.    Would a WWAM who had a goal of

21   $10 million and who achieved 110 percent of

22   their goal be considered better or worse than

1    a WWAM who had a goal of $20 million but only

2    achieved 80 percent of their goal?

3         A.    Better.  The WWAM that did 110

4    percent did better.

5         Q.    Even though their goal was less?

6         A.    Correct.

7         Q.    So it is not the total number they

8    are dealing with.  It is their percentage of

9    achievement of that goal that they have been

10   assigned?

11        A.    Correct.

12             MR. GABEL:  I have no further

13   questions.

14             MS. FARBER:  We are done for

15   today.

16             (Discussion off the record.)

17             MR. GABEL:  We waive signature.

18             (By stipulation of counsel, in the

19   presence of the witness, reading and signature

20   waived.)

21             (Whereupon, at 3:00 p.m., the

22   deposition was concluded.)

Exhibit E

COPY
1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
------------------x
                  :
ANTHONY PRATER    :
                  :
      Plaintiff :
                  :   Civil Action No.
      v.          :   1:07-CV-00022 (RBW)
                  :
FED EX CORPORATE :
SERVS., INC.      :
                  :
      Defendant :
                  :
------------------x
```

Rockville, Maryland
Thursday, May 15, 2008

Deposition of:


BARBARA J. GAMBLE

called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the offices

of Farber Legal, LLC, 11300 Rockville Pike,

Suite 808, Rockville, Maryland, before

Renee A. Feder, a Notary Public in and for the

State of Maryland, beginning at 9:34 a.m.,

when were present on behalf of the respective

parties:

FEDER REPORTING COMPANY
(202) 863-0000    (800) 956-8996

193

1          CERTIFICATE OF NOTARY PUBLIC

2                    I, Renee A. Feder, the officer

3     before whom the foregoing deposition was

4     taken, do hereby certify that the witness,

5     whose testimony appears in the foregoing

6     deposition, was duly sworn by me; that the

7     testimony of said witness was taken by me in

8     shorthand and thereafter reduced to computer

9     type under my direction; that said deposition

10    is a true record of the testimony given by

11    said witness; that I am neither counsel for,

12    related to, nor employed by any of the parties

13    to which this deposition was taken; and

14    further, that I am not a relative or employee

15    of any attorney or counsel employed by the

16    parties hereto, nor financially or otherwise

17    interested in the outcome of the action.

18

19                    _____

                      Notary Public in and for
20                    The State of Maryland

21    My Commission Expires:
      September 1, 2008
22

                  FEDER REPORTING COMPANY
              (202) 863-0000    (800) 956-8996

65

1    Q.    So you would have had no

2    opportunity to know whether that was a

3    justified warning or not?

4    A.    No.

5    Q.    Did Mr. Prater talk to you about

6    it?

7    A.    We didn't talk directly about it,

8    but I had heard about it.

9    Q.    Who did you hear about it from?

10   A.    I think office staff.

11   Q.    Do you think Mr. Prater -- and I

12   started to ask you before -- Mr. Prater's

13   termination was in part motivated by racial

14   bias?

15   A.    I think so.  I was personally told

16   that he was, Vince was there to clean up the

17   team, clean house.

18   Q.    Who told that?

19   A.    Vince did.

20   Q.    Vince told you that he had been

21   hired to clean house?

22   A.    Yes.

66

1       Q.      But did that remark suggest that

2   there was a racial bias?

3       A.      I know he was, like I said, on me

4   and Anthony a lot.

5       Q.      Were there other African American

6   employees that were working under him at that

7   time?

8       A.      Yes.

9       Q.      Who besides you and Anthony, who

10  would there have been once Mr. Scarfo came in?

11      A.      Maxine, Lillian, Calvin, myself,

12  Anthony.

13      Q.      Was he on Maxine a lot or Lillian

14  or Calvin?

15      A.      No.  I don't think he talked to

16  Maxine that much.

17      Q.      He didn't talk to her that much at

18  all?

19      A.      I don't think so, from what I can

20  remember.

21      Q.      Did Maxine ever talk to you about

22  Vince being on her a lot, bothering her or

FEDER REPORTING COMPANY
(202) 863-0000      (800) 956-8996

68

1      Q.    Who was that?

2      A.    Rod.

3      Q.    And that was something that

4  Lillian brought up?

5      A.    I think it just came up in a

6  conversation we were talking about it.

7      Q.    Did Lillian tell you that

8  Mr. Scarfo treated her differently?

9      A.    No.

10     Q.    Did Calvin ever talk about that?

11     A.    No.

12     Q.    Do you know what ORL, do you call

13  them, what ORL reports are?

14     A.    Yes.

15     Q.    What are they?

16     A.    They are the reports that we put

17  into the system weekly.

18     Q.    Were you given training for that?

19     A.    I don't believe so.  I think it is

20  something we just talked about on an

21  conference call, how to go in and put your

22  numbers and stuff in.

FEDER REPORTING COMPANY
(202) 863-0000    (800) 956-8996

1    since your conversation with Jean Miller?

2         A.    It all related.  Yes, pretty much

3    so.

4         Q.    Now, Vince Scarfo has had an

5    opportunity to review your performance since

6    he has been your boss.  Correct?

7         A.    Yes.

8         Q.    Has he ever given you a needs

9    improvement on your performance review?

10        A.    Yes, he did.  And we discussed it

11   and it was changed.

12        Q.    At the end of the day have you got

13   achieved expectations from Vince on your

14   overall score?

15        A.    Yes.

16        Q.    And that is on all of the reviews

17   he has given you?

18        A.    Pretty much, yes.

19        Q.    Has he ever given you an exceeded

20   expectations?

21        A.    Yes.

22        Q.    Other than the warning letter

Exhibit F

COPY                                          1

1          IN THE UNITED STATES DISTRICT COURT
2             FOR THE DISTRICT OF COLUMBIA

3
        ------------------x
4                         :
   ANTHONY PRATER     :
5                         :
           Plaintiff :
6                         :   Civil Action No.
           v.         :   1:07-CV-00022 (RBW)
7                         :
   FED EX CORPORATE :
8   SERVS., INC.      :
                         :
9           Defendant :
                         :
10      ------------------x

11                        Washington, D.C.
                         March 26, 2008
12
   Deposition of:
13

14              GURN H. FREEMAN,

15   called for oral examination by counsel for

16   Plaintiff, pursuant to notice, at 1101

17   Pennsylvania Avenue, N.W., Suite 600,

18   Washington, D.C., before Lynell C.S. Abbott, a

19   Notary Public in and for the State of

