# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

Anthony Prater,                           )
                                          )
          Plaintiff,                      )
                                          )
     v.                                   )     Case No. 1:07-CV-00022
                                          )
FedEx Corporate Services, Inc.,           )
                                          )
          Defendant.                      )
_____)

## Memorandum Opinion

Anthony Prater brings this lawsuit under Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e-2(a) (2006), against FedEx Corporate Services, Inc. ("FedEx Services") seeking

reinstatement, back pay, and $300,000 in unspecified compensatory damages based on the

defendant having allegedly subjected him to a hostile work environment and for the purported

wrongful termination of his employment.  Currently before the Court is the Defendant's Motion

for Summary Judgment ("Def.'s Mot.") pursuant to Rule 56 of the Federal Rules of Civil

Procedure.[1]  Upon consideration of the various filings submitted by the parties, the Court will

grant the defendant's motion.

---

[1]  The following additional papers have been submitted to the Court in connection with the
defendant's motion: (1) Defendant's Memorandum in Support of Motion for Summary Judgment
("Def.'s Mem."); (2) Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary
Judgment ("Pl.'s Opp'n"); and (3) Defendant's Reply Memorandum in Support of its Motion for
Summary Judgment ("Def.'s Reply").

## I.  Factual Background

The following facts are undisputed.[2]  From June 1, 2000, until January 3, 2006, Anthony

Prater, an African-American, was an employee for FedEx Services, a component of the FedEx

Corporation that provides services to FedEx's corporate clients.  Plaintiff's Memorandum in

Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n") at 1-2; Defendant's

Memorandum in Support of Motion for Summary Judgment ("Def.'s Mem.") at 2 & Exhibit

("Ex.") A (Prater Dep., Jan. 3, 2008) ("Def.'s Prater Dep.") at 21-22.  Mr. Prater commenced his

employment in June 2000 with FedEx Services as an Account Executive,[3] and was promoted to a

Senior Corporate Account Executive position in Government Sales in August 2000.  Pl.'s Opp'n

at 1 & Ex. 8 (Prater Affidavit) at 1;[4] Def.'s Mem. at 2 & Ex. A (Def.'s Prater Dep.) at 25-26.  As

a Senior Corporate Account Executive, Mr. Prater was a sales representative for government

agencies who used FedEx products and services in the Washington, D.C. metropolitan area.

Def.'s Mem. at 2 & Ex. A (Def.'s Prater Dep.) at 25-26.

---

[2]  Unless otherwise noted, all factual allegations set forth below are agreed to by the parties.

[3]  Mr. Prater worked for another FedEx entity before joining FedEx Services. Def.'s Mem. at 2 n.1.  According to the plaintiff, he started working for FedEx in 1987.  Pl.'s Opp'n at 2.

[4]  The exhibits submitted by the plaintiff are unnumbered, so for ease of reference, the Court has assigned the plaintiff's exhibits the following numbers and titles: (1) the Pl.'s Prater Deposition, (2) the Gamble Deposition, (3) the Gamble Affidavit, (4) the second Gamble Deposition, (5) the Allen Deposition, (6) the Dec. 10, 2002, Individual Performance and Contribution Discussion Form [-] Sales Professional (Bonus-Eligible) ("Dec. 2002 Perf. Rev."), (7) the Middlebrooks Affidavit ("Middlebrooks Aff."), (8) the Prater Affidavit, (9) the Prater Performance Review, (10) the Carson Deposition, (11) the Nov. 10, 2004, email from Anthony Prater to Laurie Carson, (12) the first Untitled Deposition, (13) the second Allen Deposition, (14) the email from Gurn Freeman to Vincent Scarfo, Date Undisclosed, (15) the Pl.'s Second Prater Deposition, (16) the third Allen Deposition, (17) the Pl.'s Third Prater Deposition, (18) the second Untitled Deposition, (19) the third Untitled Deposition, (20) the Williams Affidavit, (21) the Goodwin Affidavit, (22) the July 16, 2007,  email from Vincent Scarfo to Undisclosed Recipients, (23) the Allen Affidavit, (24) the Freeman Deposition, (25) the fourth Untitled Deposition, (26) the Scarfo Deposition, (27) the second Freeman Deposition, and (28) the second Scarfo Deposition.

Mr. Prater received the first in a series of annual performance reviews, which form the basis for much of FedEx Services' justification for its actions, in December of 2002.  Pl.'s Opp'n at 3-4; Def.'s Mem. at 3.  In this first performance review, John Middlebrooks, Mr. Prater's supervisor at that time, rated Mr. Prater's overall job performance as a 2.7 out of a possible maximum score of 4.0.  Def.'s Mem., Ex. A (Def.'s Prater Dep.) at 49 & Ex. 12 (Individual Performance and Contribution Discussion Form [-] Sales Professional (Bonus-Eligible)) ("Dec. 2002 Perf. Rev.") at 1.[5]

Laurie Carson replaced Mr. Middlebrooks as Mr. Prater's supervisor in the spring of 2004, Pl.'s Opp'n  at 4; Def.'s Mem. at 3, and Ms. Carson provided Mr. Prater with a new performance evaluation on June 21, 2004, Pl.'s Opp'n at 4; Def.'s Mem. at 3-4 & Ex. A (Def.'s Prater Dep.), Ex. 13 ([Untitled]) ("June 2004 Perf. Rev.").  This review evaluated four objectives and provided an overall evaluation along with Ms. Carson's comments; the review did not include a numeric evaluation.   Def.'s Mem., Ex. A (Def.'s Prater Dep.), Ex. 13 (June 2004 Perf. Rev.) at 1-2.  Except for the objective entitled "professional selling skills development," Ms. Carson rated Mr. Prater's performance on the other three objectives as "Needs Improvement."  Id.  Mr. Prater's "Overall Evaluation for [the] period" was also rated as "Needs Improvement."  Id., Ex. 13 (June 2004 Perf. Rev.) at 2.