20   Maryland, beginning at 1:01 p.m., when were

21   present on behalf of the respective parties:

22

            FEDER REPORTING COMPANY
        (202) 863-0000    (800) 956-8996

124

1          CERTIFICATE OF NOTARY PUBLIC

2                    I, Lynell C.S. Abbott, the officer

3     before whom the foregoing deposition was

4     taken, do hereby certify that the witness,

5     whose testimony appears in the foregoing

6     deposition, was duly sworn by me; that the

7     testimony of said witness was taken by me in

8     shorthand and thereafter reduced to computer

9     type under my direction; that said deposition

10    is a true record of the testimony given by

11    said witness; that I am neither counsel for,

12    related to, nor employed by any of the parties

13    to which this deposition was taken; and

14    further, that I am not a relative or employee

15    of any attorney or counsel employed by the

16    parties hereto, nor financially or otherwise

17    interested in the outcome of the action.

18

19                            _____

                              Notary Public in and for
20                            The District of Columbia

21    My Commission Expires:
      April 30, 2012
22

                    FEDER REPORTING COMPANY
            (202) 863-0000    (800) 956-8996

31

1    calls, that kind of information.

2         Q.    Do you remember where -- let me

3    back up a minute.  Were other employees in

4    those quarterly periods who were working along

5    with Mr. Prater, were any of them also given

6    performance improvement plans or some kind of

7    warning or negative evaluation like Mr. Prater

8    eventually was?

9         A.    Yes.

10        Q.    Do you recall who those people

11   might be?

12        A.    Not that this would be the entire

13   list.

14        Q.    I understand.

15        A.    But I know one in particular, yes.

16        Q.    Could you name me the one in

17   particular?

18        A.    Yes.  Kelly Rogers.

19        Q.    And Kelly Rogers was given a

20   Performance Improvement Plan?

21        A.    He was.

22        Q.    And what happened to Kelly Rogers?

FEDER REPORTING COMPANY
(202) 863-0000    (800) 956-8996

32

1          A.    His performance deficiencies

2    subsequently led to his termination.

3          Q.    Do you remember when he was

4    terminated compared to Mr. Prater?

5          A.    I really don't remember the date

6    at all.

7          Q.    Do you remember anyone beside

8    Kelly Rogers at the same time that you decided

9    Mr. Prater was having problems?

10         A.    I do not remember.

11         Q.    Do you remember any employees who

12   you judged to be having performance problems

13   who were not terminated?

14         A.    Not specifically.

15         Q.    So you and Mr. Scarfo concluded

16   that Mr. Prater was not meeting his objectives

17   starting around 2005.  Would that be a fair

18   statement?

19         A.    Yes.

20         Q.    And you concluded that he was

21   falling short on revenue growth?

22         A.    That was one of the indices.  It's

39

1    time.

2         A.    (Nodding.)

3         Q.    Okay.  Do you know what would

4    account for someone who had been there 17 or

5    18 years suddenly becoming so deficient?

6         A.    No.  That would vary greatly by

7    employee if there were similar cases.

8         Q.    Did anyone ever sit down and

9    specifically look at the case of Mr. Prater

10   because specifically he had been there so

11   long?

12        A.    Yes.

13        Q.    Let me ask you:  Do you remember

14   how long Kelly Rogers was there?

15        A.    Another long-term employee.

16        Q.    So one of the issues that you were

17   concerned about was how long he had been

18   there?

19        A.    Always.

20        Q.    When I say he, I mean Mr. Prater,

21   not Mr. Rogers at this point.

22        A.    That's always a consideration.

54

1          Q.     Right.

2          A.     And the omission of needing ten, I

3     think it was ten, some number of staffing on

4     site, staffing that FedEx would have to pay

5     for, was not included.  So it threw the

6     costing model quite obviously out of whack.

7          Q.     What project was this, do you

8     recall?

9          A.     I believe it was GSA Burlington.

10         Q.     And Mr. Prater would have been

11    solely responsible for that?

12         A.     Mr. Prater entered the PRS.

13         Q.     So he would have been directly

14    responsible for that?

15         A.     Yes.

16         Q.     And nobody else would have been?

17         A.     That's correct.

18         Q.     Did GSA express dissatisfaction

19    with what Mr. Prater had done?

20         A.     Well, no.  We had agreed verbally

21    to provide the staffing.  So no, GSA was not

22    dissatisfied.

1        Q.    So you think GSA might have gotten

2    sort of a bonanza as a result of what Mr.

3    Prater miscalculated?

4        A.    GSA got exactly what they asked

5    for.

6        Q.    But the cost to FedEx based on Mr.

7    Prater's mistake was what?

8        A.    Significantly higher than

9    represented.

10       Q.    Do you know what the dollar value

11   of the damages was?

12       A.    I do not recall.

13       Q.    Did Mr. Prater get training to

14   have come up with the pricing that you said

15   was deficient?

16       A.    I do not recall what training was

17   available for a PRS.

18       Q.    How would someone like Mr. Prater

19   learn what to do in that regard?

20       A.    I don't recall when the training

21   was done.  I don't remember ever being asked

22   to operate a new system without getting some

56

1    training as an employee.  And I feel certain

2    that he was trained, but I was not there.

3         Q.    Would Mr. Scarfo have been

4    involved with the GSA pricing issue as well?

5         A.    When you say involved, what do you

6    mean?

7         Q.    Would he have been supervising Mr.

8    Prater in terms of the pricing that Mr. Prater

9    came up with?

10        A.    I still don't understand what you

11   are --

12        Q.    Would the pricing have been solely

13   on Mr. Prater's shoulders?

14        A.    As previously stated, that was his

15   responsibility.

16        Q.    Would that be something that he

17   would then present to Mr. Scarfo, his

18   supervisor, for final approval?

19        A.    No.

20        Q.    Would Mr. Prater need to get final

21   approval on whatever numbers he came up --

22        A.    From pricing.

FEDER REPORTING COMPANY
(202) 863-0000    (800) 956-8996

1     Q.    Who is in pricing that he would

2  need final approval from?

3     A.    It's not a specific person.  It's

4  a pricing system.

5     Q.    Would the pricing people have been

6  a second layer of oversight if he had priced

7  inaccurately?

8     A.    Not on this issue.

9     Q.    Why is that?

10    A.    They wouldn't be expected to know

11  about something that they would have