---

[5]  The parties disagree on how this performance review should be perceived.  On the one hand, the plaintiff relies on the portions of the performance review in which he received positive feedback. Pl.'s Opp'n at 3-4.  The plaintiff further relies on Mr. Middlebrook's affidavit wherein he downplayed the negative portions of the performance review, claiming that Mr. Prater "was an excellent team player and always reached or exceeded his performance goals," Pl.'s Opp'n, Ex. 7 (Middlebrooks Aff.) at 1.  On the other hand, the defendant characterized the performance review as negative.  Def.'s Mem. at 3.  As explained later in Part III(B) and (C) of this opinion, the Court does not need to parse the details of Mr. Prater's performance reviews to resolve the merits of the defendant's summary judgment motion.

Ms. Carson followed-up her performance review on September 13, 2004, with a "Letter of Counseling for Unacceptable Performance."[6]  Def.'s Mem. at 4 & Ex. A (Def.'s Prater Dep.), Ex. 14 (Letter of Counseling for Unacceptable Performance, Sept. 13, 2004) ("Sept. 2004 Letter") at 1-2.  The letter chronicled the administrative errors committed by Mr. Prater both before and after the June 21 performance review.  Id., Ex. A (Def.'s Prater Dep.), Ex. 14 (Sept. 2004 Letter) at 1.  The letter also stated that Ms. Carson was going to put Mr. Prater on a plan with the objective of improving his sales performances.  Id., Ex. A (Def.'s Prater Dep.), Ex. 14 (Sept. 2004 Letter) at 2.  This "Performance Planner" required Mr. Prater to provide Ms. Carson with a biweekly report of his sales activities, which had to include a minimum of five attempts per week to acquire new customers.  Id., Ex. A (Def.'s Prater Dep.), Ex. 15 (Inter-Office Mem., Sept. 20, 2004) at 1. Mr. Prater's performance apparently improved as a result of the implementation of the Performance Planner, because on November 9, 2004, Ms. Carson sent Mr. Prater an email wherein she commented on improvements in Mr. Prater's recent job performance, noting: "I am very encouraged by your recent improvement and am confident that you can and will continue to improve your job performance." Id., Ex. A (Def.'s Prater Dep.), Ex. 16 (Email from Anthony Prater to Laurie Carson, Nov. 10, 2004) at 1.

Vince Scarfo replaced Ms. Carson as the supervisor of the Government Sales team in April of 2005.  Def.'s Mem. at 5 & Ex. A (Def.'s Prater Dep.) at 77.  Shortly after assuming this

---

[6]  This "Letter of Counseling for Unacceptable Performance," like the "Letter of Warning for Performance" discussed below, included the following statement: "Please be advised that recurrent patterns of this performance will not be tolerated.  A repeat of this or any other behavioral or performance problem may result in more severe disciplinary action up to and including termination."  In Mr. Prater's final "Letter of Warning for Unacceptable Performance," also discussed below, the substance of this message remained unchanged; however, the final sentence stated, "A repeat of this or any other behavioral or performance problem will result in termination."

position, Mr. Scarfo reviewed each employee's revenue goals.  Id. at 6-7 & Ex. A (Def.'s Prater

Dep.) at 80-81.  As a result of this review, on April 18, 2005, Mr. Scarfo sent Mr. Prater an email

indicating that Mr. Prater was significantly below the sales revenue goals for the customers

within his assigned territory, and that his performance was suppressing the entire team's sales

numbers.  Id. at 6-7 & Ex. A (Def.'s Prater Dep.) at 80-81.

Following Mr. Scarfo's criticism, Mr. Prater secured a Government Service

Administration facility in Burlington, New Jersey ("GSA Burlington") as a customer in April of

2005.  Id. at 7 & Ex. A (Def.'s Prater Dep.) at 74-76.  This contract required FedEx to provide

ten dock workers per day to help load and process shipments at the GSA Burlington warehouse.

Id. at 7 & Ex. A (Def.'s Prater Dep.) at 74-75, 82.  However, when Mr. Prater submitted the GSA

Burlington contract for approval to his superiors, the proposal failed to include the labor costs of

the dock workers.  Id. at 7 & Ex. A (Def.'s Prater Dep.) at 82-84.  FedEx approved the agreement

based on the cost information provided by Mr. Prater, and this mistake resulted in FedEx

sustaining a twelve percent overall monetary loss on the contract.  Id. at 7.

In addition to the GSA Burlington pricing error, Mr. Prater failed to complete software

upgrades on his customers' computers in May of 2005.  Id. at 8, Ex. A (Def.'s Prater Dep.) at 89

& Ex. 21 (Inter-Office Mem., June 3, 2005) ("June 2005 Letter of Warning") at 1.  While the

record is unclear as to what the software upgrades entailed, it is clear that Mr. Prater had until

May 18, 2005, to have the upgrades installed and that they had not been completed by that date.

Id.  As a result of this failure, other FedEx employees who were not originally assigned to that

task had to complete the upgrades.  Id.