12  absolutely no idea of.

13    Q.    How much was this project worth to

14  Federal Express?

15    A.    I don't recall the numbers.

16    Q.    Was it closer to $100,000 as

17  compared to $100?

18    A.    It was a very large account.

19    Q.    A large account can mean over what

20  amount?  Without holding you to some --

21    A.    Several million dollars is

22  probably, in Worldwide Services, an accurate

58

1    depiction.

2          Q.    So this GSA project might have

3    been a several million dollar account?

4          A.    Yes.

5          Q.    And Mr. Prater would have been

6    exclusively responsible for pricing it?

7          A.    In Worldwide Services that's

8    common.

9          Q.    Well, not what's common but in

10   this particular project, would Mr. Prater have

11   been exclusively responsible for pricing it?

12         A.    For putting in a pricing request.

13         Q.    Yes.

14         A.    Yes.

15         Q.    And there would have been no layer

16   of supervision over him so that if his numbers

17   were wrong somebody would have stopped it?

18         A.    I'm still not sure what you are

19   trying to ask.

20         Q.    Well, let me see if I can rephrase

21   it.  This was a multi-million dollar contract,

22   we think, with GSA.

60

1    utilize- --

2        Q.    Like Mr. Prater?

3        A.    Like Mr. Prater, use the PRS

4    system to request the pricing that their

5    customers have asked for.

6        Q.    And there would have been no level

7    of checks and balances before the pricing that

8    Mr. Prater recommended was accepted?

9        A.    Mr. Prater's responsible for

10   entering what the customer asks for.

11       Q.    The customer meaning GSA.

12       A.    If that wasn't accurately

13   depicted, there is no one that can have

14   oversight on something that's missing.  It's

15   the same as saying everyone who is not here

16   hold your hand up.

17       Q.    So there would have been no one

18   else working on this but Mr. Prater.

19       A.    It was his account.

20       Q.    It was his account and he would

21   have had exclusive domain on that.

22       A.    Yes.

1    and it was, you know, a reasonable economy at

2    the time, and reasonable efforts were being

3    made and the clients assigned to him were a

4    reasonable roster, would $11 million seem to

5    be in the ballpark?

6                    MR. GABEL:  Object to the form.

7                    THE WITNESS:  As stated, I think

8    the territories were developed with some

9    rational ideas about what everyone should have

10   and, yes, I think it was reasonable.

11                   MS. FARBER:  Could we just take a

12   five-minute break.

13                   MR. GABEL:  Sure.

14                   (Recessed from 2:19 to 2:26 p.m.)

15                   BY MS. FARBER:

16       Q.    Did there come a time when you

17   were notified that Mr. Scarfo was having a

18   problem relating to confidential information?

19   Does that ring a bell?  Do you want me to go

20   into it more?

21       A.    No.  I know what you are referring

22   to.

1          Q.    Good.   Tell me what you think I am

2     referring to.   And this isn't a pop quiz.   I

3     mean just to make sure we're on the same page.

4          A.    In using Outlook, Outlook will

5     auto populate a person's name.   You'll start

6     typing -- like there's actually two Gurn

7     Freemans at FedEx.   When you start typing, in

8     my e-mail it's going to fill me out first.

9          Q.    I see.

10         A.    But if I put in the name Judy, and

11    I happen to e-mail frequently to six Judys,

12    it's going to put one of them in there.

13         Q.    And you have to erase it.

14         A.    You have to toggle down to the

15    right one.   And Vince had a former, I don't

16    think an employee but a former UPS friend or

17    business associate who happened to auto

18    populate on an e-mail that he intended to send

19    to FedEx.   And it was a significant amount of

20    data that certainly didn't belong in the

21    competitor's hands.

22              He immediately notified us.   He

89

1    immediately contacted his friend at UPS.  And

2    she immediately said she deleted it.  I

3    elevated it to my boss who is a vice

4    president.

5         Q.    Who is your boss?

6         A.    Dave Kevern.  Dave Kevern

7    immediately elevated it to his boss Dave

8    Edmonds and so on until the president and CEO

9    of FedEx was aware.

10        Q.    Who is that?

11        A.    FedEx Services is T. Michael

12   Glenn.  And everyone was aware of it.  We of

13   course watched very closely to see how our

14   competitor bid thereafter to see if there was

15   any evidence of the use of this information.

16   It never appeared to be something that

17   impacted us.

18        Q.    How did you measure that?

19        A.    Through bids and their responses

20   and just a variety of ways.

21        Q.    Was Mr. Scarfo reprimanded for

22   this?

90

1      A.    There was a discussion about it.

2   There was --

3      Q.    Were you part of the discussion?

4      A.    There was official -- yes.

5      Q.    I didn't mean to interrupt.

6      A.    No.

7      Q.    I apologize, actually.

8      A.    That's fine.  It was documented

9   conversation.  That documentation was shared

10  with superiors and so on.  And I followed the

11  recommendations that were provided to me.

12     Q.    And the recommendations that were

13  provided to you were from whom?

14     A.    HR, Legal, my boss.  I mean as I

15  said, everyone that needed to know knew.  This

16  is not something that we could have tried to

17  cover up or hide.  First of all, I don't do

18  business that way.  Secondarily, this was too

19  important to our future dealings.

20     Q.    You wrote an e-mail to -- well,

21  there was an e-mail written from you to Mr.

22  Scarfo about this, wasn't there, at least one

94

1      A.    I don't know that it says that,

2    but --

3      Q.    No.  I'm not saying that it says

4    that in the e-mail, but I'm just asking you a

5    question first in general.  I apologize.  I

6    didn't mean to confuse you.

7      A.    Well, the way we do all of our

8    progressive discipline is if someone has a

9    one-time event and they have no other prior

10   performance issues, that results in verbal

11   conversation or written conversation or a

12   combination of the two.

13         This one involved both where there

14   was multiple oral conversations at multiple

15   levels about the seriousness.  And then again,

16   it's certainly well documented that it had

17   occurred and that it was elevated to senior

18   management and so on.

19         So I don't know what you mean

20   there was no discipline.  Certainly, the

21   visibility all the way to the CEO of a large

22   corporation that you send information to the

1    competition is potentially career-damaging if