Due to Mr. Prater's cost estimate mistake in pricing the GSA Burlington contract and his

failure to timely complete the customer software updates, Mr. Scarfo issued a letter of warning to Mr. Prater on June 3, 2005.  Id.  Four days later, Mr. Scarfo issued a new Performance Planner to "bring [Mr. Prater's] performance up to an acceptable level."  Id. at 8 & Ex. A (Def.'s Prater Dep.), Ex. 23 (Inter-Office Mem., June 7, 2005) at 1.  The Performance Planner required Mr. Prater to "[c]omplete [a]ll [a]ssigned [t]asks," "[t]ake [o]wnership of [r]esponsibilities," and "[i]mprove [c]ommunication."  Id.  The Performance Planner also required that Mr. Prater attend monthly meetings for the next three months to discuss his progress in achieving these goals.  Id.  Sometime during the summer of 2005, Mr. Scarfo also completed Mr. Prater's annual performance review and Mr. Prater's overall performance was rated as "needs improvement."  Id. at 8 & Ex. A (Def.'s Prater Dep.) at 108 & Ex. 22 (June 2005 Perf. Rev.) at 3.

Several weeks after the issuance of the new Performance Planner, GSA Burlington emailed Mr. Prater and Mr. Scarfo complaining about two dock workers who had not reported for duty on two days during the prior week, thereby compromising the work being performed at the GSA Burlington facility.  Id. at 9 & Ex. A (Def.'s Prater Dep.), Ex. 25 (Email from Anthony Prater to John Presper, David Steele, Scott Brumbaugh, Scott Ray, John Cameron, Vincent Scarfo, and Michael Devault, July 25, 2005) at 1.  Mr. Prater had been expected to act as an on-site manager at the GSA Burlington facility during the transition of the work performed at the GSA Burlington facility to FedEx, so it was surprising to Mr. Scarfo to learn about staffing problems from the customer and not Mr. Prater.  Id.

On September 16, 2005, Mr. Scarfo issued another letter of warning to Mr. Prater.  Id. at 9 & Ex. A (Def.'s Prater Dep.), Ex. 33 (Inter-Office Memorandum, Sept. 16, 2005) ("Sept. 2005 Letter of Warning") at 1.  The letter referenced Mr. Prater's lack of involvement with the

transition at GSA Burlington; ongoing administrative errors, namely two reports that Mr. Prater submitted with errors in them; five consecutive quarters of not achieving his business plan; and two consecutive quarters during which he was ranked last among his sales team members.  Id. The letter of warning outlined the various goals that his supervisors expected Mr. Prater to achieve during the remainder of that business quarter.  Id.  The letter then stated, "If you fail to achieve any of these elements during the quarter, you will be recommended for termination."  Id. at 2.

In an email following the meeting in which Mr. Scarfo delivered the warning letter, Mr. Scarfo asked Mr. Prater to develop a plan of action for meeting the goals outlined in the letter. Id. at 10 & Ex. A (Def.'s Prater Dep.) at 156-57.  Mr. Prater complied with this request, but Mr. Scarfo felt Mr. Prater's responses were too broad and he asked Mr. Prater to develop a more specific framework for meeting his revenue goals by the end of that week.  Id.  After agreeing to comply with this request, Mr. Prater had to perform other duties and he requested an extension to the following Monday to submit a more specific plan to Mr. Scarfo.  Id.

After Mr. Prater submitted his performance improvement plan, he delayed processing a pricing request for one of his customers despite being advised by a FedEx staff member that a quick turnaround on the request was needed.  Id. at 10 & Ex. A (Def.'s Prater Dep.) at 161-62. Although Mr. Prater experienced computer problems when the pricing request was first submitted, he took more than a week to approve the pricing request for the customer.  Id.

As a result of the long-term deficiencies in Mr. Prater's work performance, Mr. Scarfo presented a Letter of Termination for Performance to Mr. Prater on January 3, 2006, id. at 11 & Ex. A (Def.'s Prater Dep.), Ex. 39 (Inter-Office Mem., Jan. 3, 2006) ("Letter of Termination"),

terminating Mr. Prater's employment that same day, id., Ex. A (Def.'s Prater Dep.), Ex. 39

(Letter of Termination) at 1.  The letter cited the two consecutive annual performance reviews in

which Mr. Prater received overall ratings of "needs improvement," the three warning letters

focusing on specific delinquencies during that time period, and the ongoing efforts to help

improve Mr. Prater's performance as the reasons for terminating his employment.  Id.  Mr. Prater

signed the termination letter, thereby agreeing to end his employment with FedEx that day,

January 3, 2006.  Id.  Thereafter, FedEx replaced Mr. Prater with a Caucasian, who owned his

own business before joining FedEx.  Pl.'s Opp'n  at 7 & Ex. 28 (the second Scarfo Deposition) at

128.

   After his employment termination, Mr. Prater filed a complaint alleging racial

discrimination with the United States Equal Employment Opportunity Commission ("EEOC").

Compl. ¶ 9.  The EEOC issued a notice of right to sue on August 31, 2006, id. ¶ 12, and on

December 5, 2006, Mr. Prater filed a complaint in the Superior Court of the District of

Columbia, asserting wrongful termination and hostile work environment claims under Title VII,

id. ¶ 1.[7]  On January 4, 2007, the defendant removed the case to this Court.  Notice of Removal,

Jan. 4, 2007.