2    nothing else.  And certainly every effort was

3    made to impress upon Vince, as we would with

4    any employee, the seriousness of this

5    situation.

6              So I'm still not sure that we're

7    saying the same thing here.

8         Q.    Was Mr. Scarfo given any kind of

9    oral, verbal warning?

10        A.    Yes.

11        Q.    And was he given a written

12   warning?

13        A.    Not in the form of a warning

14   letter.

15        Q.    In the form of what?

16        A.    I don't know that there was a

17   written document specifically saying "Don't do

18   this again" is what I am saying.

19        Q.    So you would say there would be

20   nothing that would have been put in a

21   personnel file?

22        A.    Well, no, I'm not saying that at

96

1    all, because this had to be documented clearly

2    as an issue.  And so the extent that we keep

3    notes on things that happen with employees,

4    there certainly was clear documentation of

5    this problem.

6         Q.    So was a written warning, so to

7    speak, put in his personnel file?

8         A.    No.

9         Q.    No, okay.  And he certainly wasn't

10   given any kind of Performance Improvement Plan

11   to write up, was he?

12        A.    Not on the first occurrence of a

13   performance problem, no.

14        Q.    I'm going to mark something else

15   for you.

16              (Marked, Exhibit # 2, E-mail,

17   5/16/05.)

18              BY MS. FARBER:

19        Q.    Have you had a chance yet to look

20   at it?

21        A.    Yes.

22        Q.    Do you know what Mr. Scarfo was

122

1          EXAMINATION BY COUNSEL FOR DEFENDANT

2                    BY MR. GABEL:

3          Q.      You had mentioned an individual by

4     the name of Kelly Rogers who had some type of

5     performance issues.  Is that correct?

6          A.      Yes.

7          Q.      What is Mr. Rogers's race?

8          A.      Caucasian.

9          Q.      Other than Mr. Rogers and Mr.

10    Prater, do you recall anyone else in

11    government sales during your tenure who has

12    been placed on any type of Performance

13    Improvement Plan?

14         A.      Yes.

15         Q.      Who else?

16         A.      We have a staff individual, Edwin

17    Jimenez, with a "J," who was an analyst for us

18    hired on and had performance deficiencies.

19         Q.      Was Mr. Jimenez African-American?

20         A.      No.  He was Spanish.

21              MR. GABEL:  I have no further

22    questions.

Exhibit G

# COPY

1

1  IN THE UNITED STATES DISTRICT COURT

2  FOR THE DISTRICT OF COLUMBIA

3  ------------------x
   :
4  ANTHONY PRATER       :
   :
5                       :
   Plaintiff  :
6                       :  Civil Action No.
   v.        :  1:07-CV-00022 (RBW)
7                       :
   FED EX CORPORATE :
8  SERVS., INC.        :
   :
9  Defendant :
   :
10 ------------------x

11                       Rockville, Maryland
                         Thursday, May 15, 2008

12 Deposition of:

13

14          MAXINE DIANE AMES

15 called for oral examination by counsel for

16 Plaintiffs, pursuant to notice, at the offices

17 of Farber Legal, LLC, 11300 Rockville Pike,

18 Suite 808, Rockville, Maryland, before

19 Renee A. Feder, a Notary Public in and for the

20 State of Maryland, beginning at 1:55 p.m.,

21 when were present on behalf of the respective

22 parties:

FEDER REPORTING COMPANY
(202) 863-0000     (800) 956-8996

46

1              CERTIFICATE OF NOTARY PUBLIC

2                        I, Renee A. Feder, the officer

3      before whom the foregoing deposition was

4      taken, do hereby certify that the witness,

5      whose testimony appears in the foregoing

6      deposition, was duly sworn by me; that the

7      testimony of said witness was taken by me in

8      shorthand and thereafter reduced to computer

9      type under my direction; that said deposition

10     is a true record of the testimony given by

11     said witness; that I am neither counsel for,

12     related to, nor employed by any of the parties

13     to which this deposition was taken; and

14     further, that I am not a relative or employee

15     of any attorney or counsel employed by the

16     parties hereto, nor financially or otherwise

17     interested in the outcome of the action.

18

19                            _____
                              Notary Public in and for
20                            The State of Maryland

21     My Commission Expires:
       September 1, 2008
22

                    FEDER REPORTING COMPANY
              (202) 863-0000      (800) 956-8996

1    deadline I need some information from you, do

2    you have personal knowledge whether or not he

3    met those deadlines with those managers?

4         A.    No personal knowledge.

5         Q.    Have you received performance

6    evaluations from Vince Scarfo?

7         A.    Yes.

8         Q.    Have they been positive?

9         A.    Yes.

10        Q.    Do you know what rating he has

11   given you overall?

12        A.    On my recent performance review

13   exceeding expectations.

14        Q.    What would be the various options?

15   What grades could you get?

16        A.    Needs improvement, met

17   expectations, exceeding expectations.

18        Q.    And Mr. Scarfo gave you the

19   highest possible grade?

20        A.    Correct.

21        Q.    Have you had more than one

22   performance review from Mr. Scarfo?

36

1          A.     Yes.

2          Q.     What did he give you on the other

3     one?

4          A.     Met expectations.

5          Q.     He has never given you a needs

6     improvement?

7          A.     No.

8          Q.     Has he ever written you up or

9     disciplined you?

10         A.     No.

11         Q.     For the record, what is your race?

12         A.     Black.

13              MR. GABEL:   That is all I have.

14     Thank you.

15              MS. FARBER:   Just a couple of

16     things.

17     FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF

18              BY MS. FARBER:

19         Q.     Is Mr. Scarfo responsive in

20     sending out reports or sending things in

21     writing?

22         A.     There are some reports that I was

FEDER REPORTING COMPANY
(202) 863-0000    (800) 956-8996

Exhibit H



1

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF COLUMBIA

2

3   ------------------x
                      :
4   ANTHONY PRATER    :
                      :
5       Plaintiff    :
                      :   Civil Action No.
6       v.            :   1:07-CV-00022 (RBW)
                      :
7   FED EX CORPORATE  :
    SERVS., INC.      :
8                     :
        Defendant :
9   ------------------x

10                      Rockville, Maryland
11                      March 20, 2008

12  Deposition By Telephone of:

13              JEAN MILLER,

14  called for oral examination by counsel for

15  Plaintiffs, pursuant to notice, at the offices

16  of Farber Legal, LLC, 11300 Rockville Pike,

17  Suite 808, Rockville, Maryland, before