## II.  Standard of Review

   Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is one that is

---

[7] The complaint sought $300,000 in unspecified compensatory damages.  Compl. ¶ 25, 29.

capable of affecting the outcome of the litigation, and a genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation and citation omitted).  The party moving for summary judgment may not rely solely on "mere allegations or denials," but must set forth facts that are significantly probative. Id. at 248-50 (internal quotation and citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." Id. at 255 (internal quotation and citation omitted).  Thus, when considering a motion for summary judgment, a court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in [his] favor." Galvin v. Eli Lilly & Co., 488 F.3d 1026, 1031 (D.C. Cir. 2007) (internal quotation and citation omitted).

Summary judgment is appropriate after there has been "adequate time for discovery . . . [and the nonmoving] party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  To survive summary judgment on a wrongful termination claim, a plaintiff must show that a reasonable jury could conclude from all of the evidence that he sustained an adverse employment action and that the action was taken for a discriminatory reason.  Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003).

### III.  Analysis

### A.  The Plaintiff's Hostile Work Environment Claim

The defendant requests summary judgment on both the plaintiff's wrongful termination and hostile work environment claims.  Def.'s Mot. at 1; Def.'s Mem. at 12-18, 19-20.  However,

the plaintiff only addresses the challenge to his wrongful termination claim in his motion and supporting memorandum of law.  When "a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded," Malik v. District of Columbia, 538 F. Supp. 2d 50, 53 (D.D.C. 2008) (internal quotations and citations omitted); see also Twelve John Does v. District of Columbia, 117 F.3d 571, 577 (D.C. Cir. 1997) ("Where the district court relies on the absence of a response [to a motion] as a basis for treating the motion as conceded, we honor its enforcement of the rule."), and the Court will do so here.  Therefore, the Court will grant the defendant summary judgment on the plaintiff's hostile work environment claim and proceed to address the merits of the wrongful termination claim.

## B.  The Plaintiff's Wrongful Termination Claim

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a) (2006). Where, as here, the plaintiff relies on circumstantial evidence to establish a claim under Title VII, the Court invokes the three-step burden-shifting test of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[8] Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).  Under this framework, a Title VII plaintiff must first establish a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802.  If a prima facie case is established, the defendant must then "articulate some

---

[8]  "Direct evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in question without any need for inference. . . . [D]irect evidence includes any statement or written document showing a discriminatory motive on its face." Davis v. Ashcroft, 355 F. Supp. 2d 330, 340 n.2 (D.D.C. 2005) (internal quotations and citations omitted) (emphasis in original).  Here, the plaintiff has not presented evidence that proves "on its face," id., that he was discharged "because of his race," 42 U.S.C. § 2000e-2(a) (2006).

legitimate, nondiscriminatory reason for the employee's rejection." Id.  If such an explanation is provided, "the McDonnell Douglas framework . . . disappears, and the sole remaining issue" is whether the defendant intentionally discriminated against the plaintiff.  Jackson v. Gonzalez, 496 F.3d 703, 707 (D.C. Cir. 2007).  "At that point, the plaintiff can survive summary judgment only by showing that a reasonable jury could conclude that he was terminated for a discriminatory reason."  Id. (internal quotation marks and citation omitted).

**1.  Prima Facie Case of Discrimination**

The burden of establishing a prima facie case of discrimination under Title VII is "not onerous."  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  Nonetheless, the McDonnell Douglas analysis requires "the plaintiff [to] establish that (1) []he is a member of a protected class[,] (2) []he suffered an adverse employment action[,] and (3) the unfavorable action gives rise to an inference of discrimination."  Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999).  The defendant concedes the first two elements, see Def.'s Mem. at 14 ("Plaintiff can meet the first two [prima facie] elements of his claim."), and the plaintiff clearly satisfies those elements, see, e.g., Royall v. Nat'l Ass'n of Letter Carriers, 507 F. Supp. 2d 93, 103-04 (D.D.C. 2007) (concluding that an African American who was terminated from his position satisfied the first two elements of a prima facie case of discrimination).  The only remaining question at this stage of the analysis, then, is whether the plaintiff's termination "gives rise to an inference of discrimination."  Brown, 199 F.3d at 452.

To create an inference of discrimination, the plaintiff must demonstrate that "[his] employer took the action because of [his] membership in a protected class."  Sharpe v. Bair, 580 F. Supp. 2d 123, 133 (D.D.C. 2008) (citation omitted).  To meet this burden, the plaintiff can

demonstrate "that []he was treated differently from similarly situated employees who are not part

of the protected class," or that the adverse employment action "was not attributable to

'performance below the employer's legitimate expectation or the elimination of the plaintiff's

position altogether.'" Id.  If these options are unavailable, the plaintiff can resort to proffering

"other forms of indirect evidence that give[] rise to the inference." Id.

The plaintiff advances three circumstances that he contends are sufficient to satisfy his

burden of establishing a prima facie case of discrimination: first, that he was replaced by a

Caucasian, Pl.'s Opp'n at 9-10, second, that a sufficient nexus exists between allegedly racially

motivated statements and the plaintiff's termination, thereby establishing prima facie

discrimination, Pl.'s Opp'n at 10, and third, that the circumstantial evidence collectively supports

an inference of discrimination, Pl.'s Opp'n at 9.