18  Lynell C.S. Abbott, a Notary Public in and for

19  the State of Maryland, beginning at 2:11 p.m.,

20  when were present on behalf of the respective

21  parties:

22

          FEDER REPORTING COMPANY
      (202) 863-0000      (800) 956-8996

| | |
|---|---|
| 1 | **CERTIFICATE OF NOTARY PUBLIC** |
| 2 | I, Lynell C.S. Abbott, the officer |
| 3 | before whom the foregoing deposition was |
| 4 | taken, do hereby certify that the witness, |
| 5 | whose testimony appears in the foregoing |
| 6 | deposition, was duly sworn by me; that the |
| 7 | testimony of said witness was taken by me in |
| 8 | shorthand and thereafter reduced to computer |
| 9 | type under my direction; that said deposition |
| 10 | is a true record of the testimony given by |
| 11 | said witness; that I am neither counsel for, |
| 12 | related to, nor employed by any of the parties |
| 13 | to which this deposition was taken; and |
| 14 | further, that I am not a relative or employee |
| 15 | of any attorney or counsel employed by the |
| 16 | parties hereto, nor financially or otherwise |
| 17 | interested in the outcome of the action. |
| 18 | |
| 19 | _____ |
| 20 | Notary Public in and for<br>The State of Maryland |
| 21 | My Commission Expires:<br>August 1, 2011 |
| 22 | |

**FEDER REPORTING COMPANY**
(202) 863-0000    (800) 956-8996

13

1    you this:  What has been your responsibility

2    in the ultimate decision to terminate Mr.

3    Prater?

4          A.    We have a Request for Termination

5    process.

6          Q.    Yes.

7          A.    At that time it was three levels.

8    It went to the HR Manager, it went to the HR

9    Director and then the HR Vice President.

10          Q.    When you say it went to, who was

11    it going -- "it went to."  What do you mean by

12    that?

13          A.    Meaning all three levels had to

14    review and concur with the Request for

15    Termination.

16          Q.    Do you know where the request was

17    coming from when it got to you?

18          A.    What do you mean when you say

19    where it was coming from?

20          Q.    Who made the request to terminate

21    him, as far as you know?

22          A.    Could you repeat that?

19

1    the folks that we terminate to make sure,

2    again, that we are being consistent in our

3    decisions and our practices.

4              MS. FARBER:  Mr. Gabel, is that

5    something that would have been sent to me

6    already?

7              MR. GABEL:  I don't think so.

8              MS. FARBER:  Is that something I

9    could get from you?

10             MR. GABEL:  You could certainly

11   request it.  I would have to look at it, and

12   assuming there's no objection, then sure we'll

13   produce that.

14             MS. FARBER:  Okay.  I appreciate

15   that.

16             BY MS. FARBER:

17        Q.    So you think, Ms. Miller -- back

18   to you Ms. Miller, do you think that you

19   probably did look to see if other people were

20   terminated for the same infractions and that

21   you believe that you looked at that and there

22   were?

20

1    A.    Yes.

2    Q.    Do you then look at that to see if

3    there is a particularly high number of

4    minorities, let's say, who have been

5    terminated for the same infractions?  Do you

6    look at it from a diversity perspective?

7    A.    We look at all of those things.

8    Q.    And you looked at it for that?

9    You would have looked at it for that?

10    A.    Yes.

11    Q.    And did you also look to see if

12    there were people who committed the same or

13    purportedly committed the same infraction but

14    were not terminated?

15    A.    Yes.

16    Q.    Did you find that there were

17    people who were not?

18    A.    No.

19    Q.    You did not find anyone who was

20    not terminated for the same infraction.

21    A.    No.

22    Q.    Do you remember what the

FEDER REPORTING COMPANY
(202) 863-0000    (800) 956-8996

36

1    African-American or another minority with

2    FedEx?

3           A.    When we are looking at termination

4    we don't just say, "Oh, this is a black male"

5    or "This is a white person, we're not going to

6    terminate."  That is not something that we do.

7           Q.    Does something get triggered,

8    though, when somebody is African-American?

9           A.    No.

10          Q.    You're not asked to look at it

11   statistically or any special way?

12          A.    I think maybe ten minutes or so

13   ago you asked me a question do we look for

14   diversity, do we look at any kind of

15   consistent trend.  Yes, we do look at that.

16   But we don't just specifically say, "This is

17   an African-American male, why are we

18   terminating this person" or "We should not

19   terminate the person."  Again, we have to make

20   sure we are following our policies and

21   procedures and we are being consistent in our

22   practices.

37

1          Q.    I don't mean to put words into

2    your mouth at all, but if you can help me

3    along here, you get let's say the imminent or

4    you get the termination proposal for someone

5    like Mr. Prater who has been there a long time

6    and happens to be African-American, and are

7    you telling me you do make sure that you feel

8    comfortable that similarly situated employees

9    with similar performance warnings, let's say

10   other African-Americans or other, I should

11   say, Caucasians were also terminated for the

12   same infractions?

13         A.    Yes, ma'am.

14         Q.    We just need to get this written

15   down so bear with us when we ask you that.  So

16   you felt satisfied on that count as well.

17         A.    Yes.

18         Q.    And do you know who you were

19   comparing him to?

20         A.    I don't have names in front of me.

21         Q.    Did you have names at the time?

22         A.    Yes.  Again, we looked at

                  FEDER REPORTING COMPANY
             (202) 863-0000      (800) 956-8996

38

1    comparables.  We look at other people that

2    have been terminated for performance

3    deficiencies.

4         Q.    Right.  But I take it from what

5    you are saying, there were names that you

6    looked at.

7         A.    It's not about names we're looking

8    at.  It's not so much you look at names.  You

9    are looking at people who were terminated for

10   performance deficiencies.  So it's not about a

11   name at a person.

12        Q.    No, no.  I'm not implying that you

13   look at a name to see if it's Polish or German

14   or French.  I didn't mean it that literally.

15   But when I say names, do you look to see

16   whether similarly situated people to Mr.

17   Prater are terminated and how it breaks down?

18        A.    Yes.

19        Q.    So that if a disproportionate

20   number of terminations were, let's just say,

21   African-American, you might look further into

22   that?

1          A.    Absolutely.  We would also reach

2     out to the management trainees and ask what's

3     going on.

4          Q.    But in his situation, what you are