The Court finds that the plaintiff's first two theories fail to support his position.  First, the

fact that an African American employee was replaced by a Caucasian employee is just one part of

a four-part test for establishing prima facie of discrimination.  As stated in Klein v. Derwinsky,

869 F. Supp. 4 (D.D.C. 1994), which the plaintiff cites as support for his position, Pl.'s Opp'n at

9-10, a plaintiff opting to use this method of establishing a prima facie case must demonstrate

that: "(1) [he] is a member of a protected class; (2) []he was qualified for continued employment

and was satisfying the normal requirements of [his] job; (3) []he was terminated; and (4) []he was

either replaced by a person not in the protected class, or such a person with comparable

qualifications and work records was not terminated," Klein, 869 F. Supp. at 7; see also Burdine,

450 U.S. at 254 n.6.  Here, the evidence establishes that the plaintiff is a member of a protected

class, he was terminated, and he was replaced by a Caucasian employee.  However, the plaintiff

has not demonstrated that he "was satisfying the normal requirements of [his] job." Klein, 869 F. Supp. at 7. To the contrary, the plaintiff's performance reviews consistently indicated that he was having difficulties performing at least some facets of his position as a Senior Corporate Account Executive.[9] Moreover, the plaintiff has not demonstrated that specific instances of poor performance by the defendant were factually inaccurate. In sum, based on the record, the Court cannot find that the plaintiff "was satisfying the normal requirements of his job." Klein, 869 F. Supp. at 7.

The plaintiff's second theory is also inadequate. Undoubtedly, a sufficient nexus between discriminatory statements and an adverse employment action can create an inference of discrimination. For instance, in the first case cited by the plaintiff as support for his position, Tomsic v. State Farm Mut. Auto. Ins. Co., 85 F.3d 1472 (10th Cir. 1996), the court explained "that remarks exhibiting bias which refer directly to the plaintiff may support an inference of discrimination" and "[t]he remarks at issue in th[at] case were directed to the plaintiffs individually." Id. at 1479. In reaching this conclusion, the court distinguished another age discrimination case, because in that case, "[the court] found that [the defendant's] very general remark that 'long-term employees have a diminishing return,' had not been shown to have had any connection with a discriminatory motive in terminating the plaintiff." Id. (citation omitted). In another case cited by the plaintiff, Woodhouse v. Magnolia Hosp., 92 F.3d 248 (5th Cir. 1996), the court relied on the fact that "[t]he remark [that helped establish a nexus] was more

---

[9] See, e.g., Def.'s Mem., Ex. A (Def.'s Prater Dep.), Ex. 12 (Dec. 2002 Perf. Rev.) at 2 (describing the plaintiff as having "[n]o visible plan to work from" and describing the plaintiff's "[a]dministrative work [as] weak"); id., Ex. A (Def.'s Prater Dep.), Ex. 13 (June 2004 Perf. Rev.) at 2 (rating the plaintiff's overall work as "Needs Improvement"); id., Ex. A (Def.'s Prater Dep), Ex. 22 (June 2005 Perf. Rev.) at 3 (same).

direct than any of the comments in the cases [the defendant] cite[d] – it specifically indicated that

[the defendant] intended to use age as a factor in its decision of which positions to eliminate."

Id. at 254.

In this case, the plaintiff has presented evidence that (1) his FedEx director said she was

paying him too much money after she saw that he drove a nice car, Pl.'s Opp'n at 3; Def.'s

Mem., Ex. C (Allen Dep., May 14, 2008) ("Allen Dep.") at 34-35, (2) she said that she was

taking too many African American employees to a conference, Pl.'s Opp'n at 3; Def.'s Reply.,

Ex. E (Gamble Dep., May 15, 2008) at 33, (3) she made generally unfavorable comments

towards African Americans, Pl.'s Opp'n at 3; Def.'s Reply, Ex. C (Allen Dep.) at 20, and (4) one

of the plaintiff's other supervisors suggested, in an email written in support of another

supervisor, that it had been an error to hire two other African American employees, Pl.'s Opp'n

at 5 & Ex. 14 (Email the email from Gurn Freeman to Vincent Scarfo, Date Undisclosed ) at 1.

The plaintiff's first assertion in regards to him being paid too much, although more probative

because it directly addresses the plaintiff, is not sufficient for a jury to conclude that it was

anything more than a remark made in a joking manner.  Additionally, the probative value of the

plaintiff's second, third, and forth assertions regarding remarks made by his supervisors is

seriously undercut by the facts that the comments were made generally and that a number of the

employees in the Government Sales Department at FedEx were African American.  Def.'s Mem.,

Ex. A (Def.'s Prater Dep.) at 97 & Ex. E (Gamble Dep., May 15, 2008) at 66.  Therefore, without

further information regarding the facts surrounding these statements, the Court cannot find a

sufficient nexus between the statements and the plaintiff's termination.  See Simms v. U.S. Gov't

Printing Office, 87 F. Supp. 2d 7, 9 n.2 (D.D.C. 2000) (finding "stray remarks" like "joking

gesture" and single derogatory comment insufficient to support claim of discrimination when remarks were unrelated to employment decision at issue).

Notwithstanding the failure of these first two theories to independently raise an inference of discrimination, the Court agrees that the plaintiff may offer "other forms of indirect evidence that give[] rise to [an] inference" of discrimination.  <u>Sharpe</u>, 580 F. Supp. 2d at 133 (D.D.C. 2008).