5     saying is you felt that in looking at

6     similarly situated non-African-Americans but

7     in similarly situated situations received the

8     same outcome for performance deficiency.

9          A.    Yes.

10         Q.    And at that time when I say names,

11    let's substitute for names groups of persons

12    or identification of, let's say, Caucasians,

13    were available to you at the time.

14         A.    Yes.

15         Q.    And those are names that you don't

16    have now, but if we found we didn't have it

17    here, I could ask your attorney for that once

18    he had a chance to scrutinize that.  Is that

19    correct?

20              MS. FARBER:  Maybe I should ask

21    you that, Mr. Gabel.  We can see if we've got

22    that list.

1          A.    It is out there on the HR website

2     for all to see.

3          Q.    Do the employees know that?

4          A.    Absolutely.

5          Q.    How do they know that?

6          A.    Because remember we talked, we go

7     back to the handbook.  When any employee joins

8     FedEx -- this was prior because now we don't

9     use the handbook anymore.  But employees

10    received a handbook and they also had to sign

11    off on a receipt that they have received a

12    copy of the handbook.  In the handbook is a

13    brief synopsis of the policies and procedures.

14         Q.    So that might clue someone like

15    Mr. Prater in as to how to look up what a

16    sufficient Business Plan is or what a

17    sufficient Performance Plan is?

18         A.    I couldn't tell you how much

19    detail it has.  I don't have it in front of

20    me.  But I'm saying that it is a condensed

21    version of our policies and procedures.

22         Q.    But the handbook would at least

52

1    out to his HR Advisor for help and guidance.

2         Q.    And that would have been Jim

3    Wallace.

4         A.    Yes.

5         Q.    And Mr. Prater would have known

6    that.

7         A.    Yes.

8         Q.    And he would know that by looking

9    at the handbook?

10        A.    I can't say what he would know by

11   looking at the handbook, but there's enough

12   details in there to guide you.

13        Q.    All right.  Are the employees made

14   aware that they have EEO advisors?

15        A.    Yes.

16        Q.    How are they made aware of that?

17        A.    Well, now, and I say now because,

18   again, I wasn't there when the services

19   company was formed, every new hire that comes

20   on board, we have a link to our HR policies

21   and procedures to our website.  And also my

22   team sends out a letter to new employees to

Exhibit I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANTHONY PRATER,                    )
                                   )
        *Plaintiff,*               )
                                   )
v.                                 )        Case No. 1:07-cv-00022
                                   )
FEDEX CORPORATE SERVICES, INC. )
                                   )
        *Defendant.*               )
                                   )

## DECLARATION OF JAMES A. WALLACE IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, James A. Wallace, declare as follows:

1.    I am over the age of 21 and have personal knowledge of the facts described herein. If called as a witness at trial, I am competent to testify to the matters herein. I reserve the right to supplement my testimony at the time of hearing or trial on this matter.

2.    I am employed by FedEx Corporate Services, Inc. ("FedEx Services") as a Human Resources Advisor. In this capacity, I have access to and custody of FedEx Services' policies.

3.    FedEx Services maintains an employee complaint resolution policy entitled Explore- a complaint Review Process (formerly Complaint Resolution process). This Explore policy outlines procedures to address employee complaints, problems or concerns. I have attached hereto as Exhibit "A" a true and accurate copy of FedEx Service's Explore process policy.

4.    FedEx Services also maintains an Anti-Harassment policy that strictly prohibits any form of unlawful discrimination or harassment. I have attached hereto as Exhibit "B" a true

and accurate copy of FedEx Service's Anti-Harassment policy. This policy allows an employee to complain if the employee feels that he has been the victim of unlawful discrimination or harassment. In the event of such a complaint, FedEx Services promptly conducts an investigation and takes steps to ensure that no unlawful discrimination or harassment takes place.

5.    The Anti-Harassment policy and the Explore process policy have been communicated to all FedEx Services' employees. FedEx Services' employees were given a FedEx Services employee handbook that provides an overview of each policy and directs the employee to the FedEx Services' internal website for additional information. The website is accessible to all of FedEx Services' employees. Additionally, every disciplinary letter references the Explore Process policy and invites the employee to pursue the process if the employee believes the disciplinary action is unfair.

6.    At the time of his termination on or about January 3, 2006, Mr. Prater had never filed an internal complaint of discrimination. Mr. Prater, like every other employee, could have filed a complaint at any time if he felt like he was being discriminated against or harassed on the basis of his race.

7.    I declare under penalty of perjury that the foregoing is true and correct. Executed this 30th day of June, 2008, in Memphis, Tennessee.

*James A. Wallace*

James A. Wallace

738142

Exhibit A

Passionate People ➡ Extraordinary Results ➡ PL

 **FedEx Services Human Resources**

*Policies and Proced*

Corporate | Express | Ground | Freight | Kinko's | Custom Critical | Trade I

Today is: June 25, 2007

### Conduct, Performance & Recognition Policy

### Explore - A Complaint Review Process
Effective June 1, 2000, Last Revised April 27, 2004

**Policy**
The Company provides a process for addressing employee complaints, problems or concerns. Explore is a venue for employees to bring forth eligible issues for review by each level of management up through the vice president. It is also a means for gaining a greater understanding of perspectives as they relate to an issue. Its goal is to determine facts through additional communication and investigation. An employee's privilege to participate within the guidelines of this process is assured, although the outcome is not guaranteed to be in the employee's favor.

| Related R( |
| --- |
| Explore: A Com |
| Process Brochu |
| Explore Employ |
| Information Fon |
| Explore: A Com |
| Process Job Alc |

**Guidelines**

**Eligibility**
All permanent employees who receive discipline, including termination, or treatment that they believe to be unfair are eligible to participate in the Explore process.

**Eligible Issues:**

- An overall PPE Evaluation of Needs Improvement
- Disciplinary actions, including termination
- Non-selection for a posted position