First, evidence proffered by the plaintiff establishes that his supervisors pressured African American employees in a manner to which Caucasian employees were not subjected.  For instance, according to one of the plaintiff's coworkers, the plaintiff's supervisors were openly critical of African American employees but were not similarly critical of Caucasian employees, and the plaintiff was specifically targeted for such unequal criticism.  Pl.'s Opp'n, Ex. 3 (Gamble Affidavit) at 2.  The same supervisors also allegedly required African American employees to work only designated schedules while affording Caucasian employees more flexibility.  <u>Id.</u>  In addition, one of those supervisors allegedly made disparaging remarks about African Americans on several occasions. <u>Id.</u>

Second, Mr. Prater was replaced by a Caucasian employee.  Although, as already indicated, this fact alone cannot establish a prima facie case of discrimination, replacement by an individual of a different race can help lead a trier of fact to the reasonable conclusion that a plaintiff has established an inference of discrimination.  <u>See</u> <u>Stith v. Chadbourne & Park, LLP</u>, 160 F. Supp. 2d 1, 13 (D.D.C. 2008) (citing <u>Carson v. Bethlehem Steel Corp.</u>, 82 F.3d 157, 159 (7th Cir. 1996)) (stating that replacement by a person not a member of the plaintiff's protected class may lead to an inference of discrimination, but alone is not sufficient to support

discrimination claim).

Drawing all reasonable inferences in the light most favorable to the plaintiff from these two items of evidence, the Court concludes that, when considered collectively, a trier of fact could reasonably find that an inference of discrimination has been created.  While the inferences gleaned from these facts "may not present the strongest case of discrimination, the burden of establishing a prima facie case in not an onerous one." Sharpe, 580 F. Supp. 2d at 134 (internal quotation and citation omitted).  The plaintiff's prima facie case having been established, the Court proceeds to the second and third steps of the McDonnell Douglas analysis.

**2.  The Defendant's Nondiscriminatory Explanation for the Plaintiff's Termination**

To refute the plaintiff's prima facie case, the defendant must provide a legitimate, nondiscriminatory reason for taking the adverse action being challenged by the plaintiff. Burdine, 450 U.S. at 253.  The defendant does not need to "persuad[e] the [C]ourt that it had convincing, objective reasons for . . . [terminating] the plaintiff." Id. at 257.  Rather, "the [defendant] need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Id. "The defendant need not persuade the [C]ourt that it was actually motivated by the proffered reasons." Id. at 254.

"[P]erformance below the employer's legitimate expectations" is a "common legitimate reason[] for discharge," Czekalski v. Peters, 475 F.3d 360, 366 (D.C. Cir. 2007), and the defendant contends that it terminated the plaintiff's employment for performance reasons, Def.'s Mem. at 16.  Specifically, the defendant states that the plaintiff's job performance was on a continuous decline, as noted by his "needs improvement" performance evaluations. Id.  The

plaintiff does not challenge that he did in fact perform below the defendant's expectations at times, and as stated above, "performance below the employer's legitimate expectations" is an adequate nondiscriminatory reason for terminating a plaintiff's employment. Czekalski, 475 F.3d at 366. Accordingly, "the presumption of the prima facie case is rebutted." St. Mary's Honor Ctr v. Hicks, 509 U.S. 502, 507 (1993) (internal quotation and citation omitted). The burden therefore shifts back to the plaintiff to establish that the defendant's explanation for his termination was "merely pretextual," Sharpe, 580 F. Supp. 2d at 135, and that "a reasonable jury could conclude . . . that the adverse employment decision was made for a discriminatory reason," id. at 134.

### 3. Pretext

To defeat the defendant's legitimate, nondiscriminatory reason for terminating his employment, the plaintiff must "prove by a preponderance of the evidence that the legitimate reason[] offered by the defendant [was] not its true reason[], but [was] a pretext for discrimination." Burdine, 450 U.S. at 253; see also Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("[T]he issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers."). At this point, "the factual inquiry proceeds to a new level of specificity," id. at 255, and the plaintiff must produce either direct evidence that the employer truly discriminated against him or indirect evidence "showing that the employer's proffered explanation is unworthy of credence," id. at 256. Either way, "[t]he plaintiff must [] cast doubt upon the credibility of [the defendant's] explanation by setting forth specific facts to show that a reasonable jury could conclude 'that the [defendant's] stated reason was pretextual and that the true reason was discriminatory.'" Royall, 507 F. Supp.

2d at 109 (citing <u>Weber v. Battista</u>, 494 F.3d 179, 182-83 (D.C. Cir. 2007)); <u>see also</u>  <u>Hicks</u>, 509

U.S. at 515 ("A reason cannot be proved to be a pretext for discrimination unless it is shown both

that the reason was false, and that discrimination was the real reason.") (internal quotation and

emphasis omitted).

　　　　To satisfy his burden of demonstrating pretext, the plaintiff asserts the following: (1) John

Middlebrooks' assertion that Mr. Prater should not have been terminated, Pl.'s Opp'n at 12; (2)

the plaintiff's coworkers' and clients' assessments that he was a good employee, <u>id.</u> at 12-13; (3)

the plaintiff's replacement by a Caucasian, <u>id.</u> at 12; (4) the plaintiff's coworkers' overhearing

racially discriminatory statements made by Mr. Prater's former supervisors, <u>id.</u> at 12; and (5)

Caucasian employees were transferred, and not terminated, when they were disciplined, <u>id.</u> at 13.

### i.  The Statements Made by Middlebrooks, Coworkers, and Clients

　　　　The Court cannot agree that the plaintiff's first, second, and fourth factual assertions

offered in support of his pretext position–the statements made by the plaintiff's coworkers,

supervisor, and clients–rebut the legitimate, nondiscriminatory reason proffered by the defendant

for terminating the plaintiff's employment.  To demonstrate pretext, the plaintiff must show that

the employer's "explanation is incorrect <u>and</u> that the employer's real reason was discriminatory."