Note: When an employee adds an allegation of discrimination or sexual harassment after entering Explore, the Explore process is deferred until the allegations of employment discrimination are resolved. The director will investigate discrimination issues with the assistance of Human Resources.

**Ineligible Issues:**

- Verbal or written counseling
- An overall PPE Evaluation of Achieved or better
- Content of Compensation, Benefit and/or Human Resources policies
- Decision to suspend with pay pending investigation
- Hours of employment

**Process**
An employee who wishes to enter the process should hold an open and frank discussion with his manager within 3 business days of the issue, unless the delay is reasonable and documented. The open and frank discussion should be face-to-face, unless geographic distances prohibit.

Note: If the complaint is with a manager other than your own, e.g. non-selection for a position, all reference to "manager" would refer to the hiring manager and his chain of management.

If after the open and frank discussion the employee continues to be dissatisfied, he may proceed through the Explore process by completing the Explore Employee Information Form and submitting it to the director within five (5) calendar days of the open and frank discussion or within five (5) calendar days of the eligible issue.

**STEP 1** . The Director

Human Resources

- forwards a copy of the Employee Information Form to Human Resources;
- gathers and reviews all relevant information;
- holds a meeting and/or conference call with complainant, manager, and senior manager (if applicable) and HR
- makes a decision and communicates to the complainant in writing within ten (10) calendar days unless notification of a delay is communicated.

If the employee disagrees with management's decision at Step 1, he may proceed to the next step by notifying the vice president in writing within three (3) calendar days of receipt of the Step 1 decision. All existing documentation, including the initial Explore Employee Information Form, will be forwarded to the vice president.

STEP 2. The Vice President

- gathers and reviews all relevant information;
- may choose to hold a meeting and/or conference call with complainant; and
- makes a decision and communicates to the complainant in writing within ten (10) calendar days unless notification of a delay is communicated. Management has the option to grant a Peer Review Board or make a final decision.

**Note :** Depending on who (what level of employee) initiates a complaint, Step 1 and Step 2 will normally be conducted by the next two (2) levels of management and the decision final and binding. If necessary and appropriate, the process could reach the SVP of a division but would not advance any further through the chain of command.

Peer Review Board
Peer Review Board is an alternate resolution process available at Step 2 of the Explore process, and may be granted at the discretion of the Vice President.

The actions in the Peer Review Board are as follows:

- The vice president notifies the employee when a Peer Review Board has been granted.
- A director (other than the employee's) is identified to chair the Peer Review Board.
- The Peer Review Board is held and a decision communicated within 30 calendar days of the date granted.
- Details of the Peer Review Board process will be provided when granted.

**Peer Review Board Participants**

The Peer Review Board includes:

- Chairperson (nonvoting)
- Representative of the Human Resource department (nonvoting)
- Panel of five (5) peer voting members
- Employee (nonvoting)
- Employee's Manager (nonvoting)
- Witness(s), if appropriate (nonvoting)

The decision of the Peer Review Board is final and binding.

**Third-Party Representation**
Attorneys and other representatives are neither permitted to serve as advocates on behalf of the Company or employees, nor permitted to appear on behalf of employees or former employees in the Explore process. Attorneys or other representatives should be directed to contact Legal. No third-party is permitted to participate in any manner in the Explore process.

Web page last updated on: 5/24/2004 10:00:24 AM

Exhibit B

Human Resources

Passionate People ➡ Extraordinary Results ➡ PU

 **Human Resources**

## FedEx Services Human Resources

### *Policies and Procedur*

Corporate | Express | Ground | Freight | Kinko's | Custom Critical | Trade I

Today is: June 25, 2007

**Employment Policy**

**Anti Harassment**

Effective January 1, 2006

**Policy**

FedEx Corporate Services, Inc. does not tolerate any form of harassment.

It is every employee's responsibility to report any incidents of harassment, including sexual harassment, based upon race, religion, sex, color, age, disability, national origin, veteran status, sexual orientation, or any other characteristic protected under federal, state, or local law immediately to a member of management or Human Resources. (An Employee Information Statement form should be completed and returned to Human Resources; however, it is not required).

Any employee who believes he or she has been subjected to, or who has witnessed harassment, should immediately report such conduct to a member of management and/or his Human Resources Advisor or anonymously via Alert Line.

It is the intent of this policy that all employees have an avenue to report such incidents to a member of management who is not involved in the harassment being reported. Any member of management who receives a complaint about harassment should immediately report it to Human Resources.

If the employee feels comfortable in approaching the harasser directly, it would be appropriate to approach the individual in private and make him or her aware that his or her behavior is offensive and should be stopped immediately. If the behavior does not stop, the employee should then follow the normal procedure for filing a complaint.

Employees are protected by Company policy and the law from coercion, intimidation, retaliation, interference, or discrimination for filing a discrimination or harassment complaint. FedEx Services specifically prohibits such action on the part of its management and other employees.

**Retaliation**

FedEx Services will not take nor tolerate any retaliatory action against any employee for making or substantiating a harassment complaint in good faith. Any employee engaging in such retaliatory action will be considered in violation of this Policy and will be subject to disciplinary action. Such retaliatory actions include, but are not limited to, actual or threatened reductions in pay, refusals of promotions, assignments to less desirable work, shunning, isolation or other types of intimidation, or any other type of negative treatment intended to embarrass or punish the person for having made such complaint or substantiating statement in good faith.

Before the resolution of any harassment complaint, an employee may not be involuntarily transferred, reassigned, or subjected to any punitive action without concurrence of Human Resources and Legal.