<u>Aka v. Wash. Hosp. Ctr.</u>, 156 F.3d 1284, 1288 n.3 (D.C. Cir. 1998) (en banc) (emphasis in

original); <u>see also</u> <u>Hicks</u>, 509 U.S. at 515-16 ("[A] reason cannot be proved to be a pretext for

discrimination unless it is shown both that the reason was false, and that discrimination was the

real reason.") (internal quotation and emphasis omitted).  The plaintiff must also demonstrate

that his termination was "motivated by his employer's discriminatory intent," <u>Royall</u>, 507 F.

Supp. 2d at 110, not merely that this decision was "[un]just, or [un]fair, or [in]sensible,"

-18-

Fischbach, 86 F.3d at 1183.

Evidence that the defendant "misjudged the employee's performance or qualifications is . . . relevant to the question of whether its stated reason is pretext," but when considering an employer's business decisions, the Court "must respect the employer's unfettered discretion" to make such decisions. Id. Thus, the Court may not "second-guess an employer's personnel decision absent demonstrably discriminatory motive." Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir. 1982). Similar to the plaintiff in this case, the plaintiff in Royall attempted to establish that his former employer's poor performance explanation for terminating his employment was pretextual by "claim[ing] that he nevertheless performed his job well, citing . . . several instances in which he completed assigned tasks or was praised for his good performance." 507 F. Supp. 2d at 108. There, this Court found that these representations were insufficient to establish pretext, stating:

> The plaintiff cannot create a genuine issue of material fact as to whether the [defendant] "honestly believes in the reasons it offers" for his termination simply by contesting some portion of the defendant's account of his performances or citing certain instances in which he correctly performed the duties of his job. It is nonsensical to suppose that a plaintiff should be able to demonstrate that an employer's stated reasons for its adverse action is pretextual merely because the employer cannot prove that the plaintiff was deficient in every aspect of his job performance . . . .

Id. (citing George v. Leavitt, 407 F.3d 405, 415 (D.C. Cir. 2005)) (internal citation omitted) (emphasis in original). For the same reason, and in light of the numerous deficiencies in the plaintiff's multiple performance evaluations that rated his overall performance as "Needs Improvement," and specific uncontested instances when Mr. Prater's inadequate performance adversely impacted the defendant monetarily, the Court cannot find that the plaintiff's sweeping

assertions that his performance was adequate are alone sufficient to rebut the defendant's explanation for terminating his employment.

### ii. Replacing the Plaintiff with a Person Outside the Plaintiff's Protected Class

The plaintiff's third attempt to defeat the defendant's explanation for his termination also lacks merit.  In his opposition to the defendant's summary judgment motion, the plaintiff also relied on the fact that he was replaced by a Caucasian.  Pl.'s Opp'n at 12.  As explained above in Part III(A) of this opinion, the plaintiff's replacement by a Caucasian employee is one factor that the Court may consider in determining whether the plaintiff established a case of discrimination, but alone is not determinative.  See Burdine, 450 U.S. at 254 n.6 (relying not only on the plaintiff having been replaced by a person outside her protected class, but also on the plaintiff being qualified for the position); Klein, 860 F. Supp. at 7 (of the four factors necessary to establish a prima facie case of discrimination, only one is the plaintiff's replacement by a person outside the plaintiff's protected class).  Clearly, "the plaintiff can meet [his] burden of [establishing pretext] by either direct or circumstantial evidence." Dunaway v. Int'l Bhd. of Teamsters, 310 F.3d 758, 763 (D.C. Cir. 2002).  However, evidence that the plaintiff was replaced by a Caucasian alone does not suffice.  See Royall, 507 F. Supp. 2d at 107 n.17 ("[T]he mere fact that an African-American employee was replaced by a Caucasian employee is not, and cannot be, adequate to survive summary judgment without some evidence of discriminatory intent or some specific reason 'that the employer's proffered explanation is unworthy of credence.'") (quoting George, 407 F.3d at 413).

### iii. Dissimilar Treatment of Employees Outside of the Protected Class

The plaintiff's fifth factual assertion in support of his pretext argument also lacks merit.

Admittedly, "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury." George, 407 F.3d at 414-15 (internal citation omitted).  To survive summary judgment, however, "a [] plaintiff [alleging unequal disciplinary treatment] must demonstrate that []he and the allegedly similarly situated [] employee were charged with offenses of comparable seriousness." Holbrook v. Reno, 196 F.3d 255, 261 (D.C. Cir. 1999) (internal quotation and citation omitted).  "A plaintiff must also demonstrate that 'all of the relevant aspects of [his] employment situation were "nearly identical" to those of the [other]' employee" to show that the two were similarly situated.  Id. (quoting Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995)).  Thus, courts have repeatedly declined to find that employees at higher levels in a plaintiff's chain of command are "similarly situated" to the plaintiff.  See, e.g., Id. at 261-62 (a senior FBI agent and a new FBI agent were not similarly situated); Neuren, 43 F.3d at 1514 (D.C. Cir. 1995) (an associate and a more senior associate at the same law firm were not similarly situated); Sharpe, 580 F. Supp. 2d at 132-33 (a paralegal and an attorney in the same law firm were not similarly situated).