**Investigation**

An e-mail designating all communications as "Privileged and Confidential" must be received from Legal before initiating an investigation of any employment discrimination issues. The director of the employee submitting the complaint is typically responsible for the investigation, content of the report and is accountable for meeting the timeframes established for the process;

**21-27**

6/25/2007

typically within 30 days depending upon the complexity of the investigation.

**Process**

1. An employee completes an Employee Information Form Statement (EIS) form alleging discrimination and forwards it to the Human Resources (ER) department.
NOTE: If the employee verbally alleges unlawful discrimination to a member of management or HR, yet fails to put his/her allegations in writing, the information received verbally will be documented and the process will be followed with the known verbal information. An HR Advisor reviews the charge and forwards it with an Intake Sheet to the Legal department. The director of the complainant receives a Privileged & Confidential (P&C) e-mail from Legal. The director of the complainant reviews information in the EIS form and plans a structured investigation. An investigation is conducted. Written and signed responses are obtained from each person interviewed. All documents are labeled Privileged and Confidential/Attorney Work Product.

2. Upon completion of the investigation, the director provides report to HR for review and approval along with all supporting documentation. If appropriate, the report may include any recommendations for corrective actions.

**Third-Party Representation**
During the internal review process, attorneys are not permitted to serve as advocates on behalf of employees, nor to appear on behalf of employees or former employees, nor submit letters directly to the Company on behalf of employees or former employees. Attorneys or other such representatives must be directed to contact Legal. No third-party is permitted to participate in any manner in the internal complaint procedure.

Web page last updated on: 12 /29/2005 10:25:31 A M

| Copyright 2006. FedEx Corporation. All rights reserved. | Contact/Feedback | |



## Policies

### Employment

#### Internal EEO Discrimination or Harassment Complaint Process

It is an employee's responsibility to report any incidents of employment discrimination or harassment immediately to a member of management or your Human Resources Advisor. Human Resources will provide the employee with an *Employee Information Statement* form to complete and return. All complaints will be promptly and thoroughly investigated in as confidential a manner as possible. If the complaint is submitted to a member of management, copies of the statement should be forwarded to Human Resources no later than the close of the second business day following receipt.

Employees are protected by the Company and federal statutes from coercion, intimidation, retaliation, interference, or discrimination for filing a discrimination or harassment complaint. FedEx Services specifically prohibits such action on the part of its management and other employees.

Before the resolution of any discrimination or harassment complaint, an employee may not be involuntarily transferred, reassigned, or subjected to any punitive action without concurrence of Human Resources and Legal.

Investigations are initiated and concluded by Legal.

#### Privileged and Confidential Communications / Documents

Since litigation may result from the complaining employees' dissatisfaction with the Company's decision on the merits of their cases, the Legal department directs that all investigations be conducted in anticipation of such litigation.

All internal documents, including e-mails, relating to a complaint are attorney work products and should be labeled "Privileged and Confidential." This includes all investigative notes and materials generated in the course of the complaint process, including without limitation, internal EED and harassment investigations. These documents are confidential and subject to various legal privileges against disclosure. Circulation, distribution, or discussion of this information is strictly limited to those who have a need to know its content. Written or oral release of the contents of this information beyond this limited circulation must be approved by Legal.

#### Investigation

FedEx - Human Resources



### Training

FedEx Services provides training programs with respect to the standards and requirements of this and other applicable policies and procedures, and legal requirements applicable to job duties, including business ethics and acceptable business conduct.

### Reporting Violations

All employees who become aware of potential violations of this or any incorporated policy are expected to report such violations. It is the responsibility of the Director of Corporate Security, upon the request of the Vice President of Legal, to investigate and ensure appropriate action is taken in response to all such reports. No intimidation or retribution will result to any employee who reports a violation for the purposes stated in this policy.

### Auditing

FedEx Services employs internal auditors to review the Company's financial practices and procedures and oversee its systems for internal controls. The Internal Audit Department and other appropriate personnel as assigned will conduct periodic reviews or audits of facilities and operations and will monitor compliance with this policy. The Chief Financial Officer will be responsible for maintenance of all reports resulting from these activities.

### Policy Compliance

Failure to comply with the standards set forth in this policy subjects any employee involved to discipline as provided for in this policy.

It is the responsibility of each senior vice president for the department or division of the affected employee to determine appropriate discipline up to and including termination, following the completion of the investigation, in accordance with Company policies and with the advice of the Human Resources and Legal. It is the responsibility of each senior vice president to submit a summary of each such incident and the resulting discipline to the Vice President of Legal and Human Resources.

If unlawful conduct is suspected, the senior vice president who is responsible for the area and the senior vice president, general counsel, and secretary must be notified immediately. The vice president of Legal is responsible for conducting a prompt investigation.

If unlawful conduct is detected and is continuing, all efforts must be made to immediately stop that conduct. If past unlawful conduct is detected, but is no longer continuing, all reasonable efforts must be made to prevent such conduct from recurring.

To the extent reasonable and practical, cooperation is provided with appropriate federal, state, and local authorities investigating a criminal offense. The senior vice president who is responsible for the department or division must take prompt measures to assure that documents and other items, which might be regarded as useful to such an investigation, are preserved. Concealment of an offense, or altering or destroying evidence is a violation of this policy.

Disclaimer