Here, the plaintiff alleged that multiple Caucasian employees were treated differently when they were disciplined.  Pl.'s Opp'n at 13.  However, the plaintiff has not provided any evidence that suggests that these employees were similarly situated, had committed acts of inadequate performance similar to his, or had performance evaluations comparable to his.  See Waterhouse v. District of Columbia, 298 F.3d 989, 996 (D.C. Cir. 2002) (stating plaintiff "provided no evidence that these individuals . . . had individual performance problems or had performance problems similar to [his]") (internal quotations and citation omitted).  At best, the plaintiff argues that Vincent Scarfo, the plaintiff's supervisor, sent the company's "confidential,

privileged information" to a competitor and was never formally disciplined.  Pl.'s Opp'n at 6.

However, the Court agrees with the defendant's argument that the plaintiff's attempt "to compare

an isolated mistake made by Vincent Scarfo with [p]laintiff's two year history of performance

deficiencies," Def.'s Reply at 12, does not suffice.  In addition, Mr. Scarfo was at a higher level

in the chain of command due to his status as the plaintiff's supervisor when his transgression

occurred, and thus was not in a comparable position.  Therefore, absent additional evidence "that

the comparators were actually similarly situated to [the plaintiff], this allegation add[s] nothing to

[his] claim that the defendant['s] explanation for [his] termination was mere pretext."

Waterhouse, 298 F.3d at 995-96.

### iv. The Plaintiff's Aggregated Evidence of Pretext

Finally, even when considered collectively, the evidence proffered by the plaintiff does

not support his claim of pretext.  As stated previously, the plaintiff's ultimate burden at this stage

of the McDonnell Douglas analysis is to prove that the defendant's legitimate, nondiscriminatory

explanation for his termination was false and that the true intent behind the termination was

unlawful discrimination.  Moreover, the plaintiff must "set forth specific facts" to make this

showing, because the Court cannot second-guess employment decisions "absent demonstrably

discriminatory motive[s]."  Milton, 696 F.2d at 100.

As concluded already, none of the evidence offered by the plaintiff in support of his

pretext claim is individually sufficient to rebut the defendant's legitimate, nondiscriminatory

explanation for terminating the plaintiff's employment.  See Waterhouse, 298 F. 3d at 994

(finding that the plaintiff failed to "offer sufficient evidence for a reasonable factfinder to reject

the employer's nondiscriminatory explanation for its decision" to fire the plaintiff).  Nor do they

accomplish this objective collectively.  The Court is compelled to reach this conclusion in light

of the undisputed evidence of the plaintiff's inadequate job performance and the decline of his

performance prior to his termination.  The record "demonstrates that there [is] no genuine issue

regarding [the plaintiff's] failure to fulfill [his] basic job responsibilities, largely because [he]

failed to [rebut] many if not most of the facts on which [the defendant] rel[ies] to support [its]

termination decision."  Id. (internal quotation omitted).  To the contrary, the evidence shows that

the plaintiff apologized for his poor performance on multiple occasions to his supervisors and

acknowledged his performance problems.  See, e.g., Def.'s Mem., Ex. A (Def.'s Prater Dep.), Ex.

35 (Email from Anthony Prater to Vince Scarfo, Oct. 17, 2005) at 1 ("I will continue to work

towards getting things back on track . . . ."); id., Ex. A (Def.'s Prater Dep.), Ex. 16 (Email from

Anthony Prater to Laurie Carson, Nov. 10, 2004) at 1 ("I will continue to strive for excellence . .

. and get back to the Anthony of old.").  One of the main reasons the defendant cites for the

plaintiff's termination was that Mr. Prater was performing significantly below the sales revenue

goals for the customers within his assigned territory, and his performance was suppressing the

entire team's sales numbers.  Def.'s Mem. at 6-7 & Ex. A (Def.'s Prater Dep.) at 80-81.  At his

deposition, the plaintiff admitted that his sales revenue goals were lower than the required 100%

level.  In addition, the plaintiff admitted that an error on his part caused the company to lose

money on an important contract with the GSA Burlington facility.  The defendant also cited the

plaintiff's failure to comply with the terms of the June 3, 2005 Performance Planner, which was

created to help elevate the plaintiff's job performance to an acceptable level.  Id. at 7 & Ex. A

(Def.'s Prater Dep.) at 82-84.  Finally, the defendant references, as support for the plaintiff's

termination, his less than satisfactory annual performance reviews and several warning letters

sent to the plaintiff concerning specific job performance deficiencies. Thus, "because [the plaintiff] did not contravene—and in fact admitted—many of the deficiencies the defendant[] cite[s] concerning [his] performance, [he has] failed to establish that [his] employer's proffered explanation was unworthy of credence." See Waterhouse, 298 F.3d at 995 (internal quotations and citations omitted).

## IV.  Conclusion

"[N]either [the plaintiff's] prima facie case nor [his] evidence of pretext-either separately or in combination-[is] sufficient" to satisfy the plaintiff's burden of proving that the defendant's legitimate, nondiscriminatory reason for his termination was actually a pretext for racial discrimination. Id. Quite simply, the plaintiff has not "set forth specific facts showing that there is a genuine issue for trial" on this point. Fed. R. Civ. P. 56(c). Accordingly, in light of the absence of any evidence suggesting that the plaintiff was terminated "because of his race," the defendant is entitled to summary judgment.[10]

**SO ORDERED.**[11]


REGGIE B. WALTON
United States District Judge

---

[10] By granting the defendant's Motion for Summary Judgment, the plaintiff's motion for an oral argument on the defendant's motion is denied. In addition, the defendant's five Motions in Limine are also denied as moot.

[11] This Memorandum Opinion renders the Order granting the Defendants' Motion for Summary Judgment entered on March 27, 2009, an appealable Order